

COPY

Page 1

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
_____
                          )  CIVIL ACTION No.
                          )  3:09CV01071(WWE)
JOHN DOE                  )
                          )
VS.                       )
                          )
UNIVERSITY OF CONNECTICUT )
                          )
_____
```

VIDEOTAPED DEPOSITION OF:
DATE:    June 29, 2011
HELD AT: Office of the Attorney General
         55 Elm Street - 4th Floor
         Hartford, CT 06141

Reporter:  Aretha S. Martin, LSR
      BRANDON SMITH REPORTING SERVICE
           249 Pearl Street
      Hartford, Connecticut   06103
           (800) 852-4589

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011





Page 2

APPEARANCES:


LAW OFFICES OF BARBARA E. GARDNER
    843 Main Street, Suite 1-4
    Manchester, CT 06040
    representing the Plaintiff.
BY:    BARBARA E. GARDNER, ESQUIRE


ASSISTANT ATTORNEY GENERAL
    55 Elm Street
    Hartford, CT 06141-0120
    representing the Defendant.
BY:    NANCY A. BROUILLET, ESQUIRE



Also present:
Peter Confrancesco, videographer
Trooper Sanders
Mike Eagen
Legal Intern, Employment Rights



RECEIVED
JUL 2 2 2011
ATTORNEY GENERAL'S OFFICE


BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                              ▓▓▓▓▓▓▓▓

Page 3

I N D E X

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
| ▓▓▓▓▓▓▓ | 6* |  |  |  |

*    By (Attorney Brouillet)
**   By (Attorney Gardner)
*** By
****By

                    *   *   *   *   *   *   *

| EXHIBITS | DESCRIPTION | PAGE |
|----------|-------------|------|

Defendant's:

| Exhibit 1 | Revised Federal Notice of Videotaped Deposition | 6 |
| Exhibit 2 | Order of Probation | 36 |
| Exhibit 3 | State of Connecticut Department of Public Safety Division of State Police Sex Offender Registry | 37 |
| Exhibit 4 | Transcript of Proceedings | 42 |
| Exhibit 5 | Information - Violation of Probation | 46 |
| Exhibit 6 | Letter, 1/25/08 | 69 |
| Exhibit 7 | UCPEA Complaint/Grievance Intake | 72 |
| Exhibit 8 | Letter, 3/19/08, Letter of Decision - Termination of Employment | 84 |
| Exhibit 9 | E-mail from ▓▓▓▓▓▓▓ | 84 |

BRANDON SMITH REPORTING & VIDEO

860-549-1850        Brandon Smith Reporting & Video
                    production@brandonreporting.com     249 Pearl Street

Doe v. UCONN

6/29/2011



Page 4

Exhibits Continued:

Exhibit 10     Letter, 8/24, 2000                              100

Exhibit 11     Complaint                                       141

Exhibit 12     Real Estate Contract                           158

Exhibit 13     Workers' Compensation Commission
               Of Connecticut Packet                          162

Exhibit 14     Proposed Organizational Chart                  201

Exhibit 15     Warranty Deed - Statutory Form                 229

Exhibit 16     Copy of Check, No. 400111012                   229

Exhibit 17     Connection, Inc., Document                     249

Exhibit 18     Connection, Inc., Document                     270

Exhibit 19     Connection, Inc., Document                     273

Exhibit 20     Connection, Inc., Document                     275

Exhibit 21     Connection, Inc., Document                     278

Exhibit 22     Stipulated Agreement                           282

(Original Exhibits retained by Attorney
Brouillet.)

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

1                    S T I P U L A T I O N S

2

3        It is agreed by and between the parties that all

4    objections except objections as to the form of the

5    question are reserved to be raised at the time of trial

6    for the first time.

7

8        It is further agreed by and between the parties that

9    all motions to strike unresponsive answers are also

10   reserved to be raised at the time of trial for the first

11   time.

12

13       It is also agreed that the deponent will read and

14   sign the deposition and that the sealing of the said

15   deposition will be waived.

16

17       It is further agreed by and between the parties that

18   notification to all parties of the receipt of the

19   original deposition transcript is also hereby waived.

20                              *****

21

22

23

24

25

                   BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 6

```
 1              (Thereupon, the reporter marked Revised

 2         Federal Notice of Videotaped Deposition for

 3         identification as Exhibit No. 1.)

 4              (Thereupon, the deposition begins at 9:56

 5    a.m.)

 6              THE VIDEOGRAPHER:  The date is June 29th,

 7    2011.  We're going on the record at 9:56.  The case is

 8    John Doe versus University of Connecticut filed in the

 9    U.S. District Court of Connecticut.  This deposition is

10    being held at the Offices of the Attorney General in

11    Hartford, Connecticut.  The witness is ████████.  My

12    name is Peter Confrancesco and the court reporter is

13    Aretha Martin from Brandon Smith Reporting.

14              Counsel will now state their appearances for

15    the record, after which the court reporter will swear in

16    the witness.

17              MS. GARDNER:  Barbara Gardner representing

18    the plaintiff, ████████.

19              MS. BROUILLET:  Nancy A. Brouillet,

20    Assistant Attorney General, Employment Rights

21    Department, representing the defendant, University of

22    Connecticut.

23              ████████, having been first duly sworn,

24    was examined and deposed as follows:

25              MS. BROUILLET:  Attorney Gardner, are we
```

BRANDON SMITH REPORTING & VIDEO

Page 7

1    gonna have the usual stipulations?

2              MS. GARDNER:  Yes,

3              MS. BROUILLET:  Okay.

4                    DIRECT EXAMINATION

5    BY MS. BROUILLET:

6         Q    Good morning, Mr. ████████.

7         A    Good morning.

8         Q    I'm going to try to speak slowly and clearly to

9    you today, and if I don't, then please let me know and

10   I'll slow down.  If I ask you a question that you don't

11   understand or use a term that you don't understand,

12   please tell me.  Because if you answer the question, I'm

13   going to assume that you understood it.  Okay?

14        A    Okay.

15        Q    And I'm going to remind you -- I know your lawyer

16   has already told you this, but the reporter takes down

17   everything we say, and so we have to speak out loud

18   instead of a nod of the head or a gesture.  And it's

19   important that only one of us speak at the time, because

20   I want to make sure that we have an accurate transcript

21   and the reporter can only accurately get down question

22   and then answer.  Do you understand that, sir?

23        A    I got it, yes.

24        Q    Okay.  Now, this is what's called a deposition,

25   which you've been sworn in, and you respond to questions
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 8

```
 1    under the penalty of perjury.  Have you ever had a

 2    deposition before, sir?

 3         A    No.

 4         Q    Okay.  We can take a break any time you need it

 5    for any reason.  Uh, but if I have a question pending, I

 6    need you to respond to that question before we take the

 7    break.  Do you understand that, sir?

 8         A    Yes.

 9         Q    Okay.  And so I understand you have a bad back

10    and leg.  If you need to get up and move or you're

11    having a problem, just let me know and we can

12    accommodate that.  Um, it's not a problem.

13              Are you under -- are you taking any medication

14    today that could affect your ability to respond?

15         A    Such as?  Or normal medication?

16         Q    Whatever you might be taking.

17         A    Yes, I do.

18         Q    Okay.  Does the medication -- and I'm not asking

19    you the medication that you're taking, but does the

20    medicine that you take affect your ability to answer my

21    questions truthfully?

22         A    No.

23         Q    Okay.  And so you feel comfortable answering my

24    questions today, even though you take some medication.

25         A    Yes.
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 9

1    Q  Okay. Could you please state your name for the

2  record and spell it?

3    A  My name is ▮▮▮▮▮▮, ▮▮▮▮▮, last name is,

4  ▮▮▮▮.

5    Q  Did you review any documents prior to today's

6  deposition?

7    A  Yes.

8    Q  What did you review?

9    A  I talked with my lawyer, reviewed the -- a

10  document.

11    Q  Okay. I want to be careful. I do not want you

12  to tell me anything you said to your lawyer or she said

13  to you, but I would like you to tell me what --

14    A  Say it again, I'm sorry. I didn't understand.

15    Q  I'm sorry. When you talked to your lawyer, I

16  don't get to know what was said, that's privileged.

17    A  Right.

18    Q  And so do not tell me anything that your lawyer

19  said to you or you said to your lawyer.

20    A  Right.

21    Q  What I'm asking is, what documents -- I'm asking

22  you to describe for me what documents did you review.

23    A  The same -- uh, date today, appointments, which I

24  have with you guys today to be in the deposition. And

25  so we talk about this, to come here, and basically most

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



1    of that.

2        Q    Okay.  Did you review any paperwork other than a

3    notice of deposition?

4        A    I have.

5        Q    And what did you review, sir?

6        A    The documents, what happened, which is most of

7    the uh --- most of -- what is -- a lot of documents,

8    which is I -- I saw all of them.  I review it myself

9    also.

10       Q    Are you able to describe for me the names of the

11   documents and what the documents were that you reviewed?

12       A    Uh, the questionary [sic] (phonetic).

13       Q    Um, let me ask you, as part of the normal course

14   of the lawsuit, the defendant, University of

15   Connecticut, sent you something, some -- more than once,

16   written questions called interrogatories and production

17   requests and you responded through your attorney.  Is

18   that what you're referring to?

19       A    I don't know which one is that.

20       Q    Okay.

21       A    I am sorry.

22       Q    Did you review the complaint that you filed in

23   federal court in this case?

24       A    Yes.

25       Q    Did you review --

Doe v. UCONN

6/29/2011

1      A   Actually, I don't have to review it.  Everything

2  is in my mind.

3      Q   Okay.

4      A   And so it look like happened today, this moment.

5      Q   Okay.

6      A   I never forgot.

7          MS. GARDNER:  Okay.  Just the question.

8  Answer her question.  She asked you if you reviewed the

9  complaint --

10         THE WITNESS:  Yes --

11         MS. GARDNER:  -- you said yes.

12         THE WITNESS:  -- I did.  I'm sorry.

13         MS. GARDNER:  That's all right.

14     Q   (By Ms. Brouillet)  That's fine.

15         MS. GARDNER:  It's okay.

16     Q   (By Ms. Brouillet)  I -- and if I want more, I'll

17  go further and give you a chance to go further.  And

18  your lawyer will get a chance to also ask you questions.

19  But right now, this is fairly earlier in the deposition.

20     A   Okay.

21     Q   Did you review the complaint that you made to the

22  Commission on Human Rights and Opportunities against the

23  University of Connecticut?

24     A   Yes.

25     Q   Okay.  And if I refer to "UConn," you understand

BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 12

1    I'm referring to the University of Connecticut, right?

2      A    Yes.

3      Q    Okay.  Did you review any of the paperwork from

4    the Herbertia Williams federal lawsuit?

5      A    No.

6      Q    Okay.  Did you review any of your medical records

7    for today?

8      A    No.

9      Q    Uh, what else, if anything, did you review for

10   today?

11     A    Today, actually, I didn't review anything.  I

12   mean, the paper, yes, I did.  These papers I have.

