



of 2008, but you were not sure. Now that you have seen this, do you recall that you were terminated March 19, 2008?

A I didn't remember the date.

Q Right. But now that you see it, you remember this date?

A Yes.

Q Okay. And it says that you're being terminated for unacceptable conduct in the workplace, including violation of the University's Violence in the Workplace Prevention Policy and University General Rules of Conduct, including K which prohibits conducting oneself in any manner, which is offensive, abusive, or contrary to common decency or morality, and E, as in Edward, by interfering in any way with the work of others, and H, failing to carry out their reasonable directive of a manager, supervisor, or department head. And underneath that it says, the last paragraph begins with, "The University's investigation of the charges find sufficient credible evidence to prove that on or about November 6, 2007, you questioned Advisor Susan Atrens about the status of the," the name is blocked out, "spouse of a student, despite being instructed by both the Executive Director Boris Bravo-Ureta and Program Director Robert Chudy that you were to have no contact

with students or get involved with students receiving services from the International Relations office."

A Yes.

Q Do you recall, sir?

A Yes, ma'am.

Q And on November 6, 2007, who was your direct supervisor?

A Uh, Bob Chudy.

Q Okay. And then if you turn the page or to Page 2, it says, "In addition, on Tuesday, November 20, 2007 during a staff meeting for training purposes you became angry, lost your temper and yelled at your supervisors and co-workers. Your behavior was aggressive and threatening. Staff members reported that they were frightened by your inability to control yourself. The meeting was disrupted and the training had to be completed at another time. By these actions you have violated General Rule K, which prohibits, quote, "Conducting oneself in any manner, which is offensive, or abusive," and E, which prohibits, "Interfering in any way with the work of others." Do you remember that?

A I don't remember that.

Q Okay. It also sates in the next paragraph that your actions violate the University's Violence in the Workplace Prevention policy. Now, there is another





incident that's listed on that page, it says, "Furthermore, on November 21, 2007, after volunteering to assist your supervisor with a slow running computer, you were to contact the University Information Technology Services (UITS) office for assistance. However, directly after a meeting with Bob Chudy and Susanne Atrens to discuss the," and we blacked out the name, "matter, noted above, you stormed into your supervisor's office, dropped the office's laptop on his desk and said 'here is your laptop' in an intimidating and hostile manner. Less than a minute after you brought the laptop to the office, you reentered the office and dropped the office's cell phone box and digital camera on the laptop with a same attitude and then stormed out of the office." Do you recall that?

A I don't have to explain that. Yes I did. He requested to bring all --

Q I'm not asking you to explain it. I'm asking if you recall that?

A With the laptop, yes.

Q Okay. And then if you go down to section two, it says, "Court Order RE: Criminal Conviction. It has been found, and you have admitted, that on January 18, 2008, you were convicted of violating General Statutes Title 53, Section 53, dash, 21 Injury or risk of injury




to, or impairing morals of, children, subsection two, which states in pertinent part, colon, any person who, two, has contact with the intimate parts, as defined in section 53a-65, of a child under the age of sixteen years or subjects a child under sixteen years of age to contact with the intimate of such person, in a sexual and indecent manner likely to impair the health or morals of such child,... shall be guilty of the class C felony."

A Okay.

Q Now, it then goes on to say that they provided a transcript of the proceedings to you, which is what we have already marked, the criminal proceedings in Danielson; do you recall that, sir?

A Yes.

Q Okay. And that such conduct violates the -- specifically Section K of the university's policies, "which prohibits conducting oneself in any manner, which is offensive, abusive, or contrary to common decency or morality," and S," as in Sam, "which prohibits conviction of a crime." Now, then Dr. Taylor makes extensive findings in this, which I will not read to you, but they also note that you had prior work-related misconduct that's on Page 3. It says, "Prior Disciplinary Record," and it says, "On September 20,





2006 you agreed to serve a fifteen-day unpaid disciplinary suspension for threatening and abusive conduct towards your supervisors and others during and after a work-related social function. This incident resulted in criminal charges and ultimately a criminal conviction on June 26, 2007. By the terms of the disciplinary agreement you and your bargaining agent acknowledged that further conduct of a similar nature would be cause for discipline up to and including dismissal of your employment." Do you recall that prior discipline?

A I remember this letter, yes.

Q Do you recall your prior discipline, sir?

A Yeah. Talked about it, yes.

Q Okay. Now, after you received this letter of termination, which was also sent to Diane Matta of UCPEA, did you ask the union to take any action about it?

A I don't remember.

Q You didn't ask the union to file a grievance?

A No, I didn't ask probably.

Q Well, do you remember attending a meeting of UCPEA where you came in person and asked them to challenge your dismissal?

A I don't remember the whole procedure.




Q I understand that, sir. I'm asking you though do you remember going in person and meeting with the members of UCPEA, the union officials, and telling them --
A With HR, yes.
Q No, no. Not HR, sir. I'm not talking about human resources.
A Yes, yes.
Q Let me ask the question again so our transcript is clear.
A Go ahead.
Q Do you recall after your dismissal you went to the union, the UCPEA, board and met with them in person and told them you wanted them to appeal, to file paperwork to stop your termination from UConn. Do you remember doing that?
A Yes.
Q Okay. And what was their response?
A They said they can do nothing because HR is -- they have to protect university more than me.
Q That's what UCPEA told you at that time?
A Yes.
Q Did UCPEA --
A Peggy and, uh, Diane say they cannot do anything.
Q Did -- when we say "Peggy," we're referring to





Peggy Beckett-Rinker?

A Uh, the vice president of UCPEA.

Q Okay. Peggy Beckett-Rinker?

A I believe.

Q Okay. And when we say "Diane," we're referring to Diane Matta?

A Yes, ma'am.

Q Okay. Did Peggy Beckett-Rinker and Diane Matta tell you that because you had prior discipline that you agreed to of the three weeks suspension, that the university could terminate you because you had -- you were in trouble again in a short period of time?

A I don't remember that.

Q You don't remember that. If Peggy Beckett-Rinker says that's what she told you -- let me just ask you -- would you say she's lying?

A No, I don't say she's lying, but it seems like the procedure they have to go through. She said she cannot do anything because of the procedure of UConn. She has to protect HR and the university more than me. I said, I am in the union, um, part of union and she said it's hard, you know.

Q Okay. So after you were terminated from UConn, did you apply for unemployment compensation?

A No.

Q Now, you were terminated from UConn on March 19, 2008?

A Yes.

Q Where have you worked since then?

A I haven't been working because I cannot get job.

Q Now, you -- when did you file your complaint to the Commission on Human Rights and Opportunities about what happened at international services?

A About the abuse?

Q When did you file your complaint?

A When?

Q Yes, sir.

A 2006, I believe.

Q Would it be October 6, 2006 after you entered into the agreement to return to work with the three week suspension?

A I don't remember the dates. I believe it's October.

Q Of 2006?

A Yes.

Q Okay. And you never amended your complaint or added anything to that complaint at the CHRO, did you?

A I was -- I was talking generally. Not -- the question was, I'm sorry?

Q Let me ask you again.





A Yes.
Q You understand --
A Let me sit a little bit closer, excuse me.
Q Okay. When I say "CHRO," I'm talking about the Commission on Human Rights and Opportunities?
A Yes.
Q Okay. Did you ever file another complaint with the Commission on Human Rights and Opportunities after the October, 2006 complaint?
A No.
Q Okay. Did you represent yourself in regard to that complaint, sir?
A Say again, ma'am.
Q Did you represent yourself in regard --
A Yes.
Q -- to that complaint?
A Yes, ma'am.
Q Was the investigator on your compliant Patrick Chow?
A I remember him, yes.
Q Did you tell Mr. Chow that you had an attorney -- have someone call and say that they were your attorney on that complaint?
A Yes.
Q And that person who called, who was that?





A Vinnie Coyle.
Q Okay. Did anyone else call and say that they were an attorney on your behalf?
A I'm not sure Patrick called.
Q Did you ask anyone to call and say they were an attorney representing you who was not an attorney in Connecticut?
A No.
Q Okay. Now, Vinnie Coyle was the human rights attorney you said --
A Yes.
Q -- from New York? Okay. He wasn't representing you, was he?
A No.
Q Okay. I am going to show you something I have marked Exhibit 9.
A Yes.
Q And ask you to look at this.
A (Witness complies.)
Q Just to be clear, it starts with an e-mail exchange from, uh, June 19, 2000, 4:35 p.m.
A Yes, ma'am.
Q Okay. Have you ever seen this before, sir?
A No.
Q You've have, okay. Well, then I will ask you

some questions. It says that it's to [REDACTED] at [REDACTED], dot, org. And it says, "Subject, Afghan refugees with statutory bar -- statuary bar, S-T-A-T-U-A-R-Y". And it says it's from [REDACTED], "[REDACTED] at G-R-I-S, period, Grad, G-R-A-D, period, UConn, period, EDU." And it says, "I'm urgently looking for assistance in advocating on behalf of an Afghan refugee family that I have had close association with for the past twelve years." And it says, "[REDACTED] is a US citizen who received political asylum in the US in 1987, when brought here by Heal the Children, as a disabled mujahadeen" --

A Mujahadeen.

Q " -- mujahadeen in 1986. I was one of his sponsors and advocates." Is there any part of that paragraph that you think is incorrect?

A No.