13     Q    In preparation of your deposition, have you

14   reviewed anything else that I didn't cover?

15     A    I don't know.  The question, I don't understand

16   what it means.

17     Q    Okay.  Sometimes when people are getting ready to

18   testify like you are today, they would review documents

19   so that they would be prepared to respond to my

20   questions.

21     A    The questionary, yes.

22     Q    Okay.  And so I'm just asking you if I've covered

23   everything that you can recall that was reviewed in

24   preparation for today?

25     A    Yes.

Brandon Smith Reporting & Video
860-549-1850    production@brandonreporting.com    249 Pearl Street

Doe v. UCONN

6/29/2011

1      Q   Now, I have marked something -- Defendant's

2   Exhibit 1.   It says, "Revised Federal Notice of

3   Videotaped Deposition."   And I'm going to ask you if you

4   have seen this document before.   And so take some time

5   to look at it.

6      A   I'm not sure.

7            THE WITNESS:  Excuse me --

8      Q   (By Ms. Brouillet)  Okay.

9            MS. GARDNER:  Let me -- let me -- you can't

10   -- you can't ask me.

11           THE WITNESS:  Okay.

12           MS. BROUILLET:  Yeah.

13           MS. GARDNER:  Unless there's not a question

14   pending, we can take a break.

15           THE WITNESS:  I am not sure.  The document,

16   I review a lot of the documents that I don't know if --

17     Q   (By Ms. Brouillet)  Well, I'm going to ask you to

18   read it, okay?  What I'm most interested in -- and let

19   me preface my question by saying this, we sent you,

20   through your attorney, a notice of deposition in March

21   -- and the dates have changed.  This has been sent

22   numerous times.  Um, but what I'm really interested in

23   in the deposition is that we attached, at Page 3, what's

24   called a Schedule A asking you to bring certain

25   documents with you.  And I'm going to ask you questions

                  BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 14

1    about that list.  And so you can read the whole thing,

2    you can take as much time as you need.

3        A    Okay.

4        Q    Um, but if you look at Schedule A that's

5    attached, that's what my next questions are going to

6    focus on.

7        A    Okay.

8                MS. GARDNER:  It is this (indicating).  This

9    one.

10               THE WITNESS:  Okay.  Okay.

11       Q    (By Ms. Brouillet)  Have you have had a chance to

12   read that, sir?

13       A    Yes.

14       Q    Okay.  Mr. ████, in response to some

15   interrogatories and production requests that UConn asked

16   about your travel out of the country, you had responded

17   that you would bring your passport to the deposition.

18   Have you brought your passport today?

19       A    Ah, I don't have a passport.

20       Q    You don't have a passport?

21       A    No.

22       Q    When did you last have a passport?

23       A    I have, uh, two years ago.  But it seems like I

24   lost it.  I couldn't find it.

25       Q    And when did you last leave the United States?

                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 15

1    A    Ah, 2009.

2    Q    Do you remember what month?

3    A    I think -- or I believe was June.

4    Q    So is it accurate to say that while you may have

5    a passport assigned to you, you physically cannot locate

6    it?

7    A    Yes, I couldn't find it.

8    Q    All right.  And where did you go in June of 2009?

9    A    Afghanistan.

10   Q    And how long were you there?

11   A    Uh, three weeks.

12   Q    And where in Afghanistan did you go?

13   A    In the capital.

14   Q    And that would be Kabul?

15   A    Kabul, yes.

16   Q    Since June -- Withdraw that.

17        Since January 1st, 2006, how many times have you

18   left the country?

19   A    Since when?

20   Q    January 1st, 2006.

21   A    Just once.

22   Q    And that --

23   A    2009.

24   Q    And what was the purpose of your trip?

25   A    A family visit.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 16

```
 1    Q    And who accompanied you?

 2    A    It's my family, my brothers and sisters.

 3    Q    Your wife didn't go with you?

 4    A    No, my wife went separate.

 5    Q    And could you identify the names of your brothers

 6   and sisters who went with you on that trip?

 7    A    Oh, went with me --

 8    Q    Yes, sir.

 9    A    -- or I see them?

10    Q    No, went.

11    A    I went by myself.  Sorry.

12    Q    Okay.  Okay.  Going back to that Schedule A

13   that's before you, have you any documents to produce

14   today in response to that request for documents?

15    A    I am sorry, what is the question?

16    Q    Do you have any -- if you look at Schedule A --

17    A    Yes.

18    Q    -- it asks you to produce various documents.  Let

19   me go through it one by one.

20    A    Okay.

21    Q    Number one, All communications of any kind -- not

22   including communications with your attorney --

23   correspondence, diaries, journals, e-mails, Twitter

24   tweets, notes, Facebook entries, and other writings or

25   recordings that you have in your possession or control
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 17

```
 1    relating to your work at UConn and the incidents in your
 2    complaint.  Do you have any documents that you haven't
 3    turned over?
 4        A    I don't have it today, no, not with me.
 5        Q    But you have documents?
 6        A    Yes, some of them.
 7        Q    And you haven't given those to your lawyer?
 8        A    The document of this, she has most of it.
 9    Whatever she needs, yes.
10        Q    Okay.
11        A    Most of the documents she has, yes.
12        Q    Okay.  What I'm trying to focus on is if there's
13    any documents that you searched for and you haven't
14    turned over to your lawyer to provide to UConn through
15    our interrogatory requests.  And so, for example, since
16    you turned those documents over to your lawyer, do you
17    -- are you on Facebook?
18        A    No.
19        Q    Okay.  Um, do you use Twitter?
20        A    No.
21        Q    Okay.  Do you use e-mail?
22        A    E-mail, yes.
23        Q    Okay.  And other than any communications with
24    your attorney, have you talked about in your e-mails
25    UConn,
```

6/29/2011

1    A    Most of document --

2    Q    -- your lawsuit --

3    A    -- yes, a copy she has.

4    Q    Okay.  And when did you last communicate about

5    ███████████ or the lawsuit or UConn in your e-mail?

6    A    E-mail?

7    Q    Yes.

8    A    I haven't.

9    Q    You've never mentioned them?

10   A    No, not in the e-mail.

11   Q    Okay.  Do you have any diaries that you have not

12   provided to us?  Because I don't have any diaries about

13   UConn.

14   A    Whatever I provided, I provided to my lawyer.

15        MS. BROUILLET:  Okay.  Let me go off the

16   record for a moment.

17        THE VIDEOGRAPHER:  Off the record at 10:12.

18        (Discussion off the record.)

19        THE VIDEOGRAPHER:  On the record, 10:12.

20   Q    (By Ms. Brouillet) Mr. ██████ when we were off

21   the record, I spoke to your attorney and so I'm going to

22   ask you this question, um, you've turned over everything

23   that you have to your attorney?

24   A    Yes.

25   Q    Okay.  And Attorney Gardner has told me that
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 19

1    she's provided us with everything that you've turned

2    over.

3        A   Yes.

4        Q   Because I was looking for diaries or, you know,

5    like, daily notes.  Some people write about what

6    happened to them.  You don't have that?

7        A   No, I have e-mails.  Most of the e-mails.

8        Q   Okay.

9        A   She has that.

10       Q   You made -- I'm a little confused, because I

11   asked you if you e-mailed about ███████ or UConn

12   and you said no.  So did you --

13       A   You're talking about present or you talking about

14   before?  During when I was working at UConn.

15       Q   Well, let me ask you this --

16       A   Yes.

17       Q   -- since June of 2006, do you have any e-mails

18   about ███████ or UConn?

19       A   I have the e-mails, yes, copy e-mails.

20       Q   Okay.  Are these from your UConn e-mail address

21   or from a personal e-mail address?

22       A   Personal.

23       Q   Okay.

24       A   Which is he send me a love letter, for example.

25       Q   Well, let me -- I'm going to strike that portion.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 20

1    Let me ask you, when you say "personal" e-mail address,

2    what is your personal e-mail address that we're talking

3    about?

4        A    The one I have my own?

5        Q    Yes.

6        A    And I have UConn, which is --

7        Q    I'm asking you the actual address, sir.   What is

8    that personal e-mail address?

9        A    What do you mean?

10       Q    If I wanted to send --

11       A    You need my address?

12       Q    Yes.  If I wanted to send you an e-mail, for

13   example, what would I -- where would I send it?

14       A    Okay.  ████, dot.

15       Q    Yep.

16       A    ████.

17       Q    Yep.

18       A    Dot, UConn ED.  And then I have another e-mail

19   address --

20       Q    Let me just stop you though.  ████, dot, ████ at

21   UConn --

22       A    Dot, EDU.

23       Q    -- dot, EDU?

24       A    Yes.

25       Q    That would be a UConn e-mail address.  Now, you

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 21

1      have not worked at UConn since March of --

2          A    2008.

3          Q    -- 2008.

4          A    Yes.

5          Q    Are you telling me you still use that UConn

6      e-mail?

7          A    No, before.  I'm talking about before, not after.

8          Q    Let me focus on -- can we agree that you left

9      UConn.  After you left UConn, you do not have an e-mail

10     address at UConn?

11         A    No, I don't have UConn, no.

12         Q    Tell me your own personal e-mail address.

13         A    Okay.  ████ --

14         Q    Yep.

15         A    -- dot --

16         Q    Yep.

17         A    You don't go into my e-mail, do you?

18         Q    I'm not answering questions.

19         A    Oh, okay.

20         Q    So go ahead.

21         A    All right.  But I don't have to give you my

22     e-mail.

23         Q    Ah...

24              MS. GARDNER:  Why don't we take a break?

25              MS. BROUILLET:  Well, I have a question
                     BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 22

1    pending and he hasn't responded.

2        Q    (By Ms. Brouillet)  And so let me just clarify to

3    you, I'm asking your e-mail address --

4        A    Yeah.

5        Q    -- and if your lawyer has an objection, she can

6    put that objection on the record.

7        A    Okay.

8        Q    Just wait.

9        A    Go ahead.

10       Q    She hasn't.  And so I'm asking you your e-mail

11    address.  I am not -- just to be clear, I will not be

12    e-mailing you because you have an attorney.  But I get

13    to ask your e-mail address.  And what is your personal

14    e-mail address?

15       A    ████, dot --

16       Q    Yep.

17       A    -- ████ --

18       Q    Yep.

19       A    ████████, dot, net.

20       Q    And how long have you had that e-mail address?

21       A    Since 2005.

22       Q    Any other e-mail addresses that you use, even

23    though they're not in your name?

24       A    No.

25       Q    No?

860-549-1850       Brandon Smith Reporting & Video
                   production@brandonreporting.com   249 Pearl Street

Page 23

1   A   No.

2         MS. BROUILLET:  Do you want to take a break,

3   Attorney Gardner?

4         MS. GARDNER:  (To the witness)  I'm okay if

5   you are.

6         THE WITNESS:  No, that's fine.

7         MS. BROUILLET:  Okay.

8         MS. GARDNER:  Okay.

9         THE WITNESS:  But the question is -- I'm

10  sorry.  The question is not clear for me if -- if you

11  want to ask me then to -- before 2006 or after 2006.

12  Q    (By Ms. Brouillet)  Mr. ████, if you don't

13  understand my question --

14  A   Yes.

15  Q   -- before you answer, you tell me.

16  A   Okay.

17  Q   Okay?  And you don't get to ask me questions.

18  A   Okay.

19  Q   Okay?  And if I'm not supposed to know something

20  or there's a problem, Attorney Gardner is going to speak

21  up and say "objection."

22  A   Okay.

23  Q   Other than that, you'll be answering my

24  questions.

25  A   That's fine.

                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 24

```
 1      Q    Okay.  So have you had any communications in your

 2   e-mail, your personal e-mail, about ███████████?