Q Okay. So if this is from [REDACTED], he was saying that he was one of your sponsors to come to Heal the Children and he was your advocate.

A That's what he represents himself, yes.

Q Okay. Well, did he sponsor you to come to the United States?

A No.

Q Okay. Did you come here as part of Heal the




Children?

A Yeah, part of the government I repeated previously, under the U.S. government.

Q By Heal the Children Program?

A Yes, then they -- when I enter here, then they become my sponsor to take me around for treatment.

Q Okay. How old were you when you came to the United States?

A Nineteen.

Q Nineteen. Okay. On the next paragraph says, "[redacted]s father, widowed sister and two brothers (one with a wife and children), fled Kabul for the last time at the fall of the coalition government with the takeover by the Taliban."

A Yes.

Q Is that statement accurate?

A Yes.

Q Okay. Now, if you go down to the bottom, it says -- it talks about your -- were you seeking your family to come to the United States?

A I apply for petition, yes.

Q Okay. And did you ask [redacted] to speak to Senator Dodd's office for you?

A Yes.

Q And this e-mail says -- and I'm at the bottom




under "Current Status - Definition of Problem, I assisted [redacted] in the sponsorship of his family for resettlement to the US. The family has been registered as UN refugees and have passed the subsequent prescreening process by ICMC for referral for US Resettlement." Is that accurate?

A No.

Q Okay, what is inaccurate about it?

A I never did it, so...

Q Who never did it?

A I mean, this is not accurate information.

Q And so what part of that -- those sentences, "I assisted [redacted] in the sponsorship of his family for resettlement," is that accurate?

A Yeah, my family is in Afghanistan, not here.

Q No, I'm asking you that specific question. Is that sentence accurate, "I assisted [redacted] in the sponsorship of his family for resettlement to the US"?

A I don't remember that.

Q Okay.

A Because resettling is trying to --

Q Let me ask you specific questions.

A Go ahead.

Q The next sentence, "The family has been registered as UN refugees and have passed the subsequent





prescreening process by ICMC for referral for US resettlement." Is that accurate?

A No.

Q What is inaccurate about it?

A Because they've been in there, in a counselor or -- they never had a meeting this those.

Q Were they registered as UN refugees?

A Uh, no.

Q Okay. And it says, "In about July, 1999, the family was rejected based on 'falls outside criteria.'" Was your family rejected based on falls outside criteria?

A I don't remember.

Q Okay. Now, if you go to the last paragraph on that page, it says, "Upon congressional inquiry," --

A The last or the first?

Q The last paragraph on that page.

A This are two pages.

Q First page, last paragraph.

A Okay.

Q Okay. "Upon congressional inquiry, we learned that [redacted]s file had a statutory bar. Informally, we understand that the bar is based on allegations that [redacted] participated in oppressive activities or other HR violations," human rights violations. Was [redacted] your





brother?

A Yes.

Q Okay. And to your knowledge, was he accused of human rights violations?

A No.

Q Okay.

A He's a lawyer, and so I am not sure how he's -- he is a lawyer himself.

Q In the United States?

A No, overseas.

Q Is [redacted] in the United States?

A No, he's not. This family is not here.

Q Was he denied permission to enter the United States?

A I don't know. The whole family is not here. They talk about it this, I'm not sure.

Q You don't know whether [redacted] has applied?

A No.

Q And [redacted] helped you try to bring [redacted] over, didn't he?

A No.

Q Okay.

A No. No one brought anyone.

Q You didn't -- [redacted] didn't help you?

A No, he didn't bring any family here.

Q Did he help you bring -- try to help you?
A Yeah, I think he was trying, yes.
Q Okay.
A Yes. Because I apply for petition for my family because I became citizen.
Q No question pending, sir.
A Thank you.

(Thereupon, the reporter marked Letter, 8/24, 2000 for identification as Exhibit No. 10.)

Q (By Ms. Brouillet) I will ask you if you recognize that letter from August 24, 2000, To Senator Dodd and it says "[redacted]" and "[redacted]" at the bottom.
A Yes.
Q That's your signature, sir?
A Yes.
Q Now, August 24, 2000, at that time, were you touching [redacted]'s vagina?

MS. GARDNER: Object to the form.

You can answer.

THE WITNESS: I don't remember.

Q (By Ms. Brouillet) Okay. And so was [redacted] [redacted] trying to help you with the US government to bring your relatives, [redacted] and his family, to the



Brandon Smith Reporting & Video
860-549-1850 production@brandonreporting.com 249 Pearl Street





United States?

A No. Part of the procedure in the --

Q It was a simple question, yes or no. Your answer is no?

A Yes.

Q Let me ask it again so that it is clear. Was [redacted] attempting to help you bring your -- [redacted] and his family to the United States?

A Yes.

Q Okay. And did you ask [redacted] to write this letter for you?

A I believe so, yes.

Q Okay. And did you draft this letter or did [redacted] draft this letter? How did it come about?

A I don't remember.

Q Okay.

A Thank you.

Q We talked a little bit earlier about your damages and I want to be clear, you -- did you -- what did you plead in regard to the breach of the peace charges related to the May 5, 2006 incident at Friendly? Did you plead guilty?

A Yes, ma'am.

Q Okay. And as a result of that --

A I'm sorry, it is not guilty. They call no con...

Q No contest? Nolo contendre?
A Yes.
Q Okay. Did you agree with your union to accept a three week unpaid suspension as a result -- as a discipline at UConn for that?
A Yeah, I did, yes.
Q Okay.
A I remember, yes.
Q And that was what -- the suspension we talked about earlier, that you agreed to in September of 2006?
A Yes.
Q Okay. Are you claiming as part of this lawsuit that you should not have received that three week suspension?
A This is part of the procedure at UConn. They --
Q No, no. Listen to the question, sir. You're not answering the question. Are you claiming as part of your lawsuit --
A No.
Q Let me just ask it so that she's clear, okay?
A Okay.
Q Are you claiming as part of this lawsuit you should not receive -- you should not have received the three week suspension?
A No.





Q Okay. As part of this lawsuit against UConn, are you claiming that they should not have terminated you on March 19, 2008?

A Yes.

Q And you -- what were the reasons they terminated --

A Can I have the question -- I'm sorry.

Q Okay.

A Maybe I said wrong.

Q We agree that UConn terminated your employment on March 19, 2008. Correct?

A Yes.

Q And went through -- and I'm happy to show it to you again -- the letter from Ronald Taylor --

A That's fine, yes.

Q Okay. About why you were terminated, the incidents at work in 2007 and then your conviction on January 18, 2008.

A Yes.

Q And you could not work -- you could not have contact with anyone under age eighteen, other than your own children, following your conviction on January 18, 2008.

A Under sixteen, under sixteen.

Q Well, didn't the judge say under eighteen?





A Sixteen.

Q Okay. Let me show you Exhibit 5.

A That's fine.

Q Let me -- no, I just want to make sure that we're accurate, because we talked about this earlier. No unsupervised contact with minors except own children.

A Okay.

Q And so minors would be under age eighteen?

A No clue.

Q Okay. So if we were to assume that you turn -- you stop being a minor, you become an adult, at age eighteen, then the order would be anyone under --

A That's fine.

Q -- eighteen. Correct?

A You're right.

Q So after your criminal conviction you could not have any contact with any children under age eighteen after January 18, 2008 for ten years.

A Yes.

Q Okay. And so one of the reasons UConn listed, besides the violations of the policies for what occurred at work in 2007, was you had this conviction. And Dr. Taylor writes you could not perform the essential functions of your job because you could come into contact with people under age eighteen at UConn.





A Right.

Q And so you were let go from UConn. You were dismissed.

A Yes, ma'am.

Q Are you claiming that the dismissal from UConn on March 19, 2008 --

A No.

Q Let me finish. Was part of your damages in this case?

A No.

Q Okay. And so you are not claiming you were wrongfully dismissed?

A Right.

Q Okay. That cuts a lot of questions.

A (Witness laughing.)

MS. BROUILLET: Let me just -- off the record.

THE VIDEOGRAPHER: Off the record, 12:13.

(Discussion held off the record.)

THE VIDEOGRAPHER: On the record, 12:13.

Q (By Ms. Brouillet) Now, in your complaint to the Commission on Human Rights, the CHRO, you complained about unwanted sexual advances by your supervisor [redacted] [redacted] from 2002 to May of 2006.

A Yes, ma'am.

Q Excuse me. And you didn't include anything after that date. So am I clear that the period of time that you're claiming [redacted] [redacted] mistreated you was some time in 2002 until May of 2006?

A Yes, ma'am.

Q Okay. And since you told me earlier in your testimony that the date you last worked with [redacted] [redacted] was May 5th, 2006, would it accurate to say 2002 to May 5, 2006 would be the last date?

A No, it would be May 8, 2006.

Q Okay. On May 6, 2008 --

A That was Friday.

Q Let me just finish.

A Go ahead.

Q On May 6, 2006, were you arrested?

A Yes, ma'am.

Q And were you ordered not to have any contact with Mr. [redacted] as part of your arrest by the UConn police?

A No.

Q You weren't?

A No.

Q And it was a Friday that you were -- it actually Saturday morning, right, early?

A No; Friday. Friday night.