 3      A    No.

 4      Q    About ████████████████?

 5      A    No.

 6      Q    About the University of Connecticut?

 7      A    No.

 8      Q    About losing your job at the University of

 9   Connecticut?

10      A    No.

11      Q    About anyone who works at the University of

12   Connecticut?

13      A    No.

14      Q    About your CHRO complaint?

15      A    I talked to my lawyer about it, yes.

16      Q    I don't want to know anything about your lawyer.

17      A    No --

18      Q    Other than your lawyer.  No friends?

19      A    No.

20      Q    No exchanges with family about what's happening?

21      A    No.

22      Q    Okay.  Have you had any e-mail communications,

23   other than with your attorney, about your arrest or

24   conviction?

25      A    No.
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 25

1    Q    Have you had any e-mail communications or any

2    correspondence, which can mean a note, a letter,

3    anything in writing about Ronald Taylor?

4    A    No.

5    Q    Herbertia Williams?

6    A    No.

7    Q    Boris Bravo-Ureta?

8    A    No.

9    Q    Michael Eagen?

10   A    No.

11   Q    Mary Signor?

12   A    No.

13   Q    Dana McGee?

14   A    No.

15   Q    Peggy Beckett-Rinker?

16   A    No.

17   Q    Tina Glidden (phonetic)?

18   A    No.

19   Q    Have you received any communications from anyone

20   other than your attorney about UConn or ▮▮▮▮▮▮▮

21   since June, 2006?

22   A    No.

23   Q    Do you have any records -- withdraw the question.

24        In this case, you're claiming damages.  And all

25   we can give you is, obviously, money, but I have to ask

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 26

1    you about what damages you're claiming you suffered as a

2    result of the incidents in your complaint.  So do you

3    have any records that relate to your damages?

4        A   I'm sorry, such as what?

5        Q   Um, well, let me ask you, what are you claiming

6    as far as your damages?  Are you claiming lost wages?

7        A   The claiming is, uh, emotional, physical, mental.

8    This is a big emotional -- big thing for me.

9        Q   And so when you say emotional damages, are you --

10   and I'll go into your damages in detail -- are you

11   claiming any -- physical too -- are you claiming any

12   medical bills as a result?

13       A   Medical bill, yes.

14       Q   Okay.  And who -- and do you have those medical

15   bills?

16       A   Not with me here.

17       Q   Okay.

18       A   Because I lost job.

19       Q   Okay.  Well, let me back up.  Medical bills from

20   whom?  What medical bills?

21       A   From my health.

22       Q   No, I understand that, sir, but who -- who

23   provided the treatment that you're claiming is related

24   to UConn?

25       A   Doctors.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 27

```
 1    Q   Who?

 2    A   Uh, my doctor.  My family --

 3    Q   Name the doctor.

 4    A   Dr. ████.

 5    Q   Dr. ████?

 6    A   Yes.

 7    Q   Who else?

 8    A   Um, ████████.

 9    Q   That's a ████████?

10    A   Yes.

11    Q   Okay.  Who else?

12    A   Um, that's it at this moment.

13    Q   Okay.  And what period of time are you claiming

14    Dr. ████s bills from?

15    A   Um, probably since 2006 because of, uh, certain

16    condition I have, um, which is my insurance not cover.

17    Q   And for Dr. ████, what period of time are you

18    claiming?

19    A   Uh, two and a half years.

20    Q   So would it be accurate to say sometime in 2009?

21    Because we're in June of 2011.

22    A   Yes.

23    Q   Okay.  Um, Dr. ████, hasn't he treated you since

24    1998?

25    A   He treat me, yes.
```
BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



1    Q   So you're not claiming all of your treatment with

2   Dr. ████, just something from 2006?

3    A   Ah, yes.

4    Q   And what specific condition are you claiming that

5   he treated you for in 2006?

6    A   Um, that -- because of the insurance doesn't

7   cover, my insurance, my hip replacement, uh, it costs

8   money.  That's the point of that treatment.

9    Q   Let me ask you this, sir --

10    A   Yes.

11    Q   -- you're not claiming though that UConn caused

12   you to need a hip replacement, are you?

13    A   Well, this is part of the -- I'm not saying that.

14   But the insurance --

15    Q   Try to just answer the question.

16    A   -- health.

17    Q   Okay?  And I'll go further from that.  Are you

18   claiming your hip replacement is related to UConn?

19    A   No.

20    Q   Okay.

21    A   No.

22    Q   Is your claim then that you lost your health

23   insurance when you left UConn and so you had bills

24   related to medical conditions that are unrelated to your

25   work?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 29

1     A    At some point, yes.

2     Q    Okay.  And would it be accurate to say that the

3  bills with Dr. ████ that you're claiming, are not

4  because of conditions caused by UConn, but because you

5  lost your health insurance?

6     A    Some of it, yes.

7     Q    Okay.  Tell me what part of Dr. ████ s bills

8  you're claiming are related to something caused by

9  UConn?

10    A    Say again, please.

11    Q    What -- what conditions are you claiming Dr.

12  ████ treated you for that were caused by UConn?

13    A    Uh, for, um, doctor, a specialist.

14    Q    We're talking about Dr. ████ though, sir.

15    A    Yep.  That's what I'm referring so -- because it

16  cost to send me to see another doctor.

17    Q    Okay.  But that other doctor would charge

18  something, right?

19    A    Uh-huh.

20    Q    What did Dr. ████ charge you that you're claming

21  is related --

22    A    Well, didn't charge.

23    Q    -- to UConn?

24    A    It didn't charge me.

25    Q    Okay.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                                        

Page 30

```
 1      A   But the said damages cost to do treatment.

 2      Q   Okay.  So -- just so we're clear, you're not

 3   claiming that you have any bills from Dr. ████ that

 4   UConn should pay?

 5      A   Right.

 6      Q   Okay.  That's done.  Um, Dr. ██████, the

 7   █████████

 8      A   Yes.

 9      Q   Was he part of your court-ordered treatment?

10      A   Uh, no.

11      Q   No.  Who sent you to Dr. ███████?

12      A   Uh, myself.

13      Q   You went on your own?

14      A   Yes.

15      Q   Okay.  Um -- okay.  And do you have any bills

16   from Dr. ██████?

17      A   I have -- yes, going to be, yes.  Yes, I do.

18      Q   Okay.  Because this asked you to bring those

19   bills with you, and you didn't bring any bills.

20      A   No.

21          MS. BROUILLET:  Okay.  And so I'll be

22   leaving the record open for that.

23          THE WITNESS:  I will ask him to give me

24   that.

25      Q   (By Ms. Brouillet)  Well, I want to be clear,
                BRANDON SMITH REPORTING & VIDEO
```



Page 31

1    sir, that so far Dr. ███████ has not issued a report to

2    us. We have not received a report. In your responses

3    to interrogatories and production requests, he has not

4    so far related whatever he's treating you for to UConn.

5    And so if you have a report --

6              MS. BROUILLET: Yep?

7              MS. GARDNER: I'm going to object to the

8    form.

9              MS. BROUILLET: I'm just stating a

10   background. But I'm happy to -- Why don't we go off the

11   record for a moment.

12             THE VIDEOGRAPHER: Off the record at 10:23.

13             (Discussion held off the record.)

14             THE VIDEOGRAPHER: On the record, 10:25.

15   Q. (By Ms. Brouillet) Mr. ████, you heard Attorney

16   Gardner and I had a discussion off the record. She's

17   going to be updating your responses to the

18   interrogatories and production requests, including the

19   medical records from Dr. ███████ or the bills, too. And

20   so I am not going to ask you all of these questions

21   today, but understand I'll probably be having you come

22   back to finish your deposition after we, uh, go through

23   the questions that I have today. And I have plenty of

24   other questions, so.... Let me just ask this, anything

25   that you personally have, you've turned over to your

                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



6/29/2011

Page 32

1    attorney?

2        A    Yes.

3        Q    Okay.  Then I will deal with your attorney on

4    that.  Other than Dr. ███████ and Dr. ██████, please name

5    the other doctors that you have had medical treatment

6    with since June of 2006?

7        A    I don't have anything.

8        Q    No.  Let me ask the question again.  I want you

9    to name the medical doctors other than Dr. ███████ and

10   Dr. █████ that have provided any treatment or

11   examinations to you since June of 2006?

12       A    I don't have another doctor.

13       Q    Do you treat at Connections?

14       A    I'm sorry?

15       Q    Do you go to Connections?

16       A    What is that?

17       Q    Okay.  Let me ask you this, sir -- Well, I'll

18   withdraw that question.

19            So just to be clear, you only see Dr. █████ and

20   Dr. ███████.

21       A    Yes.

22       Q    No other health care providers --

23       A    No.

24       Q    -- since June of 2006?

25       A    Right.

BRANDON SMITH REPORTING & VIDEO

Page 33

1     Q   Okay.  What crimes were you convicted of in

2   January, 2008?

3     A   Uh, the crime, uh, because it's -- what

4   happened --

5     Q   Sir, I'm only asking you the nature of the crime

6   that you were convicted of.  Do you know it?

7     A   What do you mean what crime?

8     Q   What crimes were you convicted of in January,

9   2008?

10    A   2008, which was my supervisor give wrong

11  report --

12    Q   Sir, listen to the question, respond to the

13  question.  What crimes --

14    A   You have to --

15    Q   -- were you convicted of?

16    A   Excuse me, there has to be complete sentence. I

17  can tell you.  You don't ask me only one question, but

18  it has to be sentence completed.  That's why in the

19  beginning you tell me you have to say sentence

20  completely.  Did you say that?

21    Q   Mr. █████ --

22    A   Yes, ma'am.

23    Q   -- listen to me.  Answer my question as I ask it.

24    A   Yes.

25    Q   You don't get to add to it.  I will ask you

Brandon Smith Reporting & Video
860-549-1850     production@brandonreporting.com    249 Pearl Street

6/29/2011 

Page 34

1    further questions, your lawyer gets to ask you

2    questions. This isn't where you ask me questions.

3        A   Okay.

4        Q   What crimes were you convicted of in January

5    2008?

6        A   Uh, the crime the -- ██████████ 's daughter gave

7    wrong statement, molested.