Q You were arrested after midnight, correct, and so




by then it was May 6th?
A Saturday, yes, you're right.
Q Okay.
A May 6th and I returned back to work May 8th.
Q And as soon as you returned back to work on May 8th following your arrest, weren't you put out on paid administrative leave while your conduct was investigated?
A What I entered was, I believe, around -- the time wise you're asking me?
Q I'm trying to get a time frame.
A Okay.
Q As soon as you returned to work --
A Yes.
Q -- following your arrest on Saturday morning, Friday night, Saturday morning --
A Yes.
Q -- weren't you immediately put on paid leave and told to leave UConn, you can't work here until you're allowed to return after an investigation?
A No, it wasn't. I returned to work.
Q Yes. And when you returned to work at that time --
A Yes.
Q -- weren't you given a letter that you were not

to return to work until they completed your investigation?

A I believe it was around 11:30 they gave me a letter.

Q And wasn't it Boris Brava-Ureta who gave you the letter?

A No.

Q Who was it?

A [redacted].

Q Okay. And what time did you report for work that day?

A I came, uh, 8:00.

Q Okay. And the letter was telling you you were on paid leave from UConn until they -- while they investigated, because you had criminal charges pending?

A Do you want me to tell you the whole --

Q No, I'm asking you --

A -- thing or just simple?

Q -- the letter was about you being put on paid leave --

A Paid.

Q -- while they investigated?

A Yes.

Q All right. And the next time you returned to work at UConn wasn't until October 5th or 6, 2006. You




stayed out all that time on paid leave?
A October -- I don't believe -- I don't remember the exact date.
Q Mm-hmm.
A I know I returned back to work.
Q In October, 2006?
A I believe so.
Q Okay. Because you didn't return back to work at UConn until after the union and you signed the agreement, stipulated agreement, on September 27, 2006 accepting a three week suspension without pay. Correct?
A Yes.
Q Okay. So does October, 2006 sound about right?
A I don't exactly know the date, but you're right, yes.
Q But you weren't at work after 11:30 on May 8, 2006 until at least some time after September 27, 2006?
A No. No.
Q Okay. But you were getting paid during that time by UConn?
A Yes, because -- it -- two things -- two things happened.
Q No, I am not asking what happened. I am only asking if you got paid.
A Yes, yes.




Q Okay. When was the last time you claim [redacted] [redacted] had sex with you?
A It was my birthday, March 27, 2006.
Q Okay. So would it be accurate to say that the time period that you're claiming that [redacted] [redacted] had unwanted sexual advances towards you was 2002 to -- I'm sorry, was it May -- I'm sorry, was it --
A May 2006.
Q I'm sorry, when was your birthday though?
A March 27.
Q Okay. But you just told me the last time he --
A May.
Q -- was your birthday?
A March 27.
Q Okay. After March 27, 2006, that was the last time that he made sexual advances, right?
A Yes.
Q Okay. And so the time period in which he had sexual advances, not when he worked with you, was 2002, to March 27, 2006; is that accurate?
A No, 2006, May 2006. The last day I left -- the last day --
Q Well, let me ask you a question.
A Yes.
Q I asked you the last day you had unwanted sexual





advances by [redacted] and you said it was your birthday.

A You asked me --

MS. GARDNER: Object to form. That's not what he said.

MS. BROUILLET: Okay.

Q (By Ms. Brouillet) Let me ask you this, when was the last time that you had sex with [redacted]?

A Sex with him in March, 2006, my birthday.

Q March 27th?

A Then the --

Q Let me ask you --

A Yes.

Q -- another question then. And when is the last time you're claiming that he made sexual advances towards you?

A May, uh, 2006 -- sorry. May -- I know the date. Because of the last day for me my -- my work, May 8, 2006.

Q And so between 8 a.m. and 11:30, [redacted] made sexual advances towards you?

A Yes.

Q Okay. And what happened that day?

A He came to -- first thing, I came 8:00 in the morning. I said good morning --

Q Yeah.
A -- to everyone, staff.
Q Let me stop you. Instead of the narrative, let me ask you this. What times -- did you have sex with him?
A Uh, it was touching. He --
Q No, no. Did you have sex? Do you understand what I mean?
A Like, intercourse?
Q Well, let me ask you --
A That day no intercourse.
Q Okay.
A It was touching, holding me.
Q Touching of what?
A Huh?
Q He touched what?
A Touching my shoulder, he hold he (indicating). He said he --
Q Well, wait. You're putting your arms around yourself. Did he hug you?
A Do you want me to say completely sentence or just say --
Q I want -- when you say "touching me," the reporter is taking down touching me and you're making hand gestures of, like, a hug.





A Sexually, yes.
Q No. Sexually can cover a lot of stuff, and so I'm asking for detail. Did he give you a hug?
A Yes.
Q Okay. And when you say he touched you, what body parts of his touched you?
A He touched my shoulder.
Q No, no. What body parts of his touched you?
A In his -- the whole body, holding me.
Q He gave you a hug?
A Yeah, he was holding me, yes.
Q Did he put his --
A He said I'm very --
Q -- penis anywhere in your body?
A I'm sorry?
Q Did he put his penis --
A Yes, on my shoulder.
Q He put his penis on your shoulder?
A No, not penis.
Q Okay. That's my question.
A Okay.
Q Did he put his penis anywhere on your body?
A No.
Q Okay.
A His body was close to me, yeah.





Q Okay. So --

A Do you want me to say the whole sentences?

Q No. I'm trying to get -- I'm trying to get a description from you of what body parts. You said his whole body.

A You don't let me explain it to you.

Q I'm going to ask you questions so that we're clear.

A I'm sorry.

MS. GARDNER: And just so we're clear, at the end, I can ask you more questions.

THE WITNESS: Okay. Okay. Sorry.

Q (By Ms. Brouillet) And so he hugged you?

A Yes. He hold me -- held me, yes.

Q When you say he held you, in an embrace?

A Um, he was holding me. He said very --

Q No, no. I'm asking was it an embrace?

A Yes.

Q He didn't have you in a headlock or something like that?

A No.

Q Okay. And what were you doing while he embraced you?

A I was sitting at a desk. First he came --

Q No, I'm asking you -- I asked what you did, not





what he did.

A What I did?

Q What you -- when he embraced you, what did you do?

A I told him to stop.

Q Okay. Did you push him?

A Yes.

Q Okay. And did he stop?

A No, he said he loved me. He's in love with me.

Q Okay. And so he continued to embrace you?

A Yes.

Q Okay.

A He was holding me.

Q And how long did this embrace take?

A He talk almost two hours.

Q No, no. I didn't ask for how long he talked. I said, how long did the embrace take?

A Maybe ten minutes.

Q He embraced you for ten minutes?

A Yes.

Q Did he touch you again in an unwanted sexual manner that day?

A He was...

Q Touch, touch.

A What kind touch?

Q Unwanted sexual manner. I don't care if he shook your hand.
A Yeah, he touched me, yes.
Q Okay. In an unwanted manner?
A Pretty much, yes.
Q What did he do that was unwanted that day?
A He would hold me very hard like usual. He said he --
Q No, I am asking not what he said.
A That's a part of --
Q I'm asking you what he did.
A That's why he was touching my shoulder, my tie and he was held me.
Q Was that during that ten minutes that he embraced you?
A Yes.
Q Okay. After the ten minutes --
A Okay.
Q -- we're passed the ten minutes, what else did he do that you didn't want him to do as far as touch that day?
A I told him --
Q No, not what you told him. What did he do as far as touching?
A As part of touching?

Q Touching.
A He was talking.
Q That's not touching, sir.
A Oh.
Q Let me -- focus on the question.
A Okay.
Q I am asking you what did [redacted] [redacted] do that day, May 8th, 2006 --
A He held me --
Q -- between -- hold on. Between 8 a.m. when you appeared and 11:30 when you left work. What did he do other than embracing you for ten minutes, and you told me that he touched your shoulder and your tie.
A Ma'am, you don't --
Q Hold on. I want to know about [redacted] [redacted]'s touching. Not what he said, not what you said or did.
A Okay.
Q Tell me about the touching. What else did he do besides that --
A He touched my shoulder. He came up behind me. He massage my shoulder. I told him to stop.
Q Not -- I'm not asking you what you told him.
A Okay. He told my shoulder.
Q Yep.
A And he touched my tie and I stood up. He --

Q I'm not asking what you did. Anything else that you did?
A That's it.
Q Okay. Was that in addition to the ten minutes of embracing you or at the same time?
A This is the same time.
Q Okay. And so there was ten minutes of unwanted touching --
A Yes.
Q -- on May 8, 2006 between 8 and 11:30 a.m.?
A Yes.
Q And that's the last contact you had with [redacted] [redacted]?
A Yes, ma'am.
Q Okay. And when in 2002 did these unwanted sexual advances start?
A I am sorry?
Q When in 2002 did these unwanted sexual advances start with [redacted] [redacted]?
A I don't know exactly the date.
Q What month?
A What month?
Q What month?
A I don't remember the date, but, uh, you know, it happened a lot of times.

Q Well, give me the month, if you can.

A It usually most of the time happen on my birthday.

Q Which is March?

A Yes.

Q Okay. And so anything before March --

A When --

Q -- 27, 2002?

A When I became full-time, and that's 2001.

Q So now you're saying it happened in 2001?

A I'm sorry, 2000.

Q 2000?

A Yes.

Q So --

A When I was working at UConn, special payroll, it started and then...

Q Who Robert Chudy?