8        Q   Okay.  I'm going to strike that answer.  What

9    crime?  Do you know what crime you're convicted of?

10       A   Ah, you have the document, right?

11       Q   Once again, Mr. ████, I'm not answering your

12   questions.  What crimes were you convicted of?

13       A   Um, I'm not sure exactly what it was.

14       Q   All right.  Well, let me ask you then, were you

15   convicted of violating Connecticut General Statutes

16   Title 53 Section 53, dash, 21, Injury or risk of injury

17   to or impairing morals of children under the age of

18   sixteen?

19       A   That's the reported, yes.

20       Q   Were you convicted of that, sir?

21       A   Yes.

22       Q   And what restrictions did the judge in your

23   criminal case place on your contact with children under

24   the age of eighteen?

25       A   Say again the question.

Doe v. UCONN

6/29/2011

Page 35

```
 1      Q   What restriction did the judge in your criminal

 2   case place on your contact with children under the age

 3   of eighteen?

 4      A   Don't be around.

 5      Q   You're prohibiting with contact with any

 6   children under the age of eighteen except for your --

 7      A   No, I have my children.

 8      Q   -- own?

 9      A   I have my children.

10      Q   Sir, listen to the question.

11      A   Yes.  Stay away, yes.

12      Q   Wait.  You're -- you're speaking over me.  Let me

13   ask it again so we're clear.

14      A   Okay?

15      Q   Did the judge in your criminal case prohibit you

16   from having contact with any children under the age of

17   eighteen except for your own children?

18      A   Yes.

19      Q   Okay.  And did the judge place you on probation?

20      A   Yes.

21      Q   For how long?

22      A   Ten years.

23      Q   Do you recall the date of your conviction?

24      A   December -- December 8th, I believe.

25      Q   Of what year, sir?
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 36

```
 1    A   Uh, 2008.

 2    Q   It wasn't January 18th --

 3    A   I'm sorry --

 4    Q   -- 2008?

 5    A   -- January -- January 18th.  Sorry, you're right.

 6            (Thereupon, the reporter marked

 7             Order of Probation for identification

 8             as Exhibit No. 2.)

 9    Q   (By Ms. Brouillet)  Sir, have you seen this

10   document before?  It says, "Order of Probation"?

11    A   Yes.

12    Q   And that's dated, uh, first page, January 18th,

13   2008, and the second page is January 24, 2008?

14    A   Yes.

15    Q   And do you see at the bottom of page two, sir,

16   where it says, "Court Ordered Special Conditions"?  It's

17   under No. 12.

18    A   Yes.

19    Q   And so that would be no contact with victim or

20   family, no unsupervised contact with minors except own

21   children, sex offender evaluation and treatment as

22   recommended, submit to DNA sample, register as sex

23   offender for ten years?

24    A   Right.

25    Q   And have you had any contact with the victim or
```

BRANDON SMITH REPORTING & VIDEO

1    her family?

2        A    No.

3        Q    And have you had unsupervised contact with minors

4    except your own children?

5        A    No.

6        Q    And have you undergone a sex offender evaluation

7    and treatment?

8        A    Yes.

9        Q    Have you submitted to a DNA sample?

10       A    Yes.

11       Q    And have you registered as a sex offender for ten

12   years?

13       A    Yes.

14                  (Thereupon, the reporter marked

15             State of Connecticut Department of

16             Public Safety Division of State

17             Police Sex Offender Registry for

18             identification as Exhibit No. 3.)

19       Q    (By Ms. Brouillet)  Sir, I will show you

20   something, it says, "State of Connecticut Department of

21   Public Safety Division of State Police Sex Offender

22   Registry," and ask you if you recognize this?

23       A    Yes, I do.

24       Q    And is this your sex offender registry?

25       A    This is the paper, yes

                 BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 38

1    Q   Okay.  And is the information contained on this
2    page accurate?
3    A   Yes.
4    Q   Do you need to look at it further?
5    A   No, I don't have to.
6    Q   Okay.  And I asked you a short time ago about
7    doctors that you treat with, and you said Dr. ████ and
8    Dr. ████.
9    A   Correct.
10   Q   Who do you treat with in regard to your -- or who
11   has provided treatment in regard to your sex offender
12   evaluation and treatment?
13   A   It's part of the probation.
14   Q   No, what doctor or what clinic provides that
15   treatment?
16   A   They have it in the probation office.  They have
17   to group to meet together.
18   Q   When you say "they have a group," where do you
19   meet?
20   A   In probation office.
21   Q   In the probation office located where, sir?
22   A   In Willimantic, Connecticut.
23   Q   And is there someone who provides counseling to
24   you?
25   A   Yes, the whole group not only me.  It's not
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 39

```
 1   individual.
 2        Q    You never meet with the counselor alone?
 3        A    No.
 4        Q    And to your knowledge, is that group run by an
 5   organization called Connections?
 6        A    No clue.
 7        Q    You have no clue?
 8        A    Yes.
 9        Q    What is the name of your counselor?
10        A    Joe, that's all I know his name.
11        Q    Okay.  Have you had any other counselors since
12   2008?
13        A    No.
14        Q    And as part --
15        A    Oh, yes, I am sorry.  Dr. ███████, Dr. ███████.
16   And so before ███████ ███████, I used to see him.
17        Q    Dr. ███████?
18        A    Yes.
19        Q    But -- do you know Dr. ███████'s first name?
20        A    Uh, ███████,
21        Q    Okay.  And do you know what kind of doctor Dr.
22   ███████ is?
23        A    He's a ███████.
24        Q    Okay.  And did Dr. ███████ treat you as part of
25   your sex offender treatment?
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 40

```
 1    A    No.
 2    Q    What did Dr. ▓▓▓ treatment you for?
 3    A    It's, uh, ▓▓▓▓.
 4    Q    When did you first see Dr. ▓▓▓?
 5    A    Uh, two thousand -- the middle of 2005.
 6    Q    You never saw Dr. ▓▓▓ before 2005?
 7    A    I'm sorry, I'm sorry.  The middle of 2006.
 8    Q    Okay.
 9    A    Before the incidents happened at UConn.
10    Q    Well, there's a lot --
11    A    I was --
12    Q    Let me just stop you.  There's a lot of incidents
13  at UConn, and so let me ask you, did you treat with Dr.
14  ▓▓▓ before July 1st, 2006?
15    A    Yes.
16    Q    Okay.  Did you treat with him before May 5th,
17  2006?
18    A    Yes.
19    Q    Okay.  And you never treated with Dr. ▓▓▓
20  before 2006?
21    A    I did before 2006.
22    Q    Okay.  When in your lifetime was the first time
23  that you treated with Dr. ▓▓▓?
24    A    It was, uh, the middle of two thousand -- no,
25  sorry.  The beginning of -- before May, 2006.
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 41

```
 1     Q    Okay.   Did you treat with him before 2000?

 2     A    No.

 3     Q    Did you treat with him before 2002?

 4     A    No.

 5     Q    Have you ever seen a psychologist or counselor

 6   before Dr. ████ for any condition?

 7     A    One time I saw, um, through rehabilitation

 8   services, they send me, uh, to see one doctor because I

 9   was studying and so they said I had to go to that.   I

10   saw -- I saw one person, that's it.

11     Q    When did you come to the United States?

12     A    I came 1986,

13     Q    You didn't come in 1985?

14     A    No.

15     Q    And have you reviewed Dr. ████ s medical notes

16   about you?

17     A    No, I discuss with my lawyer -- sorry, with my

18   doctor.

19     Q    Okay.  And would you be surprised that Dr.

20   ████ s medical notes said that you were diagnosed with

21   ████████████████████████ in 1985 before coming to

22   the United States?

23     A    Nineteen eighty-five?

24     Q    Yes, sir.

25     A    It could be, but I'm not sure if he's saying
```

BRANDON SMITH REPORTING & VIDEO



1  that.  Um, I don't have it -- maybe that time I have it,

2  but after I didn't have it.

3      Q   Well, let me just ask you some questions.  So if

4  Dr. ████'s records say that you had ████████████

5  ██████████████ from incidents that occurred in the

6  Afghanistan War, um, when you came to the United States

7  in 1986, you already had ███████████████ ████████,

8  do you think his records would be inaccurate?

9      A   Well, it wasn't diagnosed this.  I was in the

10  hospital for three years.  I don't think so.  That would

11  be diagnosed for that.

12          MS. GARDNER:  Nancy, can we take a break for

13  a second?

14          MS. BROUILLET:  Okay.

15          MS. GARDNER:  I actually need to go to the

16  ladies' room.

17          THE VIDEOGRAPHER:  Off the record, 10:36.

18          (Thereupon, a short break was taken at 10:36

19  a.m.  Testimony continues at 10:47 a.m.)

20          THE VIDEOGRAPHER:  On the record, 10:47.

21  Tape two.

22          (Thereupon, the reporter marked Transcript

23          of Proceedings for identification as

24          Exhibit No. 4.)

25      Q   (By Ms. Brouillet)  Mr. ████, we just had a

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 43

1   break.  During that break, did you have an opportunity

2   to speak to your attorney?

3       A   Yes.

4       Q   Okay.  I'm gonna show this to you and ask if

5   you've seen that document before.  That's the transcript

6   of the proceedings of January 18, 2008 in criminal court

7   before Judge Robaina?

8       A   Yes.

9       Q   Okay.  And according to that transcript, you were

10  represented by the Law Firm of Fazzono Tomasiewicz &

11  Barall?

12      A   Yes.

13      Q   Okay.  Did you have another or a prior attorney

14  in your criminal proceedings?

15      A   I'm sorry, say again.

16      Q   Did you have an attorney before you had Fazzono

17  Tomasiewicz--

18      A   No.

19      Q   --and Barall?

20      A   Before, no.

21      Q   You were never represented by Attorney John

22  O'Brien?

23      A   I'm sorry, yes.

24      Q   Okay.  And there's a lot of Attorney O'Briens,

25  that would be Attorney O'Brien from Manchester?
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 44

```
 1     A    No, Vernon.

 2     Q    Vernon.   Okay.   And Attorney O'Brien is a private

 3   attorney.   He's not a state-appointed attorney, correct?

 4     A    He's private, yes.

 5     Q    Okay.   Since your criminal conviction, January

 6   18, 2008, have you been changed with any other crimes?

 7     A    Before that?

 8     Q    After, sir.

 9     A    No.

10     Q    You've never been charged with violation of your

11   --

12     A    Yes, I'm --

13     Q    -- probation?

14     A    I'm sorry.   Yes.   Uh, violated probation, yes.

15     Q    When did you violate your probation?

16     A    I don't know exactly date.

17     Q    What year?

18     A    I believe it was 2009.

19     Q    Would you have been charged with that in December

20   of 2009?

21     A    I don't know exactly the date.

22     Q    And how did your violation of probation come to

23   light?

24     A    Say again.

25     Q    Sure.   Did your violation of probation charges
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 45

1    occur after you failed a polygraph test?