A He was my supervisor.

Q And did Mr. Chudy report to Boris Bravo-Ureta?

A Yes, ma'am.

Q Okay. And did -- who was that Herbertia Williams?

A Herbertia Williams was, uh, she was advisor for immigration visa. Or they call H worker.

Q And she supervised your work, too, didn't she?





A Very short time.

Q Would that be, yes, then? She supervised your work?

A Yes, ma'am.

Q And so it is your testimony this morning that ███ ███ began unwanted sexual advances to you in 2000? Because before you told me 2002, and so I want to be clear.

A 2000 when I was a special payroll.

Q Okay.

A When --

Q Let me just get the days straight so that I know what to ask you.

MS. GARDNER: Well, Nancy, can I just interrupt?

MS. BROUILLET: Yep.

MS. GARDNER: Because I think that he's try to get the date and he's starting to kind of think out loud and then you keep cutting off.

Q (By Ms. Brouillet) Well, don't think out loud. Think in your head because it's very unclear for the transcript. And so I'm asking a very simple question.

MS. GARDNER: The only thing that is unclear is that you keep interrupting him. He's trying to remember when it started.





Q (By Ms. Brouillet) Well, then don't think out loud. Your CHRO complaint said that it started in 2002. We have an end date, May 8, 2006. I need to get the start date of these unwanted sexual advances.

A 2000, I believe.

Q 2000?

A I believe, yes.

Q Before or after you stopped touching [redacted] [redacted]'s vagina?

MS. GARDNER: Object to the form.

Go ahead.

THE WITNESS: I don't remember.

Q (By Ms. Brouillet) Do you recall [redacted], [redacted], an advanced practice nurse?

A From where?

Q Would that mean you do not recall her?

A I don't know.

Q Do you know of a [redacted] who provided medical treatment to you as part of Dr. [redacted]'s office?

A I don't know, no.

Q You don't know?

A No.

Q So if Dr. [redacted]'s records say that you were treated sometimes by an advanced practice work by the name of [redacted], you don't recall her?





A I don't remember her name.
Q Okay. Do you recall being treated sometimes by an advanced practice nurse at Dr. [redacted]s office?
A Yes, ma'am.
Q Okay. You just don't recall her name?
A Yeah.
Q Okay. Do you recall when you first started treating -- withdraw the question.
You told me earlier you first started treating with Dr. [redacted] in 1998, do you recall that?
A Yes.
Q Okay. And do you recall when you first treated with Dr. [redacted], what did you tell him about having problems with intrusive thoughts or nightmares?
A I don't remember that.
Q Well, do you recall having intrusive thoughts or nightmares in 1998?
A I don't think I have a nightmare then, no.
Q So if Dr. --
A I don't remember it, sorry.
Q Well, let me ask you this then, if Dr. [redacted]s records indicate that he discussed with you problems you were having with intrusive thoughts and nightmare and thoughts about the war in Afghanistan, would his records be inaccurate?





A I never -- I never thought about these war or anything. I don't have any nightmare in the war, no.

Q So are you telling me that Dr. [redacted]s medical records from 1998 would be inaccurate?

A I don't remember the specific, sorry.

Q So is it fair to say you can't say whether they are accurate or inaccurate?

A No, I don't know. I'm sorry. I don't remember.

Q Okay. And so you don't remember --

A Yes.

Q -- what you told Dr. [redacted] in 1998?

A Right.

Q Okay. And when did you have surgery at Yale for your gunshot wounds?

A I never got treatment from Yale. One time only, I guess.

Q Well, didn't you have surgery to your hip in 1994 at Yale?

A I got infection, yes.

Q Okay. And didn't you tell Yale that your injury to your hip and leg were due to gunshot wounds?

A Yes.

Q Okay. And did that treatment and infection leave you with hip problems?

A Yes.

Q And do you have a problem with your [redacted] different?

A Yes, [redacted].

Q What is your date of birth?

A Uh, [redacted], ma'am.

Q And where were was born?

A In Kabul, Afghanistan.

Q Where do you currently reside?

A [redacted] [redacted], Connecticut.

Q Do you own that home?

A Yes, ma'am.

Q Who lives with you?

A My wife and three children.

Q What [illegible]

A My three children.

Q How old are your -- what are the ages of your children?

A My children is, uh, my oldest son is ten, and my middle one is six and two. It's blessed.

THE REPORTER: I'm sorry, it is blessed you said?

THE WITNESS: Blessed from God.

THE REPORTER: Thank you.

Q (By Ms. Brouillet) And what are names of your three children?





A The first one is [redacted].
Q Can you spell it, please?
A [redacted] -- I'm sorry, did I spell it right? [redacted].
Q Okay.
A And first one is silent H, it's [redacted], [redacted].
Q Okay.
A Silent.
Q And the two year old?
A [redacted], [redacted].
Q Okay.
A Lovable.
Q They're all boys?
A All boys. Blessed.
Q And what's the date of your marriage?
A 2000.
Q When in 2000?
A I'm sorry?
Q What date in 2000 or what month?
A Um, January, 2000.
Q Who was the best man at your wedding?
A It was, uh, five people.
Q Well, wasn't [redacted] [redacted] the best man?
A One -- one of them [redacted] [redacted] came, yes.





Q Yes.

A Jesse -- what Jesse?

Q Well, Jesse is mentioned in your medical records, and I wasn't sure if Jesse -- is Jesse a man or woman?

A I don't know who is Jesse. I'm very sorry.

Q Well, in your medical records from your counseling, it says that you have been dating Jesse -- this is in 2010, and Jesse has asked -- have you ever had discussion --

A Oh, Jesse the person who does -- yes, I know Jesse.

Q What is Jesse's last name?

A I don't know.

Q Is Jesse a man or woman?

A A woman.

Q A woman. And your records from the Center say that you were dating Jesse; is that accurate?

A No.

Q Okay. What did Jesse ever say to you about you believing your wife and children for her?

A I don't remember that.

Q Okay. And so if it says in your medical records that Jesse -- you had been dating Jesse, that would be untrue?

A Yes.

Q Okay. And if it says in your medical records that you were thinking of leaving your wife for Jesse, that would be untrue?

A I don't remember.

Q Well, I know you don't remember, but what were you thinking -- were you thinking of leaving your wife for Jesse?

A No.

Q Okay. And if it says that in your medical records, your medical records are --

A Which medical record, ma'am?

Q Well, I'm just asking you, if it says it in your medical records, that's not true?

A No.

Q Okay. And was Jesse having problems with Department of Children and Families, DCF?

A I believe so.

Q And how many children does Jesse have?

A I don't know. One, I believe.

Q And you ever discuss Jesse with Joseph Salafia, your counselor?

A One time, I mention, yes.

Q Okay. And what did you tell Mr. Salafia about Jesse?

A She asked me to date her, take her out, and I

said no.

Q Where did you meet Jesse?

A I'm sorry?

Q Where did you meet Jesse?

A Um, I meet her in the store, which I was going with my family regularly, uh, State Ocean Lot. I was with my wife and kids.

Q And did you see Jesse after that?

A I saw her around town, yes.

Q "Around town" meaning Willimantic?

A CT Work. Most of the time CT Work because I was looking for a job -- she was looking for a job.

Q And is that where Jesse asked you out?

A Uh, yes.

Q And when did she ask you out?

A I don't remember. That was, like, five months ago or something.

Q Okay. Have you been in the military?

A Yes.

Q And how long were you in the military?

A I believe it's four years.

Q And--

A Three years.

Q Did you learn hand-to-hand combat?

A Yes.





Q Did you learn to use weapons?
A Yes.
Q And what weapons have you used?
A I've -- machine gun.
THE REPORTER: I'm sorry, I what?
THE WITNESS: Machine gun.
Q (By Ms. Brouillet) Anything else?
A Anti-aircraft.
Q Anything else?
A Tank, helicopter.
Q Anything else?
A That's it.
Q Have you ever been a member of the Taliban?
A No.
Q Have you ever killed anyone?
A In the war, yes, ma'am.
Q How many people have you killed?
A I didn't count.
Q More than ten?
A I don't remember, ma'am.
Q Are you able to estimate how many people you killed?
A I don't remember.
Q And so would that be, no, you can't estimate?
A No, ma'am. When you are in a war, how are you





going to -- you're going to protect yourself, right, and your homeland and your children.

Q Has anyone attempted the kill you?

A Yes.

Q Okay. Um, when you killed, what methods did you use?

A Method for freedom?

Q No, methods. Like, do you use a gun? Or a knife? Or your hands?

A Usually, soldier use gun, machine.

Q I'm not talking about soldiers. I'm talking about you particularly.

A Machine gun.

Q A machine gun.

A For killing...

Q Did you ever use a knife to kill anyone?

A No, never did it.

Q Okay. Tell me about your participation in Afghanistan in punishing a pregnant woman who converted to Christianity?

A I'm sorry?

Q Have you ever participated while you were in Afghanistan in punishing a pregnant woman who converted to Christianity?

A I'm not sure what you're asking me, this

question.

Q Well, have you ever told anyone that you participated in punishing a pregnant woman who converted to Christianity?

A No clue, ma'am.

Q No, you have not told anyone that?

A I don't know this question. It doesn't -- it doesn't want make sense to me.

Q Okay. Have you ever witnessed a child being cut from a pregnant woman in Afghanistan?

A Yes.