2        A    No.  That was, uh, they asked me to admit I

3    molested the girl, and so I said, no, I didn't.  They

4    told me that you violated probation for ten months.  And

5    so I was -- I wasn't on probation for ten months.

6        Q    You were not on probation for ten months?

7        A    No, no.

8        Q    So when you violated probation --

9        A    Yes.

10       Q    -- did you get another criminal conviction for

11   that violation?

12       A    I'm not sure.

13       Q    Okay.

14       A    But it went to court.  It took ten months.

15       Q    Oh, and so when you say "it took ten months,"

16   you're saying that the criminal proceedings for

17   violation of probation took ten months?

18       A    Right.

19       Q    Okay.

20       A    I don't have to report it, probation.

21       Q    Okay.

22       A    During that period.

23       Q    But to be clear, the judge didn't lift the

24   restrictions on you during those ten months.  The

25   judge -- no criminal judge lifted your restrictions for

BRANDON SMITH REPORTING & VIDEO



Page 46

1    those ten months, did he?

2        A    I'm not sure the process of that.

3        Q    All right.

4        A    It takes ten months you don't have to.

5        Q    All right.

6                    (Thereupon, the reporter marked

7              Information -- Violation of Probation

8              for identification as Exhibit No. 5.)

9        Q    (By Ms. Brouillet) Mr. ████, I'm going to show

10   you something that says, "Information -- Violation of

11   Probation," and there's some other documents attached,

12   including the application for arrest warrant, and ask

13   you to look at these documents; please?

14       A    Sure.

15       Q    And then I'm going to ask you questions.

16       A    (Witness complies)   Okay, ma'am.

17       Q    Okay.  Um, Mr. ████, does that document say that

18   Jose Torres was your probation officer?

19       A    Yes, ma'am.

20       Q    And so when you referred to Jose earlier, was

21   that the Jose you were referring to, sir?

22       A    No, that was Joe.

23       Q    Joe, okay.  Sorry.  Um, and according to first

24   document, the Probation Motion, it says under,

25   "Finding," and there's an "X, The defendant admitted
                    BRANDON SMITH REPORTING & VIDEO



Page 47

```
 1    being in violation of probation on December 2, 2009.

 2    And the violation of probation is established by the

 3    court.  And the judgment entered above is open to

 4    respect to the original order."  So would that be the

 5    date that you were judged to be in violation of your

 6    probation, sir?

 7        A   I believe.

 8        Q   Okay.  You have no reason to challenge that date,

 9    do you?

10        A   No.

11        Q   Okay.  And, sir, if you turn to, um, the page

12    that says one of two, but at the top it says, "Arrest

13    Warrant Application," and it is dated, uh, March 26,

14    '09.  It looks like this (indicating).

15        A   Okay.

16        Q   I'm going to staple that -- or you could, if you

17    want.

18        A   Thank you.  I'm sorry, what was your question?

19        Q   Um, I -- have you turned to the page where it has

20    Mr. Torres' arrest warrant application?

21        A   Page 1 and 2.

22        Q   Yes, sir.

23        A   Yes.

24        Q   And Page 1 of that it says at the top, "███████

25    ███████, comma, LKA,"?
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 48

```
 1      A.  Yes.

 2      Q   Okay.  Um, if you go down -- as part of the

 3   affidavit the one, two -- the fourth paragraph on that

 4   page, it says, "Than on January 28, 2008, ██████ was

 5   referred to special services, dash, Center for the

 6   Treatment of Problem Sexual Behavior," do you see that

 7   line, sir?

 8              MS. GARDNER:  I think you're on the wrong

 9   page.

10              MS. BROUILLET:  Oh.

11              THE WITNESS:  Am I?

12              MS. GARDNER:  Try the page before.

13              THE WITNESS:  March, 2009?

14              MS. GARDNER:  No.  Hold on.  "I, Jose

15   Torres" --- I wonder if it's not on here.

16              MS. BROUILLET:  You don't have that?

17              MS. GARDNER:  Oh, here it is.

18              THE WITNESS:  Thank you.

19              MS. BROUILLET:  Can I just look?  That's the

20   right page.

21      Q   (By Ms. Brouillet)  Um, if you go down to the

22   bottom paragraph on that page, the typed part, it says,

23   "Than on January 28th, ██████ was referred"?

24      A   Yes, ma'am.

25      Q   Do you see that, sir?
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 49

1    A    Yes.

2    Q    Okay. Were you referred to the Center of

3  Treatment of Problem Sexual Behavior?

4    A    Referred -- I think referred back to the group,

5  which is they have.

6    Q    Okay. Let me ask you this, sir, did you treat

7  with the Center or -- did you treat for the Center for

8  the Treatment of Problem Sexual Behavior?

9    A    It's in the probation office, yes.

10    Q    Okay.

11    A    They refer me back to the group.

12    Q    Okay. So when you told me you didn't have any

13  other medical treatment, you did in fact have treatment,

14  at least supervised, for the Center for the Treatment of

15  Problem Sexual Behavior?

16    A    That is part of the probation.

17    Q    Would that be yes, sir? I am looking for a yes

18  or no answer.

19    A    Yes.

20    Q    Okay.

21    A    I believe that. I'm not sure exactly your

22  question --

23    Q    Let me ask the question again then. As part of

24  your criminal charges -- I'm sorry, your criminal

25  conviction, did you have treatment, at least supervised

BRANDON SMITH REPORTING & VIDEO



Page 50

1    by the Center for the Treatment of Problem Sexual

2    Behavior?

3       A    And probation.

4              MS. GARDNER:  And I'm just going to object

5    to the form, because he did answer that before and he

6    answered yes and described that treatment.

7              MS. BROUILLET:  Well, what was unclear to me

8    was whether the transcript reflected that, because I

9    think it was a little confused.

10             MS. GARDNER:  Okay.  That's fine.

11      Q    (By Ms. Brouillet)  So -- now, when you go --

12   continue on that page, sir, it says, "The outcome of the

13   evaluation revealed that ██████ was appropriate to

14   undergo treatment and on May 22, 2008 his treatment

15   commenced."  Do you agree with that, sir?

16      A    Say it again, your question.

17      Q    Sure.  You can follow right along.  I am reading

18   from that last paragraph on that arrest affidavit.  And

19   it says, referring to the Center for the Treatment of

20   Problem Sexual Behavior, "The outcome of the evaluation

21   revealed that ██████ was appropriate to undergo treatment

22   and on May 22, 2008 his treatment commenced."  Do you

23   agree with that, sir?

24      A    I believe so.

25      Q    Okay.  You have no reason to dispute that?
              BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 51

```
 1     A   No.

 2     Q   Okay.  Now, if you turn to the next page, sir, it

 3   begins with the line, "That on March 9, 2009," do you

 4   see that, sir?

 5     A   Yes.

 6     Q   "This affiant," referring to Mr. Torres,

 7   "received a letter from Joseph Salafia, staff therapist

 8   from the Center which indicated that ████████ has been

 9   negatively discharged from sex offender treatment on

10   March 4, 2009."  When you said Joe, if you know --

11     A   That's him.

12     Q   Joseph Salafia is the Joe?

13     A   Correct.

14     Q   Okay.  Now, this provides, "The reason for the

15   discharge was due to ████'s, quote, Maintained his

16   denial of any responsibility for his sexual offense

17   behaviors."  Do you see that, sir?

18     A   Yes.

19     Q   Okay.  And further down it says, "The therapist

20   reported that since January of 2008, ████ was given the

21   opportunity several times to accept culpability, while

22   in sex offender group, during one to one meetings with

23   the therapist, and while meeting with his probation

24   officer, but despite the efforts ████ continued to deny

25   and not accept responsibility."  Do you see that, sir?
```

BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 52

1    A    Yes, for evaluation, yes.

2    Q    Now, it says in this affidavit that there were

3    one to one meetings with a therapist.  Are you saying

4    that's inaccurate?

5    A    No.

6    Q    And so you had one to one meetings with a

7    therapist?

8    A    Meet only, yes.

9    Q    Okay.

10   A    The first time you enter with the group, you have

11   to meet with her -- with him, sorry.

12   Q    Okay.  And then the next paragraph says, "On

13   February 4, 2009, ▓▓▓▓▓▓ underwent an Instant

14   Offense Psychological Detection of Deception Forensic

15   Examination with Randall Wallace," uh, doctor of

16   psychology, "Certified Polygraph Examiner."  So do you

17   recall having a polygraph examination, sir?

18   A    Yes.

19   Q    And it continues to say, "... and the test

20   confirmed that ▓▓▓▓ was deceptive on the questions of,

21   quote, sexual contact with his victim, end quote.  At

22   that time ▓▓▓▓ was advised of the results of the,"

23   polygraph, "PDD and ▓▓▓▓ responded by saying, quote,

24   there were incidents where she was sitting on his lap

25   and may have accidentally touched her vagina with his

BRANDON SMITH REPORTING & VIDEO

Page 53

1    hand," end quote, do you see that, sir?

2       A    Mm-hmm.

3       Q    Is that a "yes"?

4       A    Yes.

5       Q    And so you did touch ████████████'s vagina with

6    your hand?

7               MS. GARDNER:  Do you have the name correct?

8               MS. BROUILLET:  ████████████?

9               MS. GARDNER:  Oh.  Is that right?

10              THE WITNESS:  Yes.

11      Q    (By Ms. Brouillet)  ████████████ was the

12   victim, right?

13      A    That's why -- yes.

14      Q    Okay.

15      A    After the incident, yes.

16      Q    Okay.  And ████████████ was nine years old when

17   you began touching her vagina?

18      A    I don't remember, no.

19              MS. GARDNER:  I'm going to object to the

20   form.

21              MS. BROUILLET:  Okay.  Let me --

22              MS. GARDNER:  I think we need to go back to

23   your original question.

24              MS. BROUILLET:  All right.

25              MS. GARDNER:  Because then I interrupted
                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 54

1    about the name.

2       Q   (By Ms. Brouillet)  Okay.  Just to be clear, and

3    as I said to you in the beginning, this is under a

4    protective order, and so her name doesn't get reported

5    publically, but the child that you have been convicted

6    of improperly touching was █████████?

7       A   That's she claim, yes.

8       Q   Well, that's the child that you were convicted

9    of?

10      A   Yes.

11      Q   Okay.  And ████████ is the daughter of who?

12      A   ██████████, my █████████.

13      Q   And who else?  What is her mother's name?

14      A   ██████████.

15      Q   Okay.  All right.  When you say your "

16   ██████," █████████ has not actually worked with

17   you since May 5, 2006, isn't that correct, you have not

18   worked together?