Q And how old were you then?

A I was probably eighteen.

Q And were you part of the group who was cutting that child from the --

A No, no, no. It's -- translating it back. During the war, Society Union war I'm talking.

Q Okay. I am asking you this question, you witnessed a child being cut -- a baby --

A By a Russian.

Q -- being cut from a woman?

A By a Russian soldier, yes.

Q Let me finish. And so it wasn't -- this cutting of the child from the womb wasn't by Afghanis?

A No.

Q Okay.

A The Russian.

Q Have you told anyone that you --

A I'm sorry. Hold on one second. I have to correct this. You asking me during the war. You are not asking me in present or are you --

Q Yes, I'm asking you while you were in Afghanistan.

A Okay. That's at war.

Q Let me -- listen to my question.

A Yes, ma'am.

Q While you were in Afghanistan, you witnessed a baby being cut from a pregnant woman?

A Women, children, animals, yes.

Q Okay.

A Yes.

Q And I'm asking you this, have you told anyone at UConn at any time that you participated in cutting the baby from a pregnant woman?

A No.

Q And Afghanistan --

A Yes, ma'am.

Q -- did you ever have anal sex with men?

A No.

Q Did you ever have oral sex with man?





A No.

Q Did you ever tell anyone that while you were in a refugee camp in Afghanistan, you had anal sex?

A I never been in a refugee camp. No.

Q While in Afghanistan before you came to the United States, were you ever a prisoner?

A No.

Q You never claimed to have been a prisoner held by --

A Government, yes.

Q Hold on. You've never -- well, let me ask the question again. While you were in Afghanistan, were you ever a prisoner?

A Yes.

Q Okay. And when were you a prisoner?

A When I was --

Q I am looking for years.

A The years, I don't remember the years.

Q Well, you came to the United States when you were nineteen. Correct?

A Yes, I was against the Soviet Union. I was from city (phonetic). And so I was -- my family was very active --

Q That's not --

A I got to give sentence first --





Q. No, you're not giving me the -- let me be responsive. We don't think out loud.

MS. GARDNER: Okay. Nancy --

MS. BROUILLET: No.

MS. GARDNER: No, no, no --

THE REPORTER: One at a time.

MS. GARDNER: Maybe it is time to take a break.

MS. BROUILLET: All right. I have a question pending though.

THE WITNESS: Okay. No, I answer.

Q (By Ms. Brouillet) Let me finish the question. And let me be --

MS. GARDNER: He's trying to answer you.

MS. BROUILLET: No, he's trying to do --

MS. GARDNER: You keep cutting him off.

MS. BROUILLET: -- editorial comments, and that's not what's going to happen.

MS. GARDNER: Okay. Wait. I want to say something on the record.

MS. BROUILLET: Go ahead.

MS. GARDNER: This is a gentleman, English is not his first language, and he is trying to testify. This is very stressful. You're asking him questions on very stressful topics.




THE WITNESS: The war.

MS. GARDNER: If he needs the think out loud for a minute, let him think out load.

MS. BROUILLET: Let me be clear, Counselor, this is a gentleman who has worked in the United States for years, who is very sophisticated, who speaks to you in English, spoke only English at UConn as part of his job, and I'm trying to get clear testimony from someone who has been through not only the civil process before, but the criminal process.

MS. GARDNER: Just ask him the question again but if --

MS. BROUILLET: I will.

MS. GARDNER: -- he needs to -- don't cut him off.

MS. BROUILLET: Let me be clear --

MS. GARDNER: Let him get to the end and then let you say that wasn't responsive. It's not appropriate for you to be cutting him off before he finishes.

MS. BROUILLET: We're going to be wasting more and more time on this deposition if he doesn't respond to the question. And so let me --

MS. GARDNER: He's been doing a terrific job responding to your tedious questions.





MS. BROUILLET: That is your opinion, Counselor.

MS. GARDNER: Yes, it is my opinion.

MS. BROUILLET: And so let me be clear, I am asking for a date.

MS. GARDNER: Ask the question.

Q (By Ms. Brouillet) Sir, what date, date, were you a prisoner in Afghanistan?

A Probably I was in, uh, high school.

Q Dates, sir. What date were you in high school then?

A 1981.

Q While you were a prisoner --

A Yes, ma'am.

Q -- is it your testimony --

A No, I was not prisoner. It's temporary prisoner. Okay. Go ahead.

Q While you were a prisoner in Afghanistan --

A Yes, ma'am.

Q -- did you ever engage in anal sex?

A No, ma'am.

Q Did you ever tell anyone at UConn or any of your doctors that you were forced to engage in anal sex while in Afghanistan?

A No, ma'am.

MS. BROUILLET: Do you want to take your break now or do you want me to go --

MS. GARDNER: Are you okay to keep going?

THE WITNESS: No, I keep going, but -- excuse me, may I say one thing?

MS. BROUILLET: No.

THE WITNESS: Thank you.

Q (By Ms. Brouillet) While you were in Afghanistan, did you ever engage in oral sex?

A No, ma'am.

Q Have you ever told you doctors that your father engaged in sex with you?

A No, ma'am.

Q Have you ever reported to your doctors or to anyone else that your father molested you as a child?

A No, ma'am.

Q Are you on the abuse and neglect registry for the Department of Children and Families?

A No.

Q Have you sued the Department of Children and Families?

A Yes, I have.

Q And when did you do that?

A Um, after the reported -- [redacted] reported and so they investigated my children. I told them welcome

and --

Q I'm looking for a date, sir. When did you sue the Department of Children and Families?

A The specific date, I don't know.

Q Do you know a year?

A I believe it is 2009.

Q Two thousand --

A I'm sorry, 2008, something.

Q Before or after you were convicted?

A Before.

Q And so you were convicted January 18, 2008, and so you think it was before January 18, 2008?

A Yes, ma'am, before that. I am very sorry, the dates.

Q Do you recall telling Dr. [redacted] in 2009 that it feels like I would go off and hurt someone?

A No.

Q Did you tell him that?

A No, I didn't.

Q And so if Dr. [redacted]'s report list that, that would be inaccurate?

A I don't know. I never say I hurt someone.

Q You never told him it feels like I would go off and hurt someone?

A No.





Q When did you first apply for social security disability?

A Uh, in 1988 -- no, I am sorry. 1993 or '91, I am not sure. Very long time ago.

Q And a some point in time did you have to renew your application for social security disability?

A No, because I work off and on, off and on.

(Thereupon, the reporter marked Complaint for identification as Exhibit No. 11.)

Q (By Ms. Brouillet) Sir, I am showing you what is Exhibit 11, the complaint that you filed in federal court. It is dated July 7, 2009. Do you recall seeing this?

A Yes.

Q If you turn to Page 2 --

A Yes, ma'am.

Q -- Paragraph 6.

A Uh-huh.

Q It says, Beginning in 2002 and continuing until May, 2006, 'Defendant Executive Director of International Services and Programs, (DISP) [redacted], who is plaintiff's immediate supervisor, subjected plaintiff to unwelcome sexual harassment." Do you see that, sir?

A Yes.

Q Now, I asked you earlier today when the unwelcome

sexual advances with [redacted] began, and you said 2000?

A Yes.

Q And so is your complaint inaccurate when it says 2002?

A I believe it is 2000, yes.

Q And so this is wrong?

A With the date -- between that time, between that time, yes.

Q Between what time, sir?

A Between 2000 and 2006.

Q So the date listed in your complaint is wrong. It's really between 2000 and May 8, 2006?

A To me -- do you want the give me one chance so I can explain this?

Q No, no. I'm asking this, what is the correct period of time? Just give me the correct period of time.

A 2000, that's why it started -- he said he's in with me.

Q No, I am not asking what he said --

A It is a sexual thing.

Q 2000 to 2006?

A Yes.

Q Okay. And we agree the last date was May 8th, 2006, according to your testimony?

A May, yes.

Q May 8th?

A May 8th, 2006, yes, ma'am.

Q Okay. And when did it begin in 2000?

A I don't know exactly the dates. It usually happened, I told you, on my birthday.

Q Okay. Did it begin in 2000 before or after you were touching [redacted] inappropriately?

A I don't remember, ma'am.

Q Okay. And it says in this Paragraph 6, "The harassment was severe, including forcing plaintiff to engage in both oral and anal sex with [redacted] in the workplace for a period of two and one half years."

A Yes, ma'am.

Q Do you see that?

A Yes, ma'am.

Q Tell me when that two and a half years occurred?

A In the office.

Q No, no, I want two and a half years, because you've given me a six year time frame, 2000 to May 8, 2006. And so tell me out of that six year period, when were these two and a half years?

A Two and a half years, most of them happened in the office.

Q No. You're certainly not understanding my

question. I'm not asking you where it happened. You complained to the --

A When you say?

Q -- federal court that -- here you put 2002, today it says 2000. And so between 2000 and May 8th of 2006, what is the two and one half year period you're referring to when [redacted] had you engage in oral -- or perform oral and anal sex? What's that two and a half years?

A It usually happened in the office a lot. Okay?

Q Sir --

A Let me --

Q No, I want you to give me dates. You can think -- take as long as you want to think. I want the two and a half year period so that I can focus on that time frame. What's the two and a half year period because that's what you put in to the court?

A And so you're asking me the dates?

Q I'm asking you --

A Yes.

Q -- not specific dates. We have May 8, 2006 as the last date.