19      A   Before that.  This question is before, not after.

20      Q   Let me just clarify this though, when -- you just

21   said "my ████████."  But isn't it true that you and

22   ██████████ have not worked together --

23      A   Correct.

24      Q   Let me finish.  Since May 5, 2006?

25      A   Correct.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 55

1      Q    Okay.  And when you say, pointing to this
2   document, "this was before that," you were charged with
3   improperly touching ████████████'s vagina beginning in
4   1999.  Correct?
5      A    Correct.
6      Q    And according to the arrest application and the
7   other document I showed you, the court papers, you were
8   living in the same building as ████████████ and her
9   family?
10     A    Yes.
11     Q    And would she baby-sit your children?
12     A    Uh, I believe so.
13     Q    Okay.  And what else was ████████████ doing
14  with your wife at that time in 1999?
15     A    I don't know.
16     Q    She wasn't providing English instruction?
17     A    No.
18     Q    Okay.  And when did you stop improperly touching
19  ████████████?
20         MS. GARDNER:  Object to the form.
21            You can answer it.
22     Q    (By Ms. Brouillet)  When -- when did you stop --
23  you've told me that you were --
24     A    I move -- I move out from there.  I bought house.
25     Q    Okay.  What year did you stop touching ██████
           BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 56

1      ████████'s vagina?

2      A    I move out from the apartment.

3      Q    I want a year, sir.

4      A    Sorry?

5      Q    What year did you stop touching ████████████'s

6      vagina?

7                  MS. GARDNER:  Object to the form.

8                  You can answer.  Do you need the question

9      repeated?  She's looking for the year that you moved out

10     of the house.

11                 MS. BROUILLET:  No.  Let me --

12                 THE WITNESS:  She is asking --

13     Q    (By Ms. Brouillet)  Six --

14                 MS. GARDNER:  Oh, okay.

15     Q    (By Ms. Brouillet)  -- don't talk to your lawyer.

16                 MS. GARDNER:  Okay.  That was my fault.

17     Q    (By Ms. Brouillet)  Okay.  You told me that in

18     1999 you were touching ████████████'s vagina.

19                 MS. GARDNER:  Object to the form.  I don't

20     think he's told you that.

21                 MS. BROUILLET:  Well, let me go back.

22                 MS. GARDNER:  Yeah, that's what I mean.  I

23     interrupted about the name, and I don't think you ever

24     got an answer to that question.

25                 MS. BROUILLET:  Well, thank you for pointing

                   BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 57

1    that out.

2        Q    (By Ms. Brouillet)  You pled guilty to touching

3    the vagina of ▓▓▓▓▓▓▓▓.  Correct?

4        A.  Okay, yes.

5        Q.  And according to the records of your conviction,

6    that began in 1999, sir; is that correct?

7        A    (No audible answer.)

8        Q    That's what you pled guilty to?  I need you to

9    say out loud.

10               MS. GARDNER:  I'm going to object to the

11   question.

12               THE WITNESS:  I am not sure what's the

13   question.

14               MS. GARDNER:  Can you make it clear that he

15   pled under the Alford Doctrine?

16               THE WITNESS:  Alford Doctrine.

17               MS. BROUILLET:  Okay.

18       Q    (By Ms. Brouillet)  Well, let me go to the

19   criminal records then, sir.  Did you plead guilty to --

20   we talked earlier about the precise offense that you

21   pled guilty to, and I read to you the number of the law,

22   risk of injury to a child.  And so you pled guilty under

23   the Alford Doctrine?

24       A   Yes.

25       Q    Okay.  And you told the judge that -- when he
                    BRANDON SMITH REPORTING & VIDEO

6/29/2011

Doe v. UCONN



Page 58

```
 1    asked you at the criminal proceedings, did you tell the

 2    judge whether that was your choice to plead guilty?

 3        A   Yes.

 4        Q   Okay.  And no one forced you to plead guilty; is

 5    that correct?

 6        A   For that Alford, no.

 7        Q   Okay.  And then later on, you pled guilty to

 8    violation of probation.  Correct?

 9        A   Yes.

10        Q   Okay.  And so when you pled guilty originally to

11    the crime where you had to then register as a sex

12    offender -- let me pull out Exhibit 4 and I'll hand that

13    back to you.  And that's the transcript; and if you turn

14    to Page 2, sir, the clerk says the charges, that, "▓▓▓▓

15    ▓▓▓▓, on or about and between the dates of 1999 through

16    2000, you're charged with risk of injury to a child in

17    violation of 53, dash, 21 a, in parens, 2, in parens.

18    How do you plead, guilty or not guilty?"  And then you

19    responded, "I do."  And the clerk said, "I'm sorry?"

20    Next page, "Yes.  Guilty.  Yes."  And your lawyer said,

21    "It's under the Alford Doctrine."  Do you remember that,

22    sir?

23        A   Yes.

24        Q   Okay.  And then they read into the record the

25    facts, that the victim in January of 2008 was eighteen,
```
BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 59

1    years old.  Do you see that, Page 3?

2      A    No clue.

3      Q    You -- no, I'm asking you, sir, do you see that

4    on Page 3?

5      A    Page 3.

6      Q    Turn to Page 3.

7      A    Yep.

8      Q    And it says, "Your Honor, the facts are as

9    follows," do you see that paragraph, right here?

10     A    Yep.

11     Q    "The now 18-year-old female victim was at the

12   time living in a multi-family home.  Her family lived on

13   one floor; the defendant and his wife and child lived on

14   the floor beneath them."

15     A    Mm-hmm.

16     Q    Do you see that, sir?

17     A    Yes.

18     Q    Okay.  "And when she was approximately 10 years

19   old, in the fifth and sixth grade, she would visit.

20   Well, let me back up.  She thought of the defendant as

21   an uncle.  He was a close friend of the family."  And so

22   if ▓▓▓▓▓▓▓▓▓▓ was eighteen in January of 2008, then

23   in 2000, she would have been ten years old, wouldn't

24   she?

25     A    I don't know.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                         

```
                                                        Page 60

    1      Q    You don't know.  You're unable to subtract?

    2      A    No.

    3      Q    Do you have any reason to believe that ▓▓▓▓

    4   ▓▓▓▓▓ was older than nine or ten years old at the

    5   time?

    6      A    I don't understand your question.  I'm sorry.

    7      Q    Well, let me ask you this, how old was ▓▓▓▓

    8   ▓▓▓▓▓ when these acts you were convicted of occurred

    9   in 1999, 2000?

   10      A    I don't know how old.

   11      Q    You didn't think she was over eighteen, did you?

   12      A    No.

   13      Q    Do you have any reason to dispute what was said

   14   at your criminal trial -- I'm sorry, your criminal plea

   15   when you were convicted, that she was eighteen in

   16   January of 2008?

   17      A    Repeat it.

   18      Q    Do you have any reason to dispute that in January

   19   of 2008, ▓▓▓▓▓▓▓▓▓ was only eighteen?

   20      A    I'm sorry.  I do not understand the question

   21   completely.

   22      Q    Well, let me ask you again.

   23      A    Say it again.  You mean she was eighteen?

   24      Q    In January of 2008, to your knowledge, was ▓▓▓▓

   25   ▓▓▓▓▓ eighteen?
```
BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 61

1    A    Okay. So would be eighteen.

2    Q    Is that "yes"?

3    A    That you're asking me? I don't know.  If she was

4    eighteen, that's fine.

5    Q    No.  I am asking you this, sir --

6    A    Yeah.

7    Q    I've showed you the transcript of your criminal

8    trial.

9    A    Okay.

10   Q    And it says that ███████████ was eighteen in

11   January of 2008.

12   A    Okay.  She's -- yes.

13   Q    And so in 2000, she would be eight years younger,

14   wouldn't she?

15   A    I believe so.

16   Q    Okay.  Because 2008 to 2000 is eight years, isn't

17   it?

18   A    Uh-huh.

19   Q    Is that "yes"?

20   A    Yes.

21   Q    Okay.  And so if you subtract eight years from

22   eighteen, she would be ten years old in 2000?

23   A    I believe so, yes.

24   Q    Okay.  And in 1999, she would be nine years old?

25   A    I believe so.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 62

1    Q   Okay.  You have no reason to dispute that, do

2    you?

3    A   I'm not sure.  What does "dispute" mean?

4    Q   Oh, do you have any reason to disagree with that?

5    A   No, she's her age, so...

6    Q   Okay.  And according to this criminal transcript,

7    it says that you were a close friend of the ████

8    family --

9    A   Yes.

10   Q   -- at that time?

11   A   Yes.

12   Q   Would you agree with that?

13   A   Yes.

14   Q   Okay.  Now, I am going to go back to the more

15   recent document that I gave you -- I will take this one

16   back, thank you -- and that, so I am clear, is Exhibit

17   5.  Okay.  And so going back to Exhibit 5...

18   A   Show me which one is Exhibit 5, please.

19   Q   This is Exhibit 5, the entire thing.  The first

20   page is marked --

21   A   What page do you want me to look?

22   Q   I'm going to tell you that in a moment.  I lost

23   my place.  Okay.  Okay.  Um, I will show you -- it was

24   the page that we were last on.  It's the arrest warrant

25   application, and it says Page 1 of 2 and it begins,
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 63

1    "That on March 9, 2009."  Do you see that, sir?

2       A    Okay.

3       Q    And so we're on that page.  Correct?

4       A    Correct.

5       Q    Okay.  And at the bottom paragraph it starts, "On

6    February 4, 2009," do you see that, sir?

7       A    Yes.

8       Q    That second sentence says, referring to February

9    4, 2009, "At that time ▇▇▇ was advised of the results

10   of the psychological detection and deception and ▇▇▇▇

11   responded by saying, quote, there were incidents where

12   she was sitting on his lap and may have accidentally

13   touched her vagina with his hand," end quote.  Do you

14   see that, sir?

15      A    Did I answer that already?

16      Q    I'm asking you another question, but I read it to

17   you.  Do you see that, sir?

18      A    Yes.

19      Q    Okay.  And I want to make sure that I have a

20   clear answer then, you have told your probation officer,

21   Jose Torres, that you touched ▇▇▇▇▇▇▇▇▇'s vagina

22   with your hand?

23      A    I touched her a lot.  I was family.

24      Q    Okay.  And so any question is this, according to

25   the criminal records that we have, you did this between

                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 64

1    1999 and 2000, sir.  And so I'm asking you as you sit

2    here today, when did you stop touching her vagina?

3        A    I don't know that question.

4        Q    You don't know...

5        A    No.

6        Q    You don't know when you stopped or you -- I'm

7    unclear in your response, sir.

8        A    I'm not sure of the question.  You're asking did

9    I touch her?

10       Q    Yes.  When did you stop touching ████████'s

11   vagina?  The criminal records I have say between 1999

12   and 2000, and so I am asking you that question.

13            MS. GARDNER:  Object to the form.

14            MS. BROUILLET:  Okay.

15            MS. GARDNER:  Go ahead.

16       Q    (By Ms. Brouillet)  Go ahead, sir.

17       A    Okay.  Two thousand I move out from there.

18       Q    Okay.  I understand you moved out, but I'm asking

19   you, is that when it stopped?