A Okay.

Q And you didn't say that you had sex then.

A When is the beginning date?

Q Well, you gave me a six year time range.
A Right.
Q I want to know the two and a half years, because that's what your complaint says.
A Mm-hmm.
Q So I want to know the two and a half years during that six year period when you engaged in oral and anal sex?
MS. GARDNER: Object to the form of the question.
THE WITNESS: Okay.
MS. GARDNER: You can answer it.
THE WITNESS: Okay. 2000 is the started. He said he loved me. --
Q (By Ms. Brouillet) I'm not asking what he said.
A It's sexual. I'm not gay. I'm a straight man. Okay?
Q Let me ask you --
A I'm not gay.
Q Mr. [redacted], I never asked you if you're gay.
A I respect people --
Q Mr. [redacted], stop. Let me ask you this.
A Go ahead.
Q Is the two and a half year period accurate?
A Yes.

Q That's accurate?

A Yes, ma'am.

Q Okay. I'm not asking if you are gay, I'm not asking you what somebody said. I want dates. The two and a half year period you had anal and oral sex.

A Yes.

Q Dates.

MS. GARDNER: Object to the form of the question.

You can go ahead.

THE WITNESS: The dates?

Q (By Ms. Brouillet) Give me the dates, the time frame. You took six years that you said there were sexual advances.

A Mm-hmm.

Q You tell me the last sexual contact was March 27, 2006.

A Yes.

MS. GARDNER: Object to form of the question.

Go ahead.

Q (By Ms. Brouillet) You say two and a half years. Tell me the two and a half year period between 2000 and 2006 -- March 27, 2006. What is the two and a half year period that you engaged in anal and oral sex?





MS. GARDNER: Object to form of question.
Go ahead.
Q (By Ms. Brouillet) Take all the time you need.
A Because you don't give me a chance to explain it to you. I am sorry, ma'am. 2000, if you can go back to his love card in his e-mails, you can read it in 2000 how much he was in with me. And so it started talking, and sexual intercourse it started two and a half years.
Q One -- what year did the sexual intercourse start?
A Uh, probably 2001, because when I became full-time.
Q Okay. Sexual intercourse starts in 2001.
A Yes. Because when I became full-time, that's when --
Q Let me finish my question. Sexual intercourse starts in 2001. And you testified this morning it stopped March 27, 2006.
A Yes, ma'am.
Q And so tell me, because if it started in 2001 and we're going to 2006, we'll be talking five years. Give me the time frame when it happened for two and a half years?
A The sexual intercourse?
Q Yes.

A Okay.
Q Because that's five years.
A Yeah. I went to UConn 2002 -- sorry, 2000 -- 2002, I believe. And the incident happened and I was taking shower.
Q No, I am not asking you what happened.
A In Utah.
Q Sir, I want -- all right.
THE REPORTER: I'm sorry, in where?
THE WITNESS: In Utah.
MS. BROUILLET: In Utah.
THE REPORTER: Thank you.
Q (By Ms. Brouillet) Okay. So --
A One of the incidents.
Q It started in 2001?
A Correct.
Q Was there a time period then, if we're talking -- from 2001 to 2006, was there a time period where you did not have sex with [redacted]?
A Between which -- when?
Q You told me that the sex started in 2001, and it ended March 27, 2006.
A Yes.
Q You also told me, and it says in your federal complaint, it went on for two and a half years. And





since that's more than five years, I'm asking you if there was a gap in years where you didn't have sex with [redacted]?

A The most of them was two and half years, yes.

Q Was there a gap in years when you did not have sex with [redacted]?

A I don't remember those things you're asking me.

Q All right. Then let me ask you --

A I must have misunderstood. I'm not sure what is the --

Q Well --

MS. GARDNER: Do you know what she means by "gap"?

THE WITNESS: No.

Q (By Ms. Brouillet) Well, then I'll ask you this. Look at Paragraph 6.

A You're asking between that time?

Q Look at Paragraph 6, please. I'll ask you another question. It says, "Beginning in 2002 and continuing until May 2006."

A Okay.

Q Now, you told me earlier, and I want to make sure that I'm clear, I'm not putting words in your mouth, that's wrong. It should say beginning in 2000?

A 2001.

Q It should say beginning in 2001?
A 2001.
Q Okay.
A It, uh, December -- uh, December, 2001.
Q It began in December, 2001, you started having sex with [redacted] [redacted]?
A When I became full-time, yes.
Q That's when you started having sex with [redacted] [redacted]?
A Yes.
MS. GARDNER: Object to the form.
You can answer.
Q (By Ms. Brouillet) When did you start having sex with [redacted] [redacted]?
MS. GARDNER: Object to the form.
MS. BROUILLET: What's wrong with the form?
MS. GARDNER: The form that you're suggesting that he willingly had --
MS. BROUILLET: I didn't say willingly. I said had sex.
MS. GARDNER: Yeah, I'm objecting to the form of your question.
THE WITNESS: Forcing or sex? Which one?
Q (By Ms. Brouillet) Well, let me put it to you this way; when did you have any sexual contact with [redacted]




[REDACTED]? When did that start? And you told me December of 2001.

A Most of time, I work with [REDACTED]. He call me -- hold on.

Q I'm not -- no. Sir, you need to be responsive to the question. Let me withdraw that question --

A You don't let me explain it to --

MS. GARDNER: It's 1:00. Why don't we take a break?

MS. BROUILLET: Well, I'm still finishing my question, and then we'll take a break.

MS. GARDNER: Okay. One last question.

Q (By Ms. Brouillet) When did you first have sexual relations with [REDACTED] [REDACTED]?

A In his office.

Q When, sir? That's not a -- responsive.

A When?

Q When?

A 2001.

Q December of 2001?

A Right.

Q Okay. And the last date you testified was March 27, 2006?

A Yes.

Q Was there any period of time between December

2001 and March 27, 2006, when you went more than a month without having sexual relations with [redacted] [redacted]?

A Say it again.

Q Was there any time between December, 2001 and March 27, 2006, that you did not have sexual relations with [redacted] [redacted] for more than a month?

A It started from 2001 until that -- that time, yes.

Q Listen to the question. It started in December of 2001. Was there any period of time after December of 2001 before March 27th, 2006 that you went for more than once month without having sexual relations or advances by [redacted] [redacted]?

A Can you write it for me, please? I don't --

Q You can write down anything that you want, sir. You can even have the pen.

A No, you write your question, ma'am.

Q No, I'm not going to write a question. I'm not required to.

A Say it again slowly.

Q Do you want a pad? I will give you a pad, sir.

A No, no. I don't -- because I need to have... okay.

Q Starting December --

A Okay.

Q -- 2001 --

A Yes, ma'am.

Q -- and ending March 27, 2006?

A Okay.

Q Do you understand that, sir?

A Yes. It's off and on, yes.

Q Okay. Was there any time during that --

A I don't have a specific time. Off and on, yes.

Q Sir, listen to the question.

A Yes.

Q Okay? Starting December --

A Yes.

Q -- 2001 --

A Okay.

Q -- ending March 27, 2006, was there any time during that period, December, 2001, to March 27, 2006, that you went more than a month without having sexual advances or sexual relations with [redacted]?

A Yes.

Q And when was that?

A When he traveled to Dubai.

Q And when was that?

A See, I'm -- finally, I got your question. I'm sorry.

Q When was that?





A I believe it was 2004.
Q And how long was he gone?
A Uh, he gone for, I believe, three months. I'm not sure how long.
Q Okay. And so other than that three month time period --
A Yes.
Q -- did you have sexual relations or sexual advances by [redacted] [redacted] from December 2001, to May of 2006 -- March of 2006?
A Say again.
Q Sure.
A Please.
Q In your complaint you have claimed --
A No, I do not follow your question, not the complaint.
Q I'm referring to the complaint, sir.
A Okay.
Q Paragraph 6.
A Okay. Paragraph.
Q Six.
A Beginning in 2006 [sic] continue until May 2006 --
Q I don't want you to read it out loud. Read it to yourself.

A The question, I am trying to get the question.
Q I'm going to give you the question once you read it.
A Okay.
Q Ready for the question? You testified earlier --
A Yes.
Q -- that [redacted] [redacted] began having sexual relations with you in December of 2001?
A Yes.
Q And that your last time you had sexual relations with [redacted] [redacted] was March 27, 2006; do you recall that testimony?
A May twenty -- the last...
Q No, the last time you had sexual relations --
A Yes.
Q -- was March 27, 2006, your birthday?
A Yes.
Q Do you recall that testimony?
A Yes.
Q And you've just told me that [redacted] [redacted] was gone for three months in 2004?
A Yes.
Q Out of the country?
A Yes.
Q In Paragraph 6, you refer to, specifically --





A Yes, ma'am.
Q -- "the harassment was severe, including forcing plaintiff to engage in both anal and oral sex with [redacted] in the workplace at UConn for a period of two and one half years."
A Yes.
Q Do you see that, sir?
A Mm-hmm.
Q Is that accurate?
A Which one?
Q The sentence I just read you. Do you want me to read it again?
A Okay. Go ahead.
Q Can you read it to yourself?
A Please. March 19 you asked?
Q No, no. I'm looking at Paragraph 6, do you see that? And I'm looking to the sentence that begins with, "The harassment was severe"?
A Okay.
Q Do you see that?
A Yes.
Q And do you see it says "... for a period of two and one half years"?
A Go ahead. Okay.
Q Do you see that?