20            MS. GARDNER:  Object to the form.

21            Go ahead.

22       Q    (By Ms. Brouillet)  I'm -- I am not asking when

23   you moved out.  I got that part.  But the question

24   wasn't when you moved out.  Just because you moved out

25   isn't telling me that's when it stopped, and so I need

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 65

```
 1    you to answer.  According to this, you admitted, and

 2    you've told me, you've touched her vagina with her hand.

 3    When did you stop touching ██████████'s vagina with

 4    her hand?

 5              MS. GARDNER:  Object to the form.

 6              THE WITNESS:  You saw it in the paper.

 7         Q    (By Ms. Brouillet)  I asked -- I want you to

 8    answer me, sir.  Answer the question, please.  When?

 9         A    I don't know the date.

10         Q    You don't know the date?

11         A    No.

12         Q    You don't know the year?

13         A    No.

14         Q    Could it have been after 2000?

15         A    I don't know the date.

16         Q    Okay.  And so you don't know.  It could have been

17    after 2000.  You are unable to say?

18         A    I said I don't know.

19         Q    Okay.  I just want to be clear.

20         A    I said I don't know.

21         Q    Okay.

22         A    Thank you.

23         Q    Now, sir, if the records of the Center for the

24    Treatment of Problem Sexual Behavior, The Connection,

25    Inc. -- withdraw that question.
```
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 66

1      You understand, sir, that you provided a medical

2   authorization so we could obtain your records as part of

3   your responses to interrogatories and production

4   requests?

5      A   Yes.

6      Q   Okay.  And you now recall treating with the

7   Center for the Treatment of Problem Sexual Behavior?  As

8   part of your probation, you treated with them?

9      A   Condition, yes.

10      Q   Okay.  And if the record from Joseph Salafia on

11   January 5th, 2010, says that you admitted to improper

12   sexual contact, touching over the clothing, of your

13   minor female victim on numerous occasions and you had

14   denied it in the past, would you have any reason to

15   disagree with what Mr. Salafia wrote in January 5th,

16   2005?

17      A   That's fine.

18      Q   Okay.  So now that I've read this to you, are you

19   able to tell me when you stopped touching ████████

20   ██████? Because before you said I don't remember.

21      A   I think that the question is switching back and

22   forth.

23      Q   Yes.

24      A   If you stay on one subject, so I can answer you.

25      Q   No.  I'm not going to stay on one subject, and so

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

1    let me ask the question again.

2    A    Okay.

3    Q    You didn't remember before.

4    A    Right.

5    Q    I've read this to you.  Is your answer still I

6    don't remember?

7    A    Yes, that's fine.

8    Q    No.  "Yes, that's fine" --

9    A    Yes, yes.

10   Q    You don't remember?

11   A    Yeah.

12   Q    Okay.  All right.

13           MS. BROUILLET:  Need a break?

14           THE WITNESS:  No, that's fine.

15   Q    (By Ms. Brouillet)  Okay.  Now, you told me

16   earlier that you lost your job.  Are you claiming --

17   withdraw the question.

18          When were you terminated from UConn?

19   A    2008.

20   Q    Would it be March 19, 2008?

21   A    I believe it was December, 2008.  I'm not sure

22   exactly the date.

23   Q    Okay.  After you were convicted and had to

24   register as a sex offender, did UConn place you on paid

25   administrative leave so you would not actually work

Brandon Smith Reporting & Video
860-549-1850          production@brandonreporting.com          249 Pearl Street

Doe v. UCONN



1    there?

2        A    No,

3        Q    Well, after you were convicted on January 18,

4    2008, when did you stop working at UConn?

5        A    I believe December 18th.

6        Q    December 18th, 2008 --

7        A    They gave me a letter, yes.

8        Q    I'm sorry?  They gave --

9        A    They gave me a letter to leave.

10       Q    When you say they give you a letter to leave --

11       A    Termination.

12       Q    Did you have a meeting with anyone before that

13   letter?

14       A    I met with the union, uh, HR.

15       Q    "HR" meaning human resources?

16       A    Yes.

17       Q    While you were at UConn, were the terms and

18   conditions of your employment covered by a union

19   contract?

20       A    I believe so.

21       Q    Were you part of the -- what's called you UCPEA,

22   University of Connecticut Professional Employees

23   Association?

24       A    By name, yes.

25       Q    Okay.  And during your termination, were you

                  BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 69

1    represented by Peggy Beckett-Rinker, the director of

2    that union?

3        A    Yes.

4        Q    I'm going to show you a letter, that I'm going to

5    mark, about your employment.

6              (Thereupon, the reporter marked Letter,

7              1/25/08, for identification as Exhibit No. 6.)

8        Q    (By Ms. Brouillet)  Mr. ████, I'm going to ask

9    you -- I'm going to take back Exhibit 5 and ask you to

10   look at Exhibit 6 and see if you recognize that letter.

11       A    Yes.

12       Q    Now, that letter is dated, it looks like, January

13   23, 2008.  It says that it was hand delivered.  And it

14   says, "Dear Mr. ████, please be advised that effective

15   immediately, you are being placed on paid administrative

16   leave pending the outcome of an investigation."

17       A    The date is January 29th, 2008.

18       Q    It says the 29th?

19       A    The top on the right.

20       Q    Okay.  Sir, I'm looking on the date up here that

21   is highlighted.

22       A    That's why I am reading it.

23       Q    And you said that says January 29, 2008, not the

24   23rd?

25       A    I'm not sure exactly the date.
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 70

1    Q    Okay.

2    A    So the date is right there.

3    Q    Well, what does the date say that it was received

4    -- stamped receive --

5    A    This is a payroll.

6    Q    Let me just ask the question so we're clear.

7    A    Okay.

8    Q    What does it say date received by the payroll

9    department, the stamp?

10   A    Twenty-fifth.

11   Q    Okay.  So you would agree that the date at the

12   top that the letter was sent either January 23rd or

13   January 29th?  The date right here, sir?

14   A    Yes, ma'am.

15   Q    Okay.  Now, you told me a short while ago that

16   you were not placed on paid administrative leave.

17   A    I don't remember that.

18   Q    Okay.  Do you remember receiving this letter?

19   A    I believe so.

20   Q    Okay.  So now that you've looked at this letter,

21   does it refresh your recollection of whether you were

22   placed on paid administrative leave in January, 2008,

23   after you pled guilty to the criminal charges?

24   A    Mm-hmm.

25   Q    Is that "yes"?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 71

1     A    I believe so, yes.

2     Q    Okay.  And so you were placed on paid

3    administrative leave in January of 2008?

4     A    I don't remember that.

5     Q    Okay.  Do you have any reason to dispute that

6    this letter is accurate?

7     A    I believe so.  The system of --

8              THE REPORTER:  I'm sorry, say that again.

9    The system what?

10             THE WITNESS:  The payroll did this, you

11   know.

12    Q    (By Ms. Brouillet)  Well, this letter is from

13   Boris Bravo-Ureta.

14    A    Yes.

15    Q    And was -- who was Boris Bravo-Ureta?

16    A    He was, uh, supervise of, uh, international

17   department.

18    Q    The letter lists him as director, University of

19   Connecticut Office of International Affairs?

20    A    That's him.

21    Q    Okay.

22    A    Boris.

23    Q    So this letter from January of 2008 provides,

24   "The University's General Rules of Conduct prohibits the

25   conviction of a crime."  So by January 23rd or 29th,
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 72

1    2008, you had pled guilty to this crime against ▪▪▪▪▪▪▪

2    ▪▪▪▪▪.   Correct?

3        A    I believe so, yes.

4        Q    Okay.   And it instructs you that, "During this

5    period of paid leave, you may not visit the Storrs

6    campus, nor may you have any contact with any of your

7    co-workers, personnel, or students at the Storrs campus

8    without prior written permission from me," referring to

9    Boris.   It also scheduled you for a fact-finding meeting

10   on Monday, January 28th at the labor relations

11   conference room.   Did you attend a fact-finding meeting?

12       A    Yes.

13       Q    Okay.   And was that in regard to UConn wanting to

14   dismiss you, terminate you?

15       A    Yes.

16       Q    Okay.

17                    (Thereupon, the reporter marked

18               UCPEA Complaint/Grievance Intake Form

19               for identification as Exhibit No. 7.)

20       Q    (By Ms. Brouillet)   I will show you a document

21   that says, "UCPEA Compliant, slash, Grievance Intake

22   Form," And it's dated on the upper right-hand corner

23   January 23, 2008.   Do you see that, sir?

24       A    Yes.

25       Q    Okay.   And in January 2008, your union was UCPEA?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 73

1    A    Yes.

2    Q    Okay.  And --

3    A    Suppose to represent me, yes.

4    Q    Okay.  And it says, "Area or department,

5    International Service and Programs."  Was that some

6    times referred to by the acronym DISP, D-I-S-P?

7    A    Yes.

8    Q    Okay.  And immediate supervisor was Landry.

9    What's Landry's first name?

10   A    Larry?

11   Q    It says, "Landry," --

12   A    Landry.

13   Q    Landry.  Do you know what -- Larry Landry?

14   A    Landry, yes.

15   Q    Okay.  Do you know Landry -- is Landry a man?

16   A    Man, yes.

17   Q    Okay.  And it says, "Date event occurred, January

18   23, 2008."  So this grievance is referring to your

19   letter that you're being placed on paid leave?

20   A    Mm-hmm.

21   Q    I need you to answer "yes," sir?

22   A    I'm not sure this is -- which one is that.  No

23   clue.  I'm sorry.

24   Q    Okay.  I'm a unclear.  You have no clue as to

25   what, sir?  As to whether you were placed on paid leave?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

1    A    Yes.

2    Q    Okay.

3    A    Because they terminated me, that's all.  I don't

4    understand this letter stuff.

5    Q    Do you have any reason to believe that the letter

6    that was marked as Exhibit 6, which was sent to you --

7    delivered to you and your union from Boris Brava-Ureta,

8    do you have any reason to believe that is not an

9    accurate letter?

10    A    It could be.  I'm not sure.

11    Q    Okay.  So looking at No. 7 -- did you ask your

12    union to challenge you being dismissed?

13    A    I did ask, but they didn't do anything.

14    Q    Well, you asked?

15    A    Yes.

16    Q    And to your knowledge, did the union actually

17    file a grievance?  Because I'm showing you Exhibit 7,

18    which is an grievance intake form.

19    A    Because part of the paper they have to do the

20    procedure.

21    Q    Let me ask you specific questions though.  Look

22    at Exhibit 7, sir.  And that indicates that your union,

23    UCPEA, filed a grievance over your January 23, 2008

24    letter.

25    A    Yes.

BRANDON SMITH REPORTING & VIDEO


Page 75

1      Q    And if you go under the section where it says,

2    Grievance filing deadline," do you see that?  It is

3    underlined, sir?