A Yes.
Q Is that period of two and one half years accurate?
A Most of them, yes. Because --
Q No.
A -- when I report the specific, I didn't say the whole. I was talking generally.
Q Well --
A Because so many events happened, not only a specific. If it was a specific, I would say, yes.
Q Let me ask you this, sir --
A Yes, ma'am.
Q You put into the federal court to your complaint it was two and a half years.
A Yes.
Q As you sit here today, was it two and a half years? Is this accurate?
A Yes.
Q Okay.
MS. BROUILLET: Then we can break for lunch.
THE WITNESS: Thank you.
THE VIDEOGRAPHER: Off the record, 12:59.
(Thereupon, a lunch break was taken at 12:59 p.m. Testimony continues at 1:50 p.m.)
(Thereupon, the reporter marked Real Estate

Contract for identification as Exhibit No. 12 during the lunch break.)

THE VIDEOGRAPHER: On the record, 1:50. Tape four.

Q (By Ms. Brouillet) Ready, Mr. [redacted]?

A I'm sorry?

Q Are you ready?

A Yes, ma'am.

Q Okay. Did you and [redacted] [redacted] agree to buy a property together at some point in time?

A I purchased property, yes.

Q With [redacted] [redacted]?

A I put him as partner, yes.

Q Okay. Let me show you a document I've marked as No. 12. I ask if you recognize this, sir?

A Yes, ma'am.

Q And is that a real estate contract that you and Mr. [redacted] entered into to purchase [redacted] [redacted]?

A Yes, ma'am.

Q And did you ever live a that address?

A No.

Q What was the purpose of buying that property?

A To open business.

Q And did you and Mr. [redacted] end up renting that





property?

A Yes.

Q And how long did you own that property with Mr. -- excuse me -- Mr. [redacted]?

A 2006.

Q Up until 2006?

A Yes, ma'am.

Q And you testified earlier that Mr. [redacted] was out of the country for a while?

A Yes.

Q During that time, did you take care of that property?

A Some point, yes.

Q Did you have any involvement in collecting the rent?

A Some, yes.

Q And during what period of time were you involved with collecting the rent from that property?

A All the time. The time I rented until.

Q And so the date on this agreement is January 18th or 19th, 1999. So would it be accurate to say from January of '99, until 2006 you were involved in the --

A Yes.

Q -- rental?

A Yes, we have an account, International Resource.

Q You and [redacted]?
A Yes, we open an account.
Q When you say "an account," what kind of account?
A Business account.
Q At a bank?
A Yes.
Q What bank?
A New Alliance.
Q And when did you -- um, is that account still open?
A No.
Q Okay. When did you and [redacted] stop holding a joint account?
A I think it was 2006.
Q All right. Do you know when in 2006?
A I don't know exact time.
Q Have you ever been known by a name other than [redacted]?
A Who me?
Q Yes.
A Yes.
Q And what else have you known as?
A [redacted]
Q [redacted]?
A [redacted].

Q [redacted]

A No, last name the same.

Q Okay. And have you ever been known as [redacted] [redacted]?

A My middle name, yes, "M."

Q Okay.

(Thereupon, the reporter marked Workers' Compensation Commission of Connecticut Packet for identification as Exhibit No. 13.)

Q (By Ms. Brouillet) Was there a time when you made a workers' compensation claim against an employer?

A I got hurt in '90 -- 1988, I believe. I was working on the job and, -- I fall down. Short term, yes.

Q I'm going to show you a document --

A Yes.

Q -- a package of documents, excuse me, marked Exhibit 13. And ask you some questions.

A Sure.

Q Why don't you take a look at that?

A Yes.

Q I just want to make sure -- I think I stapled more than one thing together. I did. If you turn -- well, let me ask you this, did you -- did you ever get hurt more than once at work?

A I think I got twice, yes.

Q Okay. If your turn -- sorry, in your package, I put that as the last document. Um, it says in the upper left-hand corner "30C." It looks like this (indicating). Do you see that, sir?
A I am trying to find it.
Q Oh, I'm sorry. Let me --
A Thank you.
Q Do you see that document? Now, according to this document, it's a 30C Workers Compensation Commission of Connecticut Form for Notice of Claim for Compensation. And it says, "[redacted]" and it gives a social security Number. Is that your Social Security Number, [redacted]?
A Right.
Q Okay. And it says that you were employed by Pro Park?
A Yes.
Q Were you employed by Pro Park in July of 1997?
A Yes.
Q Okay. And were you working at the Andrea Hotel?
A Yes.
Q Okay. And this claim, the 30C Form, says, "Date of injury, July 18, 1987." And it says, "While working as parking lot attendant at Andrea Hotel, claimant was assaulted in the mouth by Jason Mayne," M-A-Y-N-E. "An





arrest was made." And it's signed by Terence S. Hawkins, Esquire?

A Yes.

Q Was Mr. Hawkins representing you?

A At that time, yes.

Q Okay. And did you receive any injuries as a result of being assaulted at work?

A No.

Q Okay. Now, if you turn further in the packet -- and I apologize, I may have put it in a different order. I'm looking for this other form.

A Okay.

Q You have that in there? It says, "Form for Notice of Claim" --

A The last one?

Q -- Compensation?

A Yes. This one.

Q That's it, sir. And this form says that you suffered an injury on March 26th -- I'm sorry, it lists you as [redacted] [redacted]?

A Yes.

Q [redacted] [redacted] --

A They put wrong name.

Q Okay. Same social security number?

A Yes.





Q On March 26, 1994, you were employed by Pro Park?
A Yes.
Q Okay. And it says, "While working at the Neon Garage on Crown Street, New Haven, claimant was running to get car for customer when he tripped over a hole and fell injuring both legs. He has also developed a gait problem which has adversely affected his back." Was that accurate?
A Yes.
Q Okay. And did you miss any time from work as a result of that injury?
A I think I took off some time, yes.
Q Okay. And it says -- it's signed by Barry J. Sinoway, attorney. Was he your attorney?
A No.
Q Okay. And so he --
A Yes, yes, he was.
Q Okay.
A Sorry.
Q Other than these two workers' compensation claims for Pro Park, did you have any other workers' compensation claims while in Connecticut or while employed in Connecticut?
A I don't remember. At least, if you have a document.

Q You don't recall?

A No.

Q Okay.

A Thank you.

Q When did you first become employed at UConn in any capacity?

A 1988.

Q 1988. And where did you work in 1988?

A I'm sorry, 1998.

Q 1998?

A Yeah, sorry.

Q And where were you working in 1998?

A I started, um, it was dining service I applied. I work there.

Q UConn dining services?

A Yes.

Q And what did you do at dining services?

A I was doing, uh, assistant chef.

Q Okay. And how long were you employed there?

A I believe it was one year.

Q How did your employment end?

A Employment because my -- I couldn't do because a lot of physical, um, physical job. Because they wanted me to move all of the carts and push the carts, plates. And so it started my hip pain. They never let me to go

see doctors. It was the issue ended. And also I complained.

Q You complained?

A Yes, I did.

Q To who, sir?

A I did a complaint to, um -- what's the name? I believe it was at that time ODE office.

Q Mm-hmm.

A I'm not sure what exactly the name was. And also I complained to [redacted] that time and -- with his boss. Again, I -- you know, because they didn't let me to go see doctor. It was a tough time and it started, um, pain.

Q Well, sir, when you say "ODE," are you referring to the Office of Diversity and Equity? Is that what ODE stands for at UConn?

A No, I don't think so was that. It was, uh...

Q Well, what do you mean by ODE?

A In the -- I'm sorry. Hold on. It was the same office. I think they call it labor employment, something they calls...

Q They --

A At that time it was labor...

Q Was it their affirmative action office?

A No.





Q Okay.

A It was a labor -- uh, they call it labor action, whatever they call it before.

Q All right.

A I don't remember the name exactly.

Q Did you file a complaint in March of two thousand -- I'm sorry, in March of 1999 with the Commission on Human Rights and Opportunities about dining services saying that you're --

A Yes, did.

Q Let me finish. Saying that you were being harassed because of your ethnicity?

A Physical.

Q Did you also complain about your ethnicity?

A I might.

Q All right. Did you complain at that time that some of your co-workers were calling you gay? That they were calling you faggot?

A No.

Q Okay. And so --

A I don't know, maybe, yes.

Q And isn't it true -- withdraw that question. While you were at dining services for that year --

A Yes, ma'am.





Q -- did you ever -- were you ever suspended for workplace violence?

A No.

Q While you were at dining services -- UConn dining services for that year --

A Yes.

Q -- what did students say about you calling them nigger?

A I don't remember that.

Q You don't remember being -- that there was a complaint filed against you for --

A They call me or they -- I call?

Q Let me finish the question, please, sir. You don't recall that student employees made a complaint that you called them nigger while at dining services?

A I don't remember that.

Q And if the records from UConn reflect that you were suspended from work while they investigated the allegations that you screamed at students and called them nigger, do you think those records are inaccurate?

A Yes.

Q Okay. And so is it your testimony today that while you were at dining services, you never used the word "nigger"?

A No.





Q You never used it?

A No.

Q Okay. And in your CHRO -- in your complaint to the Commission on Human Rights and Opportunities, which you filed May -- do you recall filing it around May 13th, 1999?