4      A    Yes.

5      Q    Okay.  It says, "Keith Hood called to give us a

6    'heads up' that ███ would receive a letter putting him

7    out on paid administrative leave pending an

8    investigation regarding his conviction on charges of

9    illegal sexual contact with a minor (age sixteen or

10   under).  Keith said he would be receiving the letter

11   within a short time and that they had somehow learned of

12   the court proceedings and Mike Eagen had gone down to

13   the court and gotten a copy of the ruling from the

14   court.  I asked if he would fax a copy of the letter and

15   the evidence and he said he would.  He also said that

16   there was a fact finding scheduled for Monday, January

17   2:30 at the Depot Campus.  Keith asked if we could

18   consider waiving the fact finding and I said: 'No.'

19   Then he said they intended to roll the pre-disciplinary

20   meetings into one.  I do not believe we can do that."

21   The next line says, "███ called and said he was getting

22   a letter.  Did he have to sign it?"  Do you recall

23   making that phone call to UCPEA, sir?

24     A    I called, yes.

25     Q    Okay.  So --

Doe v. UCONN

6/29/2011



Page 76

1      A   Not on this issue, probably.

2      Q   Well, I want to stay limited this time to this

3   issue.

4      A   Okay.

5      Q   The UCPEA complaint grievance form says that you

6   called UCPEA about -- and said you were getting this

7   letter.  Do you recall making that phone call?

8      A   Probably I called, yes.

9      Q   Okay.  Now, it says that you arrived -- looking

10   at the next paragraph, sir, that you arrived and Ros sat

11   in.  I'm reading from that paragraph that begins, "He

12   said he wanted to come over."  Do you see it, sir?

13      A   Mm-hmm.

14      Q   It says, "████ arrived and Ros sat in until Kevin

15   arrived."  Would Kevin be the president of the union,

16   sir?

17      A   I don't know who is Kevin, sorry.

18      Q   Okay.  "I read the letter and confirmed with him

19   that he had been in court on Friday, January 18, and had

20   pled nolo contendre receiving a suspended sentence --

21   seven years in jail -- for ten years probation with

22   special conditions.  ████ will remain on the State Sex

23   Offender Registry for ten years.  I also went over the

24   conditions of the letter and explained that he needed to

25   stay away from the campus and not contact anyone on the

BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 77

1   camps.  He understood that.  I asked if he had turned

2   keys, passwords, et cetera over to the department and he

3   said he had."  Do you recall discussing that with your

4   union, sir?

5       A   No.

6       Q   Okay.  Do you have any reason to believe that

7   this document is inaccurate?

8       A   No clue.

9       Q   Okay.  Now, going down below it says, "He gave me

10  his attorney's phone numbers, Attorney Patrick

11  Tomasiewicz," and it gives the phone number, and it

12  says, "ATT Vinnie Coyle."

13      A   Right.

14      Q   Who is Vinnie Coyle?

15      A   A lawyer, my lawyer.

16      Q   Your lawyer.  Where is Vinnie Coyle located?

17      A   In New York.

18      Q   Because this has a --

19      A   In New York.

20      Q   Okay.  What does Mr. Coyle represent you in

21  regard to?

22      A   For human rights.  The first time I came here, I

23  got -- he represents me for human right, um, to get my

24  documents.  Refugee, human rights.

25      Q   You came to the United States as a refugee for

                BRANDON SMITH REPORTING & VIDEO

Doe V. UCONN



1   human rights?

2     A  I came under the government.  U.S. government

3   brought me here.

4     Q  As a -- for human rights?

5     A  Freedom Fighters.

6     Q  You were a Freedom Fighter?

7     A  Freedom Fighter.  Government -- U.S. government

8   brought me here.

9     Q  And you applied --

10    A  I'm sorry?

11    Q  -- as a refugee?

12    A  No, I got my human rights paper.

13    Q  I don't understand your human right paper, sir.

14   Could you explain that?

15    A  Um, Vinnie Coyle represent me to do -- process my

16   paper.

17    Q  What do you mean human right paper?

18    A  That's what they call the -- the bar they call

19   human -- for people rights.  And it's for people who get

20   the paper.

21    Q  Did you apply to come to the United States as a

22   victim of a human rights violation?

23    A  No, no.  I said under USA government I came.  USA

24   government brought me here for treatment.

25    Q  What kind of treatment?

6/29/2011

1    A    I got shot thirty times against the Soviet Union.

2    Q    Medical treatment, sir?

3    A    Medical treatment, yes.

4    Q    Psychological treatment, too?

5    A    Medical treatment. I got shot thirty times.

6    Q    But, sir --

7    A    Yes?

8    Q    -- at time you came to the United States,

9    according to Dr. ████s records, you also had ████ from

10   being shot?

11   A    No clue.

12   Q    You have no clue?

13   A    Yeah. I haven't seen it, so...

14   Q    Okay. And so in your application to the US

15   Government to come here, you never represented that you

16   had ████ from being shot?

17   A    No, I came -- I came under the government

18   treatment. They spend money on me, and so they pay all

19   of my treatment.

20   Q    The US Government did?

21   A    Yes.  Washington DC, White House?

22   Q    The White House brought you to the United States?

23   A    Yes, state department, White House.  If you need

24   the number, I can get it to you.

25   Q    At the White House?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 80

```
 1     A    Sure.
 2     Q    Okay.  When was the last time you spoke to the
 3   White House, sir?
 4     A    Nine months ago.
 5     Q    Okay.  And who did you speak to at the White
 6   House?
 7     A    This is not the -- this issue to ask.
 8     Q    Well, I am asking you that question, sir, and so
 9   you can answer.
10     A    Uh, one of my friends.
11     Q    Who?  I would like a name, please.
12     A    Uh, FBI.
13     Q    Would you name the person, sir?
14     A    Uh, you don't -- this is confidential.  You don't
15   have to --
16     Q    Sir, answer the question.
17     A    I don't have his card.  She has to give you...
18     Q    Well, he's your friend.  Tell me his name.
19     A    Russel, Russel.
20     Q    Last name?
21     A    Um, Daryim.
22     Q    Could you spell it, please?
23     A    It's D-A-R, it's, um, Y-I-M.
24     Q    And he's at the White House or with the FBI?
25     A    With the FBI.  That's all I -- I don't want to go
```
                    BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 81

1     through that, but I give it to you.

2        Q   Who did you speak to at the White House?

3        A   This is him. I speak to him.

4        Q   You speak to Russel --

5        A   Yes.

6        Q   -- but you told me he's at the FBI, not the White

7     House.

8        A   Well, that's -- this is state department.  This

9     is White House to me.

10       Q   Okay.  And so I want to be clear, are you talking

11    about speaking to someone at the White House?  Or are

12    you talking about speaking to Russel from the FBI?

13       A   FBI.

14       Q   Okay.  And what about the state department?  Did

15    you speak to someone at the state department or did you

16    speak to Russel from the FBI --

17       A   Before I did.  Before my, uh -- well, I don't

18    have to do that.  This part of my paper, yes.

19       Q   Okay.

20       A   I was working for refugee.

21       Q   No.  You told me that a few months ago you spoke

22    to someone at the White House.  Now --

23       A   That is FBI.  I call it White House, sorry.

24       Q   Okay.  And you said you spoke to the state

25    department.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 82

```
 1    A    FBI, the state department, all they work for the
 2    House -- White House, right?
 3    Q    And so did you speak to anyone in the state
 4    department a few months ago?
 5    A    Not in there, no.
 6    Q    Okay.
 7    A    But the FBI I spoke to.
 8    Q    The FBI, Russel?
 9    A    Yes.
10    Q    And what is your relationship with Russel of the
11    FBI?
12    A    I volunteer, antiterrorism.
13    Q    You volunteer with the FBI for antiterrorism?
14    A    Yes.
15    Q    And when did you last volunteer with the FBI for
16    antiterrorism?
17    A    Two months ago.  No -- yeah, two months ago.
18    Q    And what do you do for the FBI?
19    A    I just -- a little bit help.
20         THE REPORTER:  I just what?
21         THE WITNESS:  I help a little bit I said.
22    Q    (By Ms. Brouillet)  How do you help the FBI, sir?
23    A    Information.
24    Q    About what, sir?
25    A    Antiterrorism.
```

BRANDON SMITH REPORTING & VIDEO

860-549-1850     Brandon Smith Reporting & Video
                 production@brandonreporting.com     249 Pearl Street

Doe v. UCONN

6/29/2011

Page 83

1    Q    Well, what do you know about terrorism?  I am not

2    making the connection, sir.

3    A    When I got some information for community, they

4    ask:  That's all.

5    Q    What community, sir?

6    A    The community that I live.

7    Q    In Willimantic?

8    A    Yes, Storrs.

9    Q    In Storrs?

10   A    Yes.

11   Q    And so you providing the FBI with information

12   about --

13   A    If they need it.  If they need it.

14   Q    The community of Storrs?

15   A    Correct.

16   Q    And so you are not employed by the FBI?

17   A    No.

18   Q    So --

19   A    I volunteer.

20   Q    You what?

21   A    Volunteer.

22   Q    You volunteer?

23   A    Yes.  My time.

24   Q    And so you call the FBI and report suspicious

25   activity?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



1     A    Yes.

2     Q    Okay.  And the last time you did this was two

3   months ago?

4     A    Yes.

5     Q    And have you informed the FBI of your criminal

6   convictions?

7     A    They know that.

8     Q    No, no.  That's not the question that I asked,

9   sir.  Have you informed the FBI of your criminal

10   convictions?

11     A    Yes.

12     Q    Okay.

13          THE WITNESS:  I need to take a break.

14          MS. BROUILLET:  Okay.

15          MS. GARDNER:  Okay.

16          THE VIDEOGRAPHER:  Off the record at 11:35.

17          (Thereupon, a short break was taken at 11:35

18   a.m.  Testimony continues at 11:47 a.m.)

19          (Thereupon, the reporter marked for

20          identification Exhibit Nos. 8 and 9 during the

21          break.)

22          THE VIDEOGRAPHER:  On the record 11:47.

23   Tape 3.

24     Q    (By Ms. Brouillet)  Mr. ███, during the break

25   did you have a chance to speak to your attorney?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 85

```
 1     A    Yes, ma'am.

 2     Q    Okay.  I want to show you -- I've marked

 3  something Exhibit 8.  And we've blacked out your home

 4  address, um, but it is a letter from -- dated March 19,

 5  2008 from the Office of the Vice Provost for

 6  Multicultural and International Affairs.  And on the

 7  fourth page it has the name "Ronald L. Taylor," vice

 8  provost, do you see that, sir?

 9     A    Yes, ma'am.

10     Q    Okay.  And this says, "Letter of Decision --

11  Termination of Employment."  Uh, take a look at that and

12  then I am going to ask you some questions about

13  receiving this letter, sir.

14     A    I'm sorry, what page you say?

15     Q    I --

16     A    Front page?

17     Q    Just read the letter to yourself or look at the

18  letter, and I will ask you some questions about it.

19     A    Yes, ma'am.  Go ahead.

20     Q    Are you ready?

21     A    Yes, sure.

22     Q    Do you recall receiving this letter, sir?

23     A    Yes.

24     Q    Okay.  And so earlier today you told me that you

25  thought that you were terminated from UConn in December
```

BRANDON SMITH REPORTING & VIDEO