A I don't remember.

Q Okay. And so if your complaint to the Commission on Human Rights and Opportunities --

A Yes.

Q -- said that you -- you complained that you were suspended and harassed and retaliated against on March 12th, 1999 due to your physical disability, [redacted], [redacted], [redacted] and religious creed, Muslim, that would be inaccurate? Or that would be accurate?

A Say the last word -- what did you say Muslim what?

Q Do you want me to read the whole thing back?

A Please.

Q If your complaint to the Commission on Human Rights and Opportunities against UConn dated May 13, 1999 claimed that you were -- you, [redacted], were suspended, harassed, and retaliated against on March 12, 1999 due to physical disability, a [redacted] [redacted], and religious creed, Muslim --

A Yes.

Q -- would that accurately reflect?

A Yes.

Q And if you told the CHRO in your affidavit that on March 12, 1999 you were told to punch out and go home by David Barber, and you were suspended without pay from March 30th, 1999, would that be accurate or inaccurate?

A I don't remember that.

Q Okay.

A Could be, yes.

Q And so it's possible?

A Yes.

Q Okay. And if the CHRO records for that complaint filed against UConn on May 13th, 1999 said that after a March 23, 1999 meeting, a letter was issued to you that you had been abusive, in quotes, and suspended for three days without pay and you were discharged, that would be accurate or inaccurate?

A It could be.

Q It could be accurate? And do you recall if your complaint to the Commission on Human Rights and Opportunities against UConn in 1999 claimed that you were discharged, and it was related to a long stream of harassment, because I work out in a muscular [sic]. I was humiliated and shouted, I don't want to talk to you





anymore. Do you think that would be accurate or inaccurate?

A Say it -- phrase it, please, again.

Q Okay. Let me read it to you again. If your complaint to the Commission on Human Rights and Opportunities against UConn in 1999 said that after a meeting on March 23, 1999, you were issued a letter claiming you were, quote, abusive, end quote, and suspended for three days without pay and then discharged, which was related to a long stream of harassment because I work out in a muscular. I was humiliated and I shouted I don't want to talk to you anymore, do you think that is accurate or inaccurate?

A I don't remember that, I'm sorry.

Q Okay. Do you recall [redacted]?

A There is many [redacted] when I worked there, so I'm not sure.

Q Well, [redacted] is the first name. A girl? A woman?

A Could be, yes.

Q It's someone that you worked with in dining services?

A Yes.

Q And did you ever ask [redacted] why she talked to that nigger, referring to a student worker?

A I don't remember that, no.

Q Did you work at Putnam while in dining services?

A Yes.

Q And did you fall at work in dining services in April of 1999 and said you hurt your wrist and left side?

A Could be.

Q You don't recall?

A (No audible answer).

Q You gotta answer out loud.

A I might.

Q Okay. And do you recall a March 30th, 1999 letter to you from C. Dennis Pierce, who ran dining services, saying you would have a suspension without pay for three days because of misconduct and acting in a manner that endangers the safety of others. That the March 12th incident was not an isolated incident.

A Are you ask me the incident or are you asking me about the letter?

Q I'm asking if you recall the letter.

A The letter?

Q Yes.

A But you ask me the wrist, right? My wrist was -- I fell down in then the letter.

Q No. Let me ask you this question --





A Okay.

Q -- do you recall a letter from March 30, 1999 to you from C. Dennis Pierce of dining services saying that you were suspended without three -- excuse me, you were suspended without pay for three days because of misconduct and acting in a manner that endangers the safety of others, and that the March 12th incident was not an isolated case?

A I might, yes.

Q Okay. You remember [redacted]. [redacted]?

A Yes, I saw him many times.

Q And he ran dining services at UConn?

A [redacted] [redacted], no. Another guy was.

Q Was [redacted] [redacted] at UConn when you were there?

A Yeah, but he wasn't at that time. It was someone else.

Q Okay. And did you work with someone named [redacted] at dining services?

A [redacted] [redacted] (phonetic)? Yes.

Q Okay. And do you know what [redacted] said to UConn about your temper?

A No.

Q Okay. Did you ever recall being told that [redacted] complained that you had temper outbursts?

A She never told me that.

Q All right. Do you recall on April 21st, 1999 having an investigatory hearing at UConn? A hearing about what was happening with you at dining services?

A Yes.

Q Okay. And do you recall being asked questions?

A Yes.

Q And do you recall that they talked to [redacted] [redacted] at that time?

A Could be.

Q How about [redacted] [redacted]? Do you -- do you know who [redacted] [redacted] is?

A I know a lot of -- a lot of them, yes. A lot of people they named the same thing. So many [redacted] was there, four and five, and [redacted]. Yeah, I know him, yes.

Q Okay. And to your knowledge, did [redacted] [redacted] complain about your behavior at dining services?

A It could be.

Q Okay.

A Yes.

Q And did you actually resign from dining services in a letter dated June 2, 1999?

A Yes.

Q Okay. Now, when we you filed that complaint with the CHRO against UConn in 1999 for dining services, did you list [redacted] [redacted] as a witness who would support

you?

A Yes. He said he would, you know, he would help me with this.

Q He didn't work at dining services then?

A Who me?

Q [redacted]

A No.

Q Okay.

A Because I came complained to him boss and also the, uh, employment action with the UConn.

Q You complained internally at UConn?

A Yes, internally.

Q About the harassment at dining services?

A Physical, um, job, and also they didn't let me to make -- you know, I made appointments and I told them I have to go see doctor, they said, no, you have to work. And so that was tough.

Q And while you were at dining services, were you in a union?

A Yes.

Q And did you get a union handbook?

A No, I'm sorry. I was in union, but I think it was during a probation period. I think they have a probation period.

Q Okay. After your probation -- period of





probation, you were in a union?

A Yes.

Q Okay. And that was a different union that UCPEA, right?

A Right.

Q Okay.

A It is not a state.

Q Okay.

A They are not a state employee.

Q And when you were hired at UConn in 1998 -- would that be August of 1998, do you recall?

A Yes.

Q And so you worked there --

A Exactly the date, I don't know. But it could be.

Q You worked at UConn dining services from August, 1998, until June 2nd, 1999?

A Yes, I believe.

Q Okay. And when you were hired at UConn dining services, do you recall receiving their handbook, a booklet of policies?

A Yes, yes.

Q And that -- what did that booklet tell you about being able to complain internally about harassment?

A I don't know.

Q Okay. Do you recall if it told you you could

file a complaint internally at UConn about harassment when you were there in 1998?

A I believe so.

Q Okay. You used the term earlier, "ODE." And can you just -- which are initials. What do you mean by ODE?

A I think that's, uh, employment action at that time, the same building. That's why I went there. Not ODE. They are called -- they used to call it, uh, employment action, whatever it was.

Q Would it be accurate to say that ODE used to have a different name?

A Not ODE. It was a different office there.

Q Okay.

A That's all I can describe it, so...

Q In 1998, you would go to the employment action to complain about harassment; is that accurate?

A Yes.

Q And in 2006, where would you go to complain about harassment?

A 2006?

Q Yes, sir.

A 2006?

Q Yes.

A I went to ODE.





Q Okay. Do you know what ODE stands for?
A No.
Q Okay. Do you think it might be Office of Diversity and Equity?
A Yes.
Q And so if I say, "ODE," we understand that we're talking about the same place, uh, in 2006 at UConn?
A Right.
Q Okay. And is it accurate to say that ODE at UConn is separate from the Commission on Human Rights and Opportunities?
A Yes.
Q Okay. Have you reviewed the personnel files for any UConn employee or former employee?
A UConn -- say again.
Q Have you reviewed the personnel files for any UConn employee or former employee?
A No.
Q Have you reviewed the labor relations files for any UConn employee or former employee?
A No.
Q All right. Have you reviewed the medical records for any UConn employee or former employee?
A No.
Q Okay.





A I want to come back to this -- to the third one.
Q The medical record?
A You marked it. I did only for, um, payroll. I was doing --
Q Okay.
A In the office, that's all.
Q And so to be accurate, you did the payroll when you worked at international services?
A Yeah, I was doing the time card and the payroll.
Q All right.
A For special payroll for temporary.
Q All right. Thank you. But was that the only involvement that you had?
A Yes.
Q Okay. And where would you turn those payroll records into the -- those time cards or payroll records? What would you do with them?
A I have to enter the -- the time and their name, social security and send it to payroll.
Q Okay. And you left UConn by June -- UConn dining services June 2nd of 1999. When were you next employed?
A I was in a special payroll in international office.
Q And when did you start there?
A I believe it was '99. And I went training under

the BRS, Rehabilitation Services.

Q Well, let me ask -- you said a lot of stuff in that response.

A Yes.

Q "BRS," Bureau of Rehabilitation Services.

A Yes.

Q Is that a state agency?

A Yes.

Q And is that related to you receiving social security disability benefits?

A No.

Q Okay. What was -- why were you involved with the Bureau of Rehabilitation Services?

A That's, uh, for people have injury. If they are disabled, they can help them to get job for them. And help for training. Vocation, they call it vocation.

Q And that was --

A Training.

Q -- separate from any UConn agency, correct, department of UConn?

A Yes, separate, yes.

Q Okay. And if the records indicate that you went on special payroll for international services around January 1st, 1999, do you think that would be accurate?

A I believe so, yes.