
Page 181

1       Q    Okay.  And did you stay on special payroll --

2    Withdraw the question.

3            How long were you on special payroll?

4       A    '99 to 2001, I believe.  If I don't make a

5    mistake.

6       Q    In November of 2001, did you apply for a

7    permanent position of program aide in DISP?

8       A    Yes, ma'am.

9       Q    Okay.  And was there a search process?

10      A    Yes, ma'am.

11      Q    Was their a search committee?

12      A    Yes, ma'am.

13      Q    Can you tell me who was on the search committee?

14      A    Uh, Sylvia Waller.

15           THE REPORTER:  I'm sorry, what was that

16    name?

17           THE WITNESS:  Silva (phonetic).

18           MS. BROUILLET:  Sylvia.

19           THE WITNESS:  Sylvia.  Uh, Doug Fletcher,

20    um, Susan Atrens and ███ ███.  Uh, there's another

21    lady who was from human services.  I don't remember

22    her --

23      Q    (By Ms. Brouillet)  Somebody from human

24    resources?

25      A    I don't know.  Not human resources.  There was

                    BRANDON SMITH REPORTING & VIDEO

6/29/2011



1  another lady also.

2  Q  Okay.

3  A  I think there were five people in the committee.

4  Q  And did the committee have to interview you?

5  A  Yes.

6  Q  Okay.  And that position, that program aide, that

7  was a position with the University of Connecticut?

8  A  Yes.

9  Q  Okay.  Do you know how many other candidates

10  there were?

11  A  I think it was -- I am not sure it was five or

12  four.  Exact number, I don't remember.

13  Q  And while you were at DISP as a program aide, did

14  you ever receive a promotion?

15  A  During what period?

16  Q  During the time that you worked as a program

17  aide, which you said started in 2001.

18  A  Yes, I became business supervisor.

19  Q  Did you actually become a business supervisor or

20  were you working --

21  A  I was working for --

22  Q  Let me finish, please.

23  A  Sorry.

24  Q  Were you working a temporary service in a higher

25  class?

BRANDON SMITH REPORTING & VIDEO



1     A   Uh, I think it came this new program, they called

2   track yourself.  And so they -- you have to do

3   students -- uh, they call batching --

4          THE REPORTER:   They call what?

5          THE WITNESS:   Batching, immigration, the

6   status.  So I was supposed to batch and enter all of the

7   information, like, database.  And so I went for the

8   training and they told me to do the job and that's why I

9   started to do.  And then they increase $6,000 for me.

10    Q   But my question is this, sir, wasn't that

11  business services position temporary?  You were denied a

12  permanent reclassification?

13    A   It was supposed to be in six months temporary.

14  After that, permanent.

15    Q   And did you get paid for temporary service in the

16  higher class as a business position?

17    A   Yes.

18    Q   But your actual job title never changed, did it?

19  Were you ever officially promoted?

20    A   Yes.

21    Q   Well, sir, isn't it true that your union filed a

22  grievance on your behalf because you were not promoted

23  to the business services position?

24    A   Yes, because what happened, after six months,

25  supposed to be full -- I mean, business supervisor, but

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 184

1    they never did it.  They were -- I'm not sure why.

2        Q    Well, what role did that Herbertia Williams play

3    in the denial of reclassification to a higher position?

4        A    It was between ▓▓▓ and her.  I don't understand.

5        Q    Well, when were you -- when were you denied a

6    reclassification?  Wasn't it while ▓▓▓ was in Dubai?

7        A    Yes.

8        Q    Okay.  And at that time, while ▓▓▓ was this

9    Dubai, wasn't that Herbertia Williams overseeing your

10   work at that time?

11       A    At most time, yes, she was communicating with

12   him.

13       Q    No, no.  I asked you if she was overseeing your

14   work at that time, Herbertia Williams?

15       A    Yes.

16       Q    Okay.  And didn't -- well, withdraw the question.

17   To your knowledge, was there any study done to

18   see whether you were actually performing the work of a

19   business supervisor -- business services supervisor?

20       A    Say it again.  I'm sorry.

21       Q    Was there ever a study or audit done by UConn to

22   see if you were performing the actual duties of the

23   business supervisor?

24       A    Yeah, I think she wants to change the -- the

25   office -- the whole thing, and that's why they audited

                   BRANDON SMITH REPORTING & VIDEO


Page 185

1  everyone.  So they have to -- she wants to cut peoples'

2  responsibility.

3      Q   Who is "she"?

4      A   Herbertia Williams.

5      Q   Well, do you know if other peoples jobs were

6  audited --

7      A   Yes.

8      Q   -- or just the job -- Hold on.  Or if just the

9  job you were doing there was an audit?

10     A   Uh, there was Tacoya.

11     Q   No, I'm asking you if you know.

12     A   There's another person also.

13     Q   One other person?

14     A   Yes.

15     Q   Okay.

16         THE REPORTER:  And what was that name?

17         THE WITNESS:  Tacoya.

18         MS. BROUILLET:  T-A-C-O-Y-A.

19     Q   (By Ms. Brouillet)  Now, did you file a grievance

20  over the failure of UConn to reclassify your position to

21  give you the promotion in February 7, 2005?

22     A   The grievance part of the university, yes.

23     Q   Okay.

24     A   And they encouraging you to do.  If you're

25  winning or you're losing, it doesn't matter.

                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 186

1    Q   And did you win or lose that?

2    A   She said -- the union said they don't accept

3    that, and so your title will stay, uh, program aide.

4    You don't have to do payroll.  You don't have to do

5    certain -- other database.  And so just do the budget

6    and inventory, that's it.

7    Q   Now you're not claiming as part of this case that

8    Herbertia Williams denied you that promotion?

9    A   No, ma'am.

10   Q   Okay.  You left UConn March 19, 2008.  Since that

11   time, has any doctor restricted your ability to work?

12   A   No.

13   Q   What affect on your ability to find work do you

14   think the fact that you have this conviction and you're

15   registered sex offender has had?

16   A   Can you repeat it, please?

17   Q   Sure.  What affect do you think the fact that

18   you're -- have this criminal conviction and you're a

19   registered sex offender has had on your ability to find

20   work?

21   A   It's hard to get job now.

22   Q   Is that emotionally distressing to you?

23   A   Of course.

24   Q   How are you supporting yourself now?

25   A   I'm getting disability.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

1    Q    From where?

2    A    Social security.

3    Q    Social security disability?

4    A    Mm-hmm.

5    Q    When did you start collecting social security

6    disability?

7    A    Um, I believe 2006 or '5, I'm -- '6 or '7. I'm

8    not sure of the date.

9    Q    You testified earlier today that you originally

10   started collecting it some time in the 1990s, and then

11   you went to work. And so would it be accurate to say

12   that you collected social security disability, went to

13   work, and then went back to social security disability?

14   A    Yeah, off and on, off and on. So -- because of,

15   um, they give you a chance -- you can -- it has to be

16   flexibility of the job. You have to do. If it's hard

17   for your body, and so they give you ninety days to find

18   another job. And also that's why it's, um -- did I

19   answer your question?

20   Q    I think so.

21   A    Okay.

22   Q    Who introduced you to the attorney for the

23   Association of Lawyers Committee for Human Rights?

24   A    ▮▮▮▮▮

25   Q    ▮▮▮▮ ▮▮▮▮▮▮?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 188

1    A    Yes, ma'am.

2    Q    And that would be Vinnie that you mentioned?

3    A    Vinnie Coyle, yes.

4    Q    Are you a US citizen?

5    A    Yes, ma'am.

6    Q    When did you become a US citizen?

7    A    Two thousand -- nov 2005, I believe.

8    Q    I'm going to show you, um, Exhibit 11, again,

9    which is your complaint for the federal court. Are you

10   claiming as a result of the allegations in that

11   complaint that you have any lost wages related to UConn?

12   A    No.

13   Q    Okay. In paragraph -- in one of the paragraphs,

14   I believe it's Paragraph 10, it says that, "In 2003,

15   defendant through ████ promoted plaintiff to Business

16   Services Supervisor." Didn't the paperwork provide that

17   it would be a temporary position for up to two years?

18   That you would be a business --- you work as a business

19   services supervisor for up to two years and then you

20   could be promoted?

21   A    I thought it was six months, so the procedure has

22   changed.

23   Q    Okay. When you say, in that paragraph,

24   "defendant through ████," isn't it true that Boris

25   Brava-Ureta did the paperwork to promote you?

BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 189

1    A    I think he -- ████ worked with.  I'm not sure --

2    Q    Okay.

3    A    -- exactly how the process worked.

4    Q    All right.

5    A    With him.

6    Q    Have you ever spoken to a reporter about your

7  federal lawsuit?

8    A    No.

9    Q    Have you ever spoken to anyone from the Hartford

10  Courant about your lawsuit?

11    A    No.

12    Q    Who have you discuss -- when you went to file

13  this lawsuit, and it was actually filed with the court

14  on July 7th, 2009, who did you tell, other than,

15  obviously, your lawyer knew, that you were filing this

16  lawsuit?

17    A    No one.  Except my lawyer.

18    Q    You only talked to your lawyer about it?

19    A    Yes.

20    Q    You didn't talk to any family members?

21    A    My family, yes.  My wife knows, yes.

22    Q    Who else have you talked to about filing the

23  lawsuit?

24    A    My father knows.

25    Q    Where is your father?  Where was your father in

BRANDON SMITH REPORTING & VIDEO

1    July of 2009?

2        A    Here, with me.

3        Q    Does your father speak English?

4        A    No.

5        Q    You're aware that an article appeared in the

6    Hartford Courant in July of 2009 about your lawsuit?

7        A    I don't remember.

8        Q    You don't know?

9        A    No.

10       Q    Okay.  So you -- did you ever ask anyone --

11       A    Oh, I'm sorry.  I read the paper, yes.  I'm

12   sorry.

13       Q    Did you ever ask anyone to contact the press

14   about your lawsuit.

15       A    No.

16       Q    Other than your complaint --

17       A    Yes, ma'am.

18       Q    -- about UConn dining services to the CHRO in

19   1999, and then your complaint to CHRO in 2006, have you

20   ever filed a complaint with CHRO or the Equal Employment

21   Opportunities Commission against UConn?

22       A    After 2006?

23       Q    No.  Let me rephrase this.  I'll withdraw the

24   question.

25       A    Yes, ma'am.

BRANDON SMITH REPORTING & VIDEO



Page 191

1    Q    You've testified today that you've filed two

2   complaints against UConn with the Commission on Human

3   Rights and Opportunities, the CHRO, in 1999 for UConn

4   dining services and then around October of 2006 for --

5   while you were working at DISP.

6    A    Yes.

7    Q    Any other complaints that you have filed with

8   CHRO?

9    A    No, ma'am.

10    Q    Okay.  Have you filed any other complaints with

11   the Equal Employment Opportunities Commission?

12    A    No, ma'am.

13    Q    Now, you've filed this complaint -- this lawsuit

14   against UConn in July of 2009 in the federal court.  And

15   you told me that you sued the Department of Children and

16   Families.

17    A    Yes.

18    Q    Any lawsuits that you have filed?

19    A    No.

20    Q    Has anyone filed any lawsuits against you?

21    A    No.

22    Q    Have you ever been a witness in a lawsuit?

23    A    No.

24    Q    Have you ever testified at a court hearing?

25    A    No.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 192

1    Q    And you claim in this lawsuit that ▓▓▓ ▓▓▓▓

2    was sexually assaulting you against your will for years,

3    and in the lawsuit it says starting in 2002. Why have

4    you never sued ▓▓▓ ▓▓▓▓?

5          MS. GARDNER:   Object to the form.  That

6    might call for attorney/client privilege.

7    Q    (By Ms. Brouillet)  I am not asking anything that

8    you've said or your lawyer or your lawyer has said to

9    you.

10   A    Okay.

11   Q    I want to know why you never sued ▓▓▓ ▓▓▓▓?

12   A    Because it never happened outside.  Most of the

13   time it happened in his office or in my office.  He

14   would come and he give me a project to do and then he

15   tell me, We do it here, and then he lock the door.  This

16   happened most time on the job.

17   Q    And so that's why you've never sued ▓▓▓ ▓▓▓▓?

18   A    I couldn't sue because he said he would destroy

19   my life if I said anything.  He will make me miserable,

20   my life.

21   Q    Have you ever -- did you ever tell ▓▓▓▓▓▓▓▓

22   --

23   A    Yes.

24   Q    -- that if she told about you abusing her you,

25   would destroy her father?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 193

1    A   No.

2    Q   You never said that?

3    A   No.

4    Q   Did you ever tell [REDACTED] that if she told

5    about you abusing her, that you would ruin her family?

6    A   No.

7    Q   And so if she says that under oath, she's lying?

8    A   Yes.

9    Q   Okay.

10   A   I never say that.

11   Q   Now, when you went to the Office of Diversity and

12   Equity, did they ask you if you had been abusing [REDACTED]

13   [REDACTED]?

14   A   No.

15   Q   Well, do you recall Mary Signor?

16   A   Yes.

17   Q   Who is Mary Signor?

18   A   She was a caseworker and lawyer, I believe.

19   Q   And did she ask you questions about what happened

20   with [REDACTED] [REDACTED] and UConn?

21   A   Yes.

22   Q   And you're claiming that she never asked you if

23   you had ever assaulted [REDACTED]?

24   A   Right.

25   Q   And so if that's contained in Mary Signor's

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                                    

Page 194

1    statement, that would be a lie?

2        A    Later, um, I believe that when ████ get the

3    suspended and he was fired, I am not sure, and this --

4    the issue came later.  After, um --

5        Q    But that's not my question.  I understand that

6    the issue came up, and so let me ask it this way.  When

7    the issue came up with Mary Signor, did she ask you if

8    you ever assaulted ██████████████?

9        A    Yes.

10       Q    And what did you tell her?

11       A    Because she told me go to report it to the

12   police, local.

13       Q    No, no.  What did you tell Mary Signor about

14   assaulting ██████████?

15       A    I don't remember what I say to her.

16       Q    You didn't tell her that you had done it, did

17   you?

18       A    I haven't talked to her like that, no.  She

19   didn't ask me too many questions.

20       Q    And so if Mary Signor --

21       A    Yes, ma'am.

22       Q    -- wrote that you denied ever touching ██████

23   ██████ improperly --

24       A    Mm-hmm.

25       Q    -- would that be inaccurate?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 195

```
 1    A   No clue.

 2    Q   No clue?

 3    A   No.

 4    Q   Okay.  But we have --

 5    A   If she put it in the paper, that's fine.   That's

 6   her opinion.

 7    Q   That's her opinion?

 8    A   Yeah.

 9    Q   Now, that would be wrong because you pled guilty

10   to that.  Correct?

11    A   Mm-hmm.

12        MS. GARDNER:   I'm going to object to the

13   form.  He plead under the Alford Doctrine.

14    Q   (By Ms. Brouillet)  Okay.  But when you pled

15   guilty to the violation of probation, that wasn't under

16   the Alford Doctrine; was it?

17    A   No.

18    Q   Okay.  And so when you pled guilty to violation

19   of your probation --

20    A   It's part of the process, same process.  No

21   differences.

22    Q   Well, let me ask my question.  It's a

23   continuation of the -- withdraw that.

24        The probation you were ordered to participate in,

25   the counseling, was required because of your conviction
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 196

1   on the original criminal charge, right?

2      A   Say it again, please.  I didn't understand what

3   you say.

4      Q   As part of the original criminal charge --

5      A   Yes.

6      Q   -- of impairing the morals of a minor, you were

7   required to participate in a counseling program for sex

8   offenders.  Correct?

9      A   Yes.

10     Q   And you were put on probation for ten years,

11  right?

12     A   Yes, ma'am.

13     Q   Okay.  So when you violated the probation --

14     A   Yes.

15     Q   -- in December of 2008, you were accused of --

16  withdraw the question.

17         When you violated the probation, isn't it true

18  that you then admitted that you had touched ▓▓▓▓

19  ▓▓▓▓▓'s vagina on numerous occasions?

20         MS. GARDNER:  Object to the form.

21         You can answer it.

22         THE WITNESS:  I don't know that.

23     Q   (By Ms. Brouillet)  Well, do you want me to show

24  you the documents that we covered this morning?

25     A   Fine.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



1          MS. GARDNER:  And I'm going to object

2   because its already been asked and answered.

3          MS. BROUILLET:  But I'm trying to get to

4   what he told Mary Signor, and he said it's her opinion

5   if he denied

6          MS. GARDNER:  Well, maybe you need to

7   rephrase the question.

8          MS. BROUILLET:  Well, I have to get to the

9   question first, and right now he seems confused about

10  whether he admitted it or not.  And so that's what I

11  want to get to make sure that I show him accurately so I

12  can then ask the question.

13          MS. GARDNER:  Well, the exhibit speaks for

14  itself.  And that question has been asked and answered.

15          MS. BROUILLET:  Okay.  And so will you

16  stipulate then that he testified this morning that, yes,

17  he told -- when he violated the probation, that he said

18  there were incidents where she was sitting on his lap

19  and he had touched her vagina with his hand?

20          MS. GARDNER:  I'll stipulate that that's

21  what the document says.  I don't recall his exact

22  testimony this morning --

23          MS. BROUILLET:  Well --

24          MS. GARDNER:  -- but I know that you asked

25  him about that.

BRANDON SMITH REPORTING & VIDEO

Brandon Smith Reporting & Video
860-549-1850        production@brandonreporting.com    249 Pearl Street

Doe v. UCONN

6/29/2011



Page 198

1     Q     (By Ms. Brouillet)  Do you recall me asking you

2     about --

3     A     Yes.

4     Q     -- that this morning?

5     A     You asked me five, ten times this question.

6     Q     Yes.

7     A     More than that.

8     Q     Yes.  And so did you tell Mary Signor -- what did

9     you tell Mary Signor about touching ████████████'s

10    vagina?

11    A     We never talked about that.

12    Q     And so if she puts in her report that she asked

13    you --

14    A     Yes.

15    Q     -- if you had touched the child improperly,

16    you're saying that's not true?

17    A     I don't know about that, what she says.  That's

18    why I said whatever she say.

19    Q     I'm sorry, your response is whatever she say?

20    A     My response is, I don't know.  What -- whatever

21    she say, this is her opinion.  It's a document.  You can

22    write in the computer easy to write --

23    Q     All right.  Well, you told me a short while ago

24    that after ████ brought up that you had touched his

25    daughter inappropriately, that Mary Signor asked you

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 199

1    questions about that.

2         A.  No, it wasn't like that.  He said you have to

3    drop this case

4         Q.  No, no.  Let me ask you a question.

5         A.  Hold on.  Hold on.

6         Q.  No, I'm asking you a question, sir.

7                    MS. GARDNER:  Okay.

8         Q.  (By Ms. Brouillet)  Let me be clear.

9                    MS. GARDNER:  Let's take a break.

10                   THE WITNESS:  You don't let me --

11                   MS. BROUILLET:  No, I have a --

12                   MS. GARDNER:  There's no question pending.

13                   MS. BROUILLET:  No, I have a question

14   pending and he stopped.

15                   MS. GARDNER:  Is there another question

16   pending?

17                   THE REPORTER:  Yes, there is.

18                   THE WITNESS:  Okay.  Well --

19                   MS. GARDNER:  Let's answer that question --

20                   MS. BROUILLET:  All right.

21                   MS. GARDNER:  -- and then we're gonna take a

22   break.

23                   THE WITNESS:  Okay.  I answer it.

24        Q.  (By Ms. Brouillet)  You told me a short while ago

25   that after [ ] [ ] spoke to Mary Signor, she asked

                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 200

1   you about what happened with his daughter.  That he

2   claimed you had molested his daughter.

3       A   No.

4       Q   Let me finish my question.

5           MS. GARDNER:  Objection to the form.

6       Q   (By Ms. Brouillet)  And so my question to you is

7   this, is your testimony now that Mary Signor never asked

8   you about ██████████?

9       A   No.  I -- I can explain this, how.

10      Q   Did you ask you about --

11      A   Do you want to give me a chance so I can explain

12  it, or no?

13      Q   Yes.  Did she ask you about ██████████?  Mary

14  Signor, did she ask you about --

15      A   I'm not going to answer you for five minutes.

16  I'm sorry.

17      Q   You're not going to answer me for five minutes?

18      A   No.  Because --

19      Q   No, sir.  Let me --

20      A   You don't let me to speak.

21      Q   Sir, this is a deposition --

22      A   Excuse me.  My --

23      Q   -- and it's --

24          THE REPORTER:  One at a time.

25          MS. GARDNER:  It's all right.  Let's see if
            BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 201

1    there is a question pending.

2            THE WITNESS:  Give me time to -- what you're

3    asking me, question.

4        Q    (By Ms. Brouillet)  You can take all the time you

5    need --

6        A    Okay.

7        Q    -- to think.

8        A    Oh, okay.

9        Q    But you answer the question I ask, sir.

10       A    Sure.  No, problem.  Okay.

11       Q    Did Mary Signor ever ask you about ██████

12   ██████?

13       A    No.

14       Q    At no time?

15       A    No.

16       Q    Okay.

17       A    Thank you.

18            MS. BROUILLET:  Then we can take the break.

19            THE VIDEOGRAPHER:  Take off your

20   microphones.  Off the record, 2:39.

21            (Thereupon, a short break was taken at 2:39

22   p.m.  Testimony continues at 2:51 p.m.)

23            (Thereupon, the reporter marked for

24            identification Exhibit No. 14 during the

25            break.)
              BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

Page 202

1          THE VIDEOGRAPHER:  On the record, 2:51.

2     Tape five.

3     Q   (By Ms. Brouillet) Mr. ████, um, during the

4     break, did you have a chance to talk to your attorney?

5     A   Yes, ma'am.

6     Q   Um, I have in front of you Exhibit L [sic], which

7     is the complaint to the federal court.  If you turn to

8     Page 3, I want to ask you some more questions about your

9     complaint.  At Paragraph 8 it says, "Plaintiff's

10    friendship with ████ continued for the next fifteen

11    years and he did volunteer work for the DISP until being

12    hired as a program aide in 2001."  So your friendship

13    with ████ ████ continued through 2001?  And if you

14    have to, you can turn to the prior paragraph.

15    A   Your question was, I volunteered?  Or my

16    friendship?

17    Q   My question is this, looking at Paragraph 8

18    A   Right.

19    Q   -- you had a friendship with ████ ████ from

20    1986 through 2001

21    A   2006.

22    Q   2006, okay.  And if you look at Paragraph 9,

23    "████'s behavior towards plaintiff became more

24    aggressive after plaintiff was hired as a full-time

25    program aide in January, 2002."  Is that accurate?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 203

1    A    2001, ma'am.

2    Q    Well, it says 2002 in this lawsuit, doesn't it?

3    A    Okay.  That's fine, but I --

4    Q    Well --

5    A    2001.

6    Q    Let me ask you this question then, is this

7    paragraph inaccurate then, Paragraph 9?

8    A    Well, I was hired 2001.

9    Q    Okay.  Let me read you this sentence and ask you

10   if it's true or not true, "████████'s behavior towards

11   plaintiff became more aggressive after plaintiff was

12   hired as a full-time program aide in January, 2002."

13   A    2001.

14   Q    Is that sentence I read to you accurate accurate

15   or inaccurate?

16   A    Inaccurate.

17   Q    Okay.  The next sentence says, Plaintiff would

18   ask -- "████████ would ask plaintiff to come to his

19   office on the pretext of discussing business and he

20   would then close and lock the office door."  What

21   business were you discussing?  The property, real

22   estate; that you owned together or UConn business?

23   A    UConn business.

24   Q    Okay.  And when did this -- when was the first

25   incident when ████ ████████ closed and locked the door?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 204

1       A.  The incident... exactly the dates -- 2001 and --

2    probably 2001, after that.

3       Q.  Okay.  And it says in that paragraph, "█████

4    would then touch plaintiff's thighs, genitals, and

5    attempt to kiss him."  Did -- every single time did he

6    touch your thighs, genitals, and attempt to kiss you?

7       A   Yes, ma'am.

8       Q   "███████ then began forcing plaintiff to engage

9    in oral and anal copulation with him over the next two

10   and one half years."

11      A   Yes, ma'am.

12      Q   When did he first force you to engage in oral

13   copulation?

14      A   I remember one incident -- many times happened.

15   I can remember one of them.  And when he gave me blow

16   job,

17      Q   Okay.  I am looking for a date.

18      A   The date, I don't know exactly the date.  There

19   are so many incidents that happened.

20      Q   I'm looking for the first date he forced you to

21   engage in oral copulation.

22      A   I'm sorry.  I don't know exactly.

23      Q   All right.  Do you know a year when he first

24   forced you to engage in oral copulation?

25      A   Two thousand -- I believe it's -- one was, uh...

                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 205

```
 1     Q   I mean the first date.
 2     A   The first one.
 3     Q   The first time he forced you to engage in oral
 4   copulation?
 5     A   2000 -- the end of 2001.
 6     Q   Okay.  When did he first force you to engage in
 7   anal copulation?
 8     A   Um, that was, I believe was, around 2002.  The
 9   one incident I can tell you that, uh, in the meeting,
10   the staff meeting --
11     Q   No, I'm asking you dates.
12     A   The dates -- I don't know exactly the date
13   because so many happened, so many times.
14     Q   Well, when did it first happen, anal copulation
15   with ▓▓▓▓ ▓▓▓▓▓▓?
16     A   At the end of 2001, I believe.
17     Q   And when was the last time ▓▓▓▓ ▓▓▓▓▓▓ forced
18   you to engage in oral Copulation?
19     A   That was 2000 -- March, 2006, my birthday.
20     Q   When was the last time ▓▓▓▓ forced you to engage
21   in anal copulation?
22     A   That was two thousand -- I said March.
23     Q   Well, I asked you about oral.  Are you saying
24   that --
25     A   Yes.
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 206

1    Q    -- on your birthday you engaged in both oral and

2    anal copulation?

3    A    That's what he did, yes.

4    Q    Okay.  Now, every time this happened, did you

5    engage in both oral and anal copulation?

6    A    And off and on.

7    Q    And so sometimes one, sometimes the other?

8    A    Yes.

9    Q    Okay.  And it says, "These" -- the next line in

10   your Paragraph 9 says, "These sexual encounters occurred

11   two to three times per week."

12   A    Yes.

13   Q    So two to three times per week for two and a half

14   years?

15   A    Yes, ma'am.

16   Q    And so that would be about 390 times?

17   A    Sure.

18   Q    Would that -- would that be accurate?

19   A    Sure.

20   Q    And these 390 times, how many of them occurred in

21   ▓▓▓▓s office?

22   A    Most of them.

23   Q    Well, out of 390, how many?

24   A    Most of them was -- happened -- outside, he

25   couldn't do anything.  Only inside when I start work.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 207

1      Q    Well, out of 390, can you give me a percentage?

2    When we say "most," are we saying 51 percent?

3      A    All of them.

4      Q    90 percent?

5      A    Everything workplace.  He never -- he couldn't do

6    it outside.

7      Q    Everything happened in ████s office?

8      A    Most.  In workplace.

9      Q    Well, I want to stop you because I want to be

10    clear because you tried to tell me earlier today about

11    something in Utah --

12      A    What's Utah?

13      Q    -- and that is not ████s office?

14      A    No, that's a part of the job I went with him for

15    training.

16      Q    And so let me be very specific.  I'm asking the

17    physical location where you engaged in anal or oral

18    copulation with ████ 390 times.  Give me the physical

19    locations.

20      A    There was one for business trip, which is

21    training was Utah, and UConn most.  Everything is was

22    work related.

23      Q    Well, is it accurate to say there were only two

24    locations then, ████s office at International Services

25    and then the trip at Utah --

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

Page 208

1    A    Utah.

2    Q    -- at Utah?

3    A    Utah.

4    Q    That's it?

5    A    Yes.

6    Q    No -- not at ███ s home?

7    A    No.

8    Q    Not at your home?

9    A    No.

10   Q    And nowhere else on the UConn campus except for

11   ███ s office?

12   A    Office and the game room.

13   Q    Where's the game room located?

14   A    Uh, was down the stairs.  Not -- we used to have

15   old -- it was Whitney Road.  Our office was in Whitney

16   Road.  It have a basement.  We set up computer and game

17   room for students.

18   Q    A game room at the DISP offices on Whitney Road?

19   A    Yes.

20   Q    Okay.  And so three locations is where you

21   engaged in oral or anal copulation with ███?

22   A    Yes.

23   Q    Once in Utah?

24   A    One is Utah and then rest in office and basement.

25   Q    Okay.  How many times in the game room?
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 209

1      A   Uh, and one incident I can tell you once -- so

2   many times happened, but one of them. Do you want me to

3   say?

4      Q   Wait, many times what happened?  And so let me

5   ask you this question, how many times did you engage in

6   anal or oral copulation with ▓▓▓ ▓▓▓▓ in the game

7   room out of the 390 --

8      A   I didn't count how many.  There's so many things

9   -- so many times happened.

10     Q   It happened in the game room more than once?

11     A   The game, yes.

12     Q   How many --

13     A   The one -- I can describe you one.

14     Q   Okay.  I'm not asking you to describe it.  I'm

15  asking you how many times -- I've got one in Utah --

16     A   I didn't count, I'm sorry.

17     Q   One in Utah.  Correct?

18     A   Yes.

19     Q   And out of the remaining, say, 389, what

20  percentage was in ▓▓▓s office and what percentage was

21  in the game room?

22     A   I'm not sure exactly the -- how many times.  I --

23  I say I didn't count.

24     Q   Why don't you give me a percentage, if you can't

25  give me numbers?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 210

```
 1      A    Probably, 10 percent.

 2      Q    Was in the game room?

 3      A    Yes, one of the incidents I -- if you want me to,

 4   I can say.

 5      Q    Get to my questions.

 6      A    Yes.

 7      Q    But -- so 10 percent of the time in the game

 8   room?

 9      A    Yes.

10      Q    And when you say you engaged in oral copulation

11   with █████ ████████ in this paragraph --

12      A    Yes, ma'am.

13      Q    -- who did what to who?

14      A    He did to me; Most times he wants.

15      Q    He would perform oral sex on you?

16      A    Yes.

17      Q    Did you ever perform oral sex on him?

18      A    Once I did.

19      Q    What year was that?

20      A    I don't know what the year was.

21      Q    Where did it happen --

22      A    In ████.

23      Q    -- that you performed oral sex?

24      A    In the office.

25      Q    █████s office?
```
                    BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 211

1    A    Yes.

2    Q    Okay.  And when we refer to anal sex -- anal

3    copulation with ███ ████ --

4    A    Yes.

5    Q    -- who did what to who?

6    A    He -- most time he wanted to have, you know.  He

7    want me -- he asked me to -- to have sexual intercourse

8    with him.  And I tell him, no, no, no.

9    Q    And so you would put your penis in his anus?

10    A    That's what he wants, yeah.

11    Q    You said "most of the time."

12    A    Yes.

13    Q    Would he ever put his penis in your anus?

14    A    I tried.  He -- he didn't want it.  But he wanted

15    to get, excuse me my language, fucked.  He wants to get

16    fucked.  I'm sorry.

17    Q    Okay.  I understand that, but my question is, did

18    he ever put his penis in your anus?

19    A    No.

20    Q    No.  And so before you said most of the time you

21    would put your penis in his anus.  What -- and so was it

22    100 percent of the time he would put his penis -- you

23    would put your penis in his anus --

24    A    Yes.

25    Q    -- his rectum?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 212

1      A     That's what he wants, yes.

2      Q     A 100 percent?

3      A     Yes.

4      Q     Okay.

5      A     He gave me blow job and he want to get fucked.

6   Excuse me my language.

7      Q     And you would give -- and you -- you gave him one

8   blow job?

9      A     No, he would give me blow job.

10      Q     I thought you told me that one time you performed

11   oral sex?

12      A     Yes.

13      Q     Okay.  And so once you gave ████ ██████ a blow

14   job?

15      A     Yes.

16      Q     Okay.  But you never had ███ ██████ perform

17   anal sex on you?  ████ █████ never put his penis --

18   other than the one time he put his penis in your mouth,

19   did ███ ██████ ever put his penis -- insert his penis

20   in his body?

21      A     No, he just wanted to get fucked himself, you

22   know.  He wanted.

23      Q     And so he never --  he never --

24      A     No.

25      Q     -- anal sex.  Okay.  And just the one time that

                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

Page 213

1    you gave him a blow job?

2         A    Yes.

3         Q    Okay.  Now, when you would engage -- well -- let

4    me withdraw that question.

5              The one time that you gave ▓▓ a blow job, did

6    you use protection?

7         A    No.

8         Q    Okay.

9         A    I got sick for two weeks.

10        Q    I'm sorry, what did you say?

11        A    I was throwing up for two weeks.

12        Q    You were sick for two weeks.  Um, did you

13   swallow?

14        A    No.  He swallowed mine.

15        Q    So when you -- is that amusing?

16        A    I'm sorry?

17        Q    You were laughing.  I'm perplexed by that.

18        A    I'm not laughing.

19        Q    Okay.

20        A    The question, the way you asking me, no.

21        Q    And so my question is this, when you performed

22   anal sex on ▓▓▓▓, did you use protection?

23        A    Yes, most of time he bring a condom.

24        Q    Every time or most times?

25        A    Most of time he has condom with him.

Doe v. UCONN

6/29/2011

Page 215

1    Q    And so every time he produced a condom?

2    A    Yes.

3    Q    Okay.  And these sexual encounters with ▓▓▓

4    ▓▓▓▓▓ began around December of 2001?  Or earlier?

5    A    After 2001.

6    Q    Okay.  You testified earlier today that ▓▓▓

7    ▓▓▓▓▓ began making sexual advances in 2000.  Is it

8    accurate to say then that your -- you didn't engage in

9    oral or anal copulation with ▓▓▓ ▓▓▓▓▓ until --

10   A    Until after --

11   Q    -- what year?

12   A    -- I became full-time employee.

13   Q    Okay.

14   A    2001.

15   Q    2001?

16   A    Yes, ma'am.

17   Q    Okay.

18   A    It started 2000, you know, touching me and

19   holding me, but I wasn't thinking about the sex like

20   that?

21   Q    And so when -- but when it says 2002, that is

22   inaccurate.

23   A    Yes.

24   Q    And so we've established that your first sexual

25   encounter with ▓▓▓ ▓▓▓▓▓ was December of 2001?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 217

```
 1     A    Yes, 2001.

 2     Q    I'm going to -- I didn't ask -- I didn't finish

 3    asking you question yet, and so please don't interject

 4    because the reporter can't take it.

 5     A    Okay.

 6     Q    And so let me say it again.  What you've alleged

 7    to the court is, once this behavior became more

 8    aggressive after you were hired as a full-time program

 9    aide in 2002.  And then you described for me that your

10    first anal or oral copulation occurred in December of

11    2001.

12     A    Two thousand -- after.

13     Q    Let me finish.  And so what was the date?  Now,

14    that you've had time to think about it -- and take as

15    much time as you need -- what was the date when you

16    first engaged in anal or oral copulation with ▮▮▮

17    ▮▮▮▮▮?

18     A    I --

19          MS. GARDNER:  Asked and answered.

20          You can answer it again.

21     Q    (By Ms. Brouillet)  What is the date you first

22    engaged in anal or oral copulation with ▮▮▮ ▮▮▮▮▮▮?

23     A    After I became full-time.

24     Q    What was the date, sir?

25     A    2001.
```

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 218

1      Q    2001?

2      A    Yes.

3      Q    Okay.  So while you were at the Department of

4    International Services and Programs in January of 2002,

5    who was the executive director?

6              MS. GARDNER:  Are you okay, ▇▇?

7              THE WITNESS:  Yes.

8              MS. GARDNER:  Okay.

9              THE WITNESS:  What is your question, please?

10             MS. BROUILLET:  Could you read back the

11   question, please?

12             (Thereupon, the question was read back by

13   the court reporter.  Testimony continues as follows:)

14             THE WITNESS:  ▇▇▇ ▇▇▇▇.

15     Q    (By Ms. Brouillet)  I'm going to show you an

16   organizational chart, and ask you have you seen that

17   before.

18     A    I see more than twenty of these.

19     Q    Okay.

20     A    Different time, different changes.

21     Q    When did Boris Brava-Ureta became the executive

22   director of International Affairs?

23     A    I don't know what date it was -- what year.

24     Q    Was Boris Brava-Ureta above or below ▇▇▇

25   ▇▇▇▇?
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                                    

Page 219

1      A    Above.

2      Q    And so do you know as you sit here now whether

3    ████ ██████ was the executive director or whether Boris

4    Brava-Ureta was in January of 2002?

5      A    I think -- 2002?

6      Q    Yes, January 2002.  I asked you if ████ --

7      A    ████.

8      Q    ████ ██████ was?

9      A    Yes, ma'am.

10     Q    And what was Boris Brava-Ureta's job at the --

11     A    I think he --

12     Q    Let me finish.  At International Services and

13   Programs in January of 2002?

14     A    I think he was the director of International

15   Services.  Not International Service, he was, um,

16   International Affair --

17               THE REPORTER:  International what?

18               THE WITNESS:  Affair.  Affair.  And

19   including -- included our department.

20     Q    (By Ms. Brouillet)  You think that Boris

21   Brava-Ureta was the director of Internation Affairs in

22   January of 2002 and that ████ ██████ was the executive

23   director?

24     A    I'm sorry, I'm sorry.  I misunderstood.  Okay.

25   ████ was director -- he was executive director, I

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 220

1    believe.

2       Q    Who was the "he" who was executive?

3       A    Boris, Boris.

4       Q    And so in January of 2002, Boris Brava-Ureta was

5    the executive director?

6       A    Yes.

7       Q    And ▆▆▆ was the director?

8       A    Director of International Department.

9       Q    And wasn't Robert Chudy at the same level as ▆▆▆

10   ▆▆▆▆▆?

11      A    No.

12      Q    What was Robert Chudy's job in January, 2002?

13      A    International advisor.

14      Q    And what was Herbertia Williams' job in 2002?

15      A    Um, she was international advisor for H worker.

16      Q    And what was Susan Atrens' job in January 2002?

17      A    International advisor for F1.

18      Q    And when was -- withdraw the question.

19           Who were your supervisors from January of 2002

20   until you left the March of 2008?

21      A    Um, it was Susan Atrens, operations, Bob Chudy,

22   the guy was new, Landry, he was new.  Four people.

23      Q    And it's Larry Landry?

24      A    Larry, yeah.

25      Q    And when we say "Herbertia," we're referring to
                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 221

1    Herbertia Williams?

2      A    Yes, ma'am.

3      Q    How did you --

4      A    Very -- very short time.

5      Q    How did you get along with Herbertia Williams?

6      A    Uh, the beginning I get along with her pretty

7    good.  And later, um, I think was, um, between ███ and

8    her was some issue.  I don't know how, but then later

9    she became upset and angry.  No clue how it worked.

10     Q    To your knowledge, did Herbertia Williams ever

11   file a complaint about you?

12     A    No.

13     Q    To your knowledge, did Herbertia Williams --

14   withdraw the question.

15          Do you recall January 11th of 2005 that Herbertia

16   Williams filed a grievance alleging that you were

17   abusive?

18     A    No.

19     Q    Uh, did you ever receive communication from

20   Herbertia Williams that comments you made made her

21   uncomfortable?

22     A    No.

23     Q    Were you ever instructed by Herbertia Williams to

24   never speak to her alone?

25     A    Yes.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 222

1     Q.  Did you ever tell anyone, other than ██████

2     ████████, that you were having an affair with someone

3     at -- who was employed at International Services?

4     A   No.

5     Q.  You never told anyone that you were having an

6     affair with Susan Atrens?

7     A   No.

8     Q   When did you begin reporting to Bob Chudy?

9     A   I think it was 2005.

10    Q   Would it be February 3rd, 2005?

11    A   I don't know exact date.

12    Q   Why did you stop reporting to Herbertia Williams

13    and start reporting to Bob Chudy?

14    A   I think it was issue of the budget.  And she

15    didn't know budget that much and I sent e-mail to Boris

16    and she get angry and said why you don't want to, uh,

17    send it to me first because I'm in charge.  But Boris

18    send me that, that's why I got an e-mail back and so

19    then she got very angry.

20    Q   "She" is who?

21    A   Herbertia Williams.

22    Q   Herbertia Williams is very angry with you?

23    A   Yes, because I was communicating with Boris over

24    the budget.

25    Q   And to your knowledge, did Herbertia Williams

Doe v. UCONN

6/29/2011

Page 223

1  ever complain to UConn that you raised your voice and

2  shouted at her?

3      A   No.

4      Q   You were never asked about that?

5      A   No.  I never shouted.

6      Q   While you were at the University of Connecticut,

7  how many times have you raised your voice or shouted?

8      A   I don't understand.  What do you mean "raise" or

9  "shout"?

10     Q   Raise your voice.

11     A   I talk sometimes very loud.  I mean, you know...

12     Q   How many times while you were at the University

13  of Connecticut, and I'm including while you were

14  employed at dining services --

15     A   Mmm.

16     Q   -- did any other employees complain that you

17  shouted at them?

18     A   Yes, I shout if I'm in the hallway, which at

19  dining service you gotta call, Bring the cart: Please

20  push it.  And so this is -- I have, yes.

21     Q   Okay.  My question, sir, was not if you ever

22  shouted.

23     A   Oh, okay.

24     Q   My question, sir, is, how many times did other

25  employees complain while you were employed at UConn,

Doe v. UCONN

6/29/2011

1   including dining services, that you had shouted or

2   raised your voice at them?

3      A   I don't know how many times they did it.

4      Q   Okay.  Do you know that it happened more than

5   once?  That more than one employee complained about you

6   shouting?

7      A   I don't know.

8      Q   You don't know?

9      A   No.

10     Q   Did you and ████ ██████ have a mortgage together

11  for real estate?

12     A   I purchased the house, yes.

13     Q   Your response is unclear to me, and so let me ask

14  it again.  Did you and ████ ██████ have a mortgage

15  together for real estate -- a real estate mortgage?

16     A   Yes.

17     Q   And while -- withdraw the question.

18         During what period of time was ████ ██████ out

19  of the country while you were employed at International

20  Services?

21     A   I believe he went three times.

22     Q   And when was that?

23     A   I believe it was 2004.  And Christmas I believe

24  was 2005.  I'm not sure of the date.

25     Q   Well, between 2004 and 2006, was ████ ██████ out

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 225

```
 1    of the country while you were employed at International

 2    Services for --

 3         A    I think --

 4         Q    Let me finish.  For more than twelve months

 5    total?

 6         A    No.

 7         Q    How many months total?

 8         A    I think it was, uh, three months he went?   I

 9    believe.

10         Q    A total of three months or a three month period?

11         A    I think a three month period.

12         Q.   And so if the records indicate that he was out of

13    the country longer than that, do you think those records

14    would be inaccurate?

15         A    They could be, because the date -- I don't know

16    exactly the date.

17         Q    You're not sure of how many months?

18         A    Right, ma'am.

19         Q    Okay.  Now, tell me the addresses of the real

20    estate that you had an interest in with ████ ███████?

21         A    ████████. I think ███, I'm not sure.

22         Q    Is that the only real estate venture you had with

23    ████ ███████?

24         A.   Yes.  There's two in there, commercial and

25    residential
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 226

1      Q    And when did you stop owning real estate with

2    ███ ████████?

3      A    2006.

4      Q    When in 2006, sir?

5      A    I'm sorry?

6      Q    When in 2006?

7      A    May -- May 8th.

8      Q    You stopped owning property with ████ ████████ on

9    May 8, 2006?

10     A    Yeah, because I'm not sure he -- he sold it.  He

11   took the money and he left.

12     Q    So your understanding is that ████ ████████

13   disposed of that real estate in Willimantic in May 8th,

14   2006?

15     A    Say it again.  I'm sorry.

16     Q    I want to clear about your testimony.

17     A    Yes.

18     Q    And I had asked you when you stopped owning real

19   estate with ████ ████████, and you said May 8, 2006.

20     A    This is the times -- he sold when I had -- when I

21   complained about him, that's why he sold the house.  He

22   took the money.

23     Q    Well, May 8, 2006 is the date that you were put

24   out on paid administrative leave after being arrested on

25   May 6, 2008.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 227

```
1      A   Yes.

2      Q   And so you think the same day you were put on

3  paid administrative leave from UConn is the day that

4  ███  ██████  sold the property?

5      A   I'm not sure what day he sold it, but the -- the

6  lot -- the house I purchased, I put ten thousand dollar.

7  He gave me the ten thousand dollar check after -- before

8  he got suspended from UConn.

9      Q   Okay.  You received --

10     A   Thank you for letting me this time explain.

11     Q   You received a ten thousand dollar check from

12  ███ ████████?

13     A   Yes.

14     Q   When did you receive a ten thousand dollar check

15  from ███  ███████?

16     A   I don't know the dates.

17     Q   Well, how many checks did you receive from ███

18  ████████?

19     A   Just one.

20     Q   Just one.  Ten thousand dollars.

21     A   Yes.

22     Q   And you don't know when that -- when you received

23  that check?

24     A   I don't know the dates.  If you don't, I will

25  provide it for you.
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 228

1    Q    You have a copy of the check?

2    A    Yes, ma'am.

3    Q    Okay.  And the check was for the sale of the ███

4    ███████████  Street?

5    A    Yes, ma'am.

6    Q    Okay.  Was your name on the mortgage deed for

7    that property?

8    A    Uh, when I purchased the house, it was completely

9    in my name.  And later I didn't know how it changed.

10   And I put ten thousand dollars down payment.

11   Q    Wait a moment.

12   A    Yes?

13   Q    When you purchased the house, what address are we

14   talking about?

15   A    ███████████

16   Q    Willimantic?

17   A    Yes.

18   Q    Okay.  The address that you said you owned with

19   ████ ██████, that was ███████████  Street?

20   A    I believe, yes.

21   Q    Was your name on the property?

22   A    Supposed to be.  Yes, when I purchased, I put the

23   money and, uh, I sign and, uh, later I am not sure what

24   happened.  He changed it behind my back, so no clue.

25   Q    When did he change it behind your back?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 229

1    A    I don't know.  I don't know, I'm sorry.

2              (Thereupon, the reporter marked for

3         identification Exhibit Nos. 15 and

4         16.)

5    Q    (By Ms. Brouillet)  Mr. ██████ --

6    A    Yes, ma'am.

7    Q    -- I know you're not an attorney, but I'm to show

8    you the warranty deed forms for that property and

9    description of that, um, property --

10   A    Yes, ma'am.

11   Q    -- including the settlement statement from the

12   U.S. Department of Housing Urban Development.

13   A    Yes.

14   Q    And that lists the borrower as ██████  ██████

15   ██████ Street, Willimantic and --

16   A    That was his house.

17   Q    And it lists a property location as ██████

18   ████ Street, Willimantic.  And then the first page is a

19   warranty deed.  It says, "██████  ██████."  And what I

20   couldn't find on that property, sir, is your name being

21   on the property.

22   A    Okay.

23   Q    Including the commercial records, so --

24   A    My lawyer will provide it for you.

25   Q    Well, let me ask you this, to your knowledge, was

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 230

1    your name ever on the real estate for ████ Street?

2       A   Yes, I purchased the house.  Yes.

3       Q   And did you pay taxes on it to the Town of

4    Windham?

5       A   Yes, ma'am.

6       Q   Did you purchase the house from ████ ████?

7       A   No, for myself to open business down the -- down

8    -- there's a commercial and residential.

9       Q   No, maybe you misunderstood my question.

10      A   Go ahead.

11      Q   Did you purchase it from ████ ████?

12      A   No, ma'am.

13      Q   You didn't.  Okay.

14      A   Thank you.

15      Q   And you said that ████ ████ paid you ten

16   thousand dollars --

17      A   I can't believe it.  I understand now.  It's

18   easy.

19      Q   Well, you don't get to make comments.

20      A   Thank you.

21      Q   So let's go through this.

22      A   I'm sorry.

23      Q   Here's another exhibit.  You said that ████

24   ████ --

25      A   He send it through someone else.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

1      Q    Wait.  You said that ███ ████ paid you ten

2  thousand dollars --

3      A    Yes.

4      Q    -- after he disposed of the property without your

5  knowledge.

6      A    Yes.

7      Q    And I'm showing you an official bank check for

8  ten thousand dollars dated July 6, 2006.

9      A    Yes, ma'am.

10     Q    And it says, "Re: ███ ████."  Is that what

11  you were referring to?

12     A    That's the one, yes.

13     Q    Okay.  Do you know whose handwriting that is?

14  There's some handwriting where it says, "Re: ████

15  ████," and something else has been written in.

16     A    This one, I believe, is ████.  This one is the

17  guy, um, he purchased the house from him.

18     Q    But -- hang on.  Because she can -- the reporter,

19  when you say "he" and "the guy," next to ████

20  ████ it has handwritten in on this copy, "for

21  settlement of ████ Street."  Do you recognize that

22  handwriting that says for settlement of ████ Street?

23     A    Yes.

24     Q    Whose handwriting is it?

25     A    ████.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 232

1      Q   Okay.  And if ▇▇▇▇ denies that's his handwriting,

2   you still think it is his handwriting?

3      A   He cannot deny it.  It's right here.

4      Q   Well, I am just asking you, you --

5      A   No.

6      Q   You think it would be wrong if he said that's not

7   my handwriting?

8      A   That's -- he wrote the check.

9      Q   No, no.  I'm asking whose handwriting it is.  Are

10  you that familiar with ▇▇▇ ▇▇▇▇▇▇'s handwriting that

11  you would say that's his handwriting?

12     A   Yes.

13     Q   Okay.

14     A   He writes two different things -- different way,

15  handwriting.  Two, three ways.

16     Q   And so this check is dated July 6, 2006.

17     A   He sold the house --

18     Q   No.

19     A   -- to this guy.

20     Q   I have a question.

21     A   Okay.

22     Q   This check is dated July 6, 2006.  When did you

23  receive it?

24     A   That's the date -- I'm not sure what day was it

25  though.

Brandon Smith Reporting & Video
860-549-1850    production@brandonreporting.com    249 Pearl Street

Doe v. UCONN

1    Q    You did receive it?

2    A    Yes.

3    Q    You don't know what day you received?

4    A    I'm not sure what day was it.  I met the guy.  He

5    brought it to me.

6    Q    Who is "the guy"?

7    A    I don't know his name.  Um, he sold it the him

8    and so he brought the check.  He said, ████, this is --

9    ████ give you this, um, because you don't own the house

10   anymore.  No equity, anything.  And so he sold it 135

11   for this guy.

12   Q    Where did you meet this man that gave you the

13   check, the guy?

14   A    At UConn.

15   Q    Where at UConn?

16   A    In, uh, by -- Wooster Street (phonetic).

17        THE REPORTER:  By what street?

18        THE WITNESS:  I'm not sure what the street

19   is that.  It's by -- they call chemistry building.  By

20   the -- it's a -- it's chemistry building by the

21   sidewalk.  And so he came and I talked to him.

22   Q    (By Ms. Brouillet)  And you met with this man

23   shortly after July 6, 2006?

24   A    Yes.

25   Q    On campus?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 234

1    A    Yes, ma'am.

2    Q    And you're sure it was July of 2006?

3    A    July -- I'm not sure what day was it.

4    Q    No, no.  I'm asking what month it was.  Are you

5    sure it was July of 2006?

6    A    I'm not sure what day is it.

7    Q    Well, isn't it true that you were under

8    suspension from UConn starting May 8, 2006 --

9    A    Yes.

10   Q    -- and prohibited from being on campus until you

11   signed the agreement on September 27, 2006?

12   A    The property, not on the highway.  Not in the

13   street.

14   Q    And so you --

15   A    I cannot drive through UConn?

16   Q    So let me ask you this, was it your

17   interpretation that you were allowed to go on UConn

18   property --

19   A    Sure.

20   Q    -- as long as you stayed in the street?

21   A    Well, I'm driving.  I come on 95, where are you

22   going to go?  You're going Manchester or you're going to

23   Willimantic?  And so it's a highway.  How am I going to

24   stop that?

25   Q    Well, I'm not going to answer your question, but

Brandon Smith Reporting & Video
860-549-1850      production@brandonreporting.com      249 Pearl Street

Doe v. UCONN

6/29/2011

Page 235

1    you testified that you were on the road where the

2    chemistry building is --

3        A    And --

4        Q    -- and that's part of UConn.

5        A    The street, highway, is like this (indicating).

6    Chemistry is on the right -- on the left.  Um, church is

7    on the right.  A mosque, synagogue, is on the right.

8        Q    And so what road -- you met the man at UConn on

9    the street?

10       A    Across -- across from -- which is, here is

11   synagogue, church, and mosque (indicating).  And so I

12   met him right in the road.

13       Q    You were in the road and received ten thousand

14   dollars from a man that you don't know who he was?

15       A    I know him one time he came into the office.

16   He's a -- this guy is, um -- I'm trying to -- ▮▮▮▮▮

17   (phonetic).  He's name is ▮▮▮▮.   ▮▮▮▮▮ is from Iran

18   and he's wrestler instructor and he works on, uh, high

19   school.

20       Q    And this is the gentleman that you claim bought

21   the property?

22       A    He bought it from ▮▮▮.  He bought it from ▮▮▮.

23       Q    And he works for the high school.  Is he a

24   teacher?

25       A    Yes.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 236

1    Q    Have you seen him at the mosque at UConn?

2    A    No.  I'm not sure.  I think he -- he travel.

3    Q    And so other than that time when you met on the

4    street --

5    A    Yes.

6    Q    -- to receive a ten thousand dollars check --

7    A    Yes.

8    Q    -- between May 8th of 2006, when you were

9    suspended from UConn, and when you returned to UConn

10   after September 27th of 2006, how many times were you on

11   UConn's property, on campus?

12   A    I went to pray in the mosque, uh, every Friday.

13   Q    And so how many times were you on UConn's

14   property?

15   A    This is not UConn's property.  It's a mosque for

16   worship place.

17   Q    Let me clear with my question.

18   A    It's a private.

19   Q    I mean on campus at UConn.

20   A    This is not campus, no.

21   Q    Let me finish, sir.  And so if we are talking

22   property that's on the campus, that's what I'm referring

23   to.

24   A    No --.

25   Q    And so how many time were you on UConn's campus

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 237

1    between May 8th --

2        A    I don't need to --

3        Q    Let me finish.  Let me finish.

4        A    Yes.

5        Q    Between May 8th, 2006 --

6        A    Yes.

7        Q    -- and September 27, 2006?  How many times were

8    you on the property?

9        A    Nothing.  I don't need to go there.  I don't have

10   any business.

11       Q    Well, you told me you were there --

12       A    This is the mosque only.  The 195 [sic] you turn

13   right, the first thing is church, second is mosque.

14   Mosque does not belong to UConn.  UConn gave it to

15   people who worship.

16       Q    Is the mosque on the UConn campus?

17       A    Yes.

18       Q    Okay.

19       A    It does not belong to UConn.

20       Q    I'm not asking you who owns property.  How many

21   times -- I will ask the question again.

22       A    Every Friday.

23       Q    Sir, I haven't asked the question.

24       A    Okay.

25       Q    How many times between May 8th, 2006 and

BRANDON SMITH REPORTING & VIDEO



Page 238

1    September 27, 2006, were you on the UConn campus?

2                    MS. GARDNER:   Asked and answered.

3                    MS. BROUILLET:   He didn't respond to that

4    question.

5                    MS. GARDNER:   He responded two different

6    ways.  He told you he's been to mosque every Friday.  He

7    also said that other than that he was not on the UConn

8    campus.

9                    MS. BROUILLET:   And I think you can agree

10   that --

11                   THE REPORTER:   One at a time.

12                   MS. GARDNER:   How is this --

13                   MS. BROUILLET:   I think you can agree that

14   how many -- that going to mosque is not a number.  And

15   so when I say --

16                   THE WITNESS:   It's a number.

17                   MS. BROUILLET:   -- how many times --

18                   MS. GARDNER:   Don't say a word.

19                   MS. BROUILLET:   -- then there is a number,

20   Attorney Gardner.  And so, yes -- remember, in the

21   federal rules, I just have to ask for something that can

22   lead to admissible evidence.

23                   MS. GARDNER:   Yes, and so he answered.

24                   MS. BROUILLET:   No, he didn't.

25                   MS. GARDNER:   Every Friday --
                     BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 239

1          MS. BROUILLET:  That's not a number.  Do you

2    understand that when I say --

3          MS. GARDNER:  Should we get out a calendar

4    and --

5          THE REPORTER:  One at a time.

6          MS. GARDNER:  -- count the number of

7    Fridays?

8          MS. BROUILLET:  The sarcasm is certainly not

9    appreciated.  But let me --

10         MS. GARDNER:  You started it --

11         MS. BROUILLET:  Let me tell you this, when I

12   say "how many," the response is a number or "I don't

13   know."  But the response is a number.  And since your

14   client refuses to provide a number, I'm asking the

15   question.

16         MS. GARDNER:  And so you're going to keep

17   asking it until he provides a number.

18         MS. BROUILLET:  Or he says, "I don't know,"

19   yes.

20         MS. GARDNER:  Okay.

21         MS. BROUILLET:  Because when I ask for a

22   number or a date, I mean a number or date.  This can go

23   very quickly.

24         THE WITNESS:  Okay.  From one year, 300,

25   whatever it is, calculator to Friday, every Friday.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



Page 240

1      Q    (By Ms. Brouillet)   Okay.   Between May 8th, 2006

2   and September 27, 2006, other than going to the mosque

3   and other than the one time when you were on campus to

4   receive the check on the street, how many times were you

5   on the UConn campus?   How many times?

6      A    Your question is, if I physically in the campus.

7      Q    Let me have her read the question back so that

8   you hear it.

9      A    If you can slow a little bit, please.

10     Q    Let me have her read the question back.

11     A    Thank you.

12              (Thereupon, the question was read back by

13   the court reporter.  Testimony continues as follows:)

14              THE WITNESS:  Probably because I went to

15   ODE's office and I went to -- ODE told me to report it

16   in the police station.  I went to the police station.

17   Probably, I'm not sure, ten.  More than that?  To meet

18   Mary from ODE --

19     Q    (By Ms. Brouillet)   I didn't ask you what you

20   were doing?

21     A    ODE office, yes.

22     Q    And so when you were on campus --

23     A    Yes, ma'am.

24     Q    -- not counting going to the mosque, during that

25   time, period you only went to the police station or to

Doe v. UCONN

6/29/2011

Page 241

1   ODE?

2       A   Yes, ma'am.

3       Q   Have you ever filed a complaint with the police

4   that ▓▓▓ ▓▓▓▓ was sexual assaulting you?

5       A   Yes, but, uh, the thing is that because --

6       Q   Now, that you've answered yes, I'll ask you

7   further questions.

8       A   Okay.

9       Q   What police department did you file that

10  complaint with?

11      A   After I complained to ODE and I complained to a

12  police -- a police station, sorry, at UConn.

13      Q   UConn police?

14      A   Yes.

15      Q   When did you file a complaint with the UConn

16  police that you were being sexually assaulted by ▓▓▓

17  ▓▓▓▓▓?

18      A   Um, the day -- um, he get suspended and I went to

19  Mary and he was telling me that --

20      Q   No, I'm --

21      A   Hold on.

22      Q   -- not asking you what he was telling you.

23      A   No.

24      Q   Let me focus on the question.  I'm asking a date.

25      A   I have to remember.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



1    Q    Take all the time that you need to remember.

2    A    No, no.

3    Q    Take all of the time you need.

4    A    It has to be the whole thing, sentences.

5    Q    No, it does not, sir.  Let me tell ya, I'm asking

6    you for a date and then I will ask you further

7    questions.  Take as much time as you need to remember

8    accurately.  I just don't want you to list all of these

9    things on the record.  What date did you go to the UConn

10   police to file a complaint that ▓▓▓ was sexually

11   assaulting you?

12   A    I don't know exactly.  August.  And he said, If

13   you don't drop the complaint --

14   Q    I'm not asking you what people said.  Mr. ▓▓▓

15   -- 

16   A    -- you molested my daughter.  And so I went to

17   report it to the police, which is Mary told me to go to

18   the --

19   Q    All right.  Mr. ▓▓▓ --

20   A    -- police department to report it.

21   Q    I am going to move to strike your response as

22   nonresponsive.

23   A    Okay.

24   Q    You reported it once to the UConn police

25   department?

Page 243

1    A    Yes, ma'am.

2    Q    And did you ask the UConn police department to

3  investigate?

4    A    Yes.

5    Q    And if the UConn police department records --

6    A    Yes.

7    Q    -- include a statement by you that you asked them

8  not to take any action, you think that would be

9  inaccurate?

10   A    Yes, because Mary told me not to because we do --

11   Q    No, I'm not asking you --

12   A    -- internal investigation.

13        THE REPORTER:  One at a time.

14   Q    (By Ms. Brouillet)  Mr. ████  I am striking

15  that.

16   A    Yes, ma'am.

17   Q    I am asking you did you ever tell the UConn

18  police I don't want you to do anything about this?

19   A    No, I didn't.

20   Q    You didn't?

21   A    No.

22   Q    And so if the police reports indicate that you

23  told the UConn police don't do anything.  I just want to

24  tell you about it, but please don't take any action,

25  that would be inaccurate?  The police are lying?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 244

1    A    No, I didn't say that.

2    Q    Okay.  And so the police report would be

3    inaccurate?

4    A    I'm not sure.

5    Q    You're not sure?

6    A    I'm not sure.  Because --

7    Q    Well, I'm not asking you anything further.

8    A    Mary gave me advice.

9    Q    Mr. ████, there's not question pending.

10   A    -- internal investigation.

11        THE REPORTER:  One at a time.

12   Q    (By Ms. Brouillet)  Mr. ████?

13   A    Yes.

14   Q    I'm moving to strike that.  You can't continue to

15   answer.  Let me ask you the questions and then you can

16   respond.

17   A    You don't like me to answer, ma'am.

18   Q    Yes, you don't get it.  You only --

19        MS. GARDNER:  Okay.  Let's get this over

20   with.

21   Q    (By Ms. Brouillet)  You only get -- you only get

22   respond to the question asked.

23   A    No.  No, I didn't say.

24   Q    There's not a question pending.  And so I don't

25   know what the, "no," is.

860-549-1850       Brandon Smith Reporting & Video
                   production@brandonreporting.com   249 Pearl Street

Doe v. UCONN



1    A    You asked me, I said, no.

2    Q    What is your --

3    A    If I say to the police department to take action,

4  I said no.

5    Q    No, you did not ask the police to take action?

6  Or, no, the police are lying if they wrote that you said

7  please do not take any action?

8    A    I didn't say don't take action.

9    Q    Listen to my question.

10    A    Yes.

11    Q    If the police report says that you asked them not

12  to take any action, is that a lie?

13    A    I'm not sure it is a lie or not.

14    Q    Is it truthful?

15    A    Yeah, because I --

16    Q    Is it truthful?

17    A    Yes.  I get advice from --

18    Q    No, I'm not asking --

19    A    -- ODE --

20    Q    -- you that, Mr. ██████.

21    A    -- to tell me not do it.

22            THE REPORTER:  One at a time.

23    Q    (By Ms. Brouillet) -- that's not responsive.

24    A    -- because it's internal --

25    Q    Mr. ██████, if I have to call the judge, I will.

                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                                    

Page 246

1    A   -- investigation. Okay.

2    Q   I will call judge if necessary, Mr. ████, so

3    that you can answer the question.

4         MS. GARDNER:  Is there a question pending?

5         MS. BROUILLET:  Yes, there is.

6         MS. GARDNER:  Okay.  Can we have it read

7    back?

8         MS. BROUILLET:  I'm happy to have it read

9    back.  But let me be clear, Attorney Gardner, that Mr.

10   ████'s comments afterwards is not responsive and

11   this is -- I am going to ask the court for additional

12   time for his deposition because he's refusing to respond

13   to the question asked.

14   Q   (By Ms. Brouillet)  So, first, let me ask you the

15   question again one more time.

16   A   Go ahead.

17   Q   If the UConn police report says that you asked

18   them not to take any action, is that untruthful?

19   A   Do you want me to say the sentence or say "yes"

20   or "no"?

21   Q   I want you to answer yes or no to that question.

22   A   Then it's not correct -- correct information for

23   you.

24        MS. GARDNER:  I can ask you another question

25   later.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 247

1           THE WITNESS:  Okay.

2           MS. GARDNER:  And so just answer it yes or

3    no.

4           THE WITNESS:  Okay.  No.  I didn't state.

5    Q   (By Ms. Brouillet)  No, it's not untruthful.

6    A   Yes.

7    Q   Okay.  Now --

8    A   Yes, ma'am.

9    Q   -- when did you report ████ ████'s sexual

10   assault of you to UConn?

11   A   When?

12   Q   Yes, sir.  When?

13   A   May -- I believe it's June.

14   Q   Do you have a year?

15   A   June, 2006.

16   Q   Would it be accurate --

17   A   Excuse me, I have to stand up.

18           MS. GARDNER:  That's all right.

19           MS. BROUILLET:  Do you need to take a break?

20           THE WITNESS:  No, I just -- you can ask

21   me --

22           MS. BROUILLET:  Well, I want to make sure

23   you're being videotaped.  Can you --

24           THE WITNESS:  (To videographer)  Is that

25   okay?  I can stand up?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 248

1          THE VIDEOGRAPHER:  Yes, just put on your

2    mic.

3          THE WITNESS:  I'm sorry.  Go ahead, ma'am,

4    please.  I'll stand up and answer you.

5          MS. BROUILLET:  I'll wait.  I'll wait.  Take

6    your time.

7          MS. GARDNER:  Well, I told you this morning

8    that he might have to stand up.

9          MS. BROUILLET:  I'm saying he can stand.

10   Take a standing break.

11         MS. GARDNER:  But you're going to stop

12   asking questions?

13         MS. BROUILLET:  I'm reading something.  No,

14   I did not say that.  I said I'll wait if he has to walk

15   around or something.  But I'm looking at a document,

16   Counselor.  I didn't say I'm not going to ask him

17   questions.  Well, I guess he took a break.

18         THE VIDEOGRAPHER:  I'll go off.  Off the

19   record --

20         MS. BROUILLET:  I guess so.  The deponent

21   walked out.

22         THE VIDEOGRAPHER:  Do you want me to go off?

23         MS. BROUILLET:  Well, since the deponent is

24   not here and he walked out, yes.

25         THE VIDEOGRAPHER:  Off the record, 3:38.

BRANDON SMITH REPORTING & VIDEO



Page 249

1          (Thereupon, a break was taken at 3:38 p.m.

2     Testimony continues as follows at 3:44 p.m.)

3          (Thereupon, the reporter marked Connection,

4     Inc., Document for identification as

5     Exhibit No. 17 while off the record.)

6          THE VIDEOGRAPHER:  On the record, 3:44.

7     Tape 6.

8          THE WITNESS:  I'm sorry, my back was hurting

9     and so I have to get up.

10    Q    (By Ms. Brouillet)  While you had that break, did

11    you have an opportunity to speak with your attorney?

12    A    Yes, ma'am.

13    Q    And any time have you told the UConn police that

14    you did not want to contact any of the witnesses in this

15    case?

16         MS. GARDNER:  Object to the form.

17         You can answer.

18         THE WITNESS:  No.

19    Q    (By Ms. Brouillet)  Who was ███ ████, ████████,

20    ████████?

21    A    Was international student.

22    Q    He was a student?

23    A    His wife was a student and he was F2, dependent.

24    His wife was professor.

25    Q    In what -- his wife was a student and a

                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 250

1   professor?

2      A    She was professor.

3      Q    Was she also a student?

4      A    I am not sure.  But she was a processer.

5      Q    How do you know Mr. ▮▮▮?

6      A    Through -- um, he used to come in the office a

7   lot for his documents to be signed.  I used to sign his

8   documents for traveling or he need something.

9      Q    When you say into "the office," at --

10      A    International department.

11      Q    And who is ▮▮▮▮ ▮▮▮▮?

12      A    ▮▮▮▮ ▮▮▮▮ is -- he is from the community.

13      Q    What community?

14      A    He is ▮▮'s friend.

15      Q    Well, when --

16      A    ▮▮▮ ▮▮▮▮'s friend.

17      Q    When you say "from the community," what

18   community?

19      A    Ashford, I believe.

20      Q    And when you said "from the community," you are

21   referring to the Ashford community?

22      A    Yes.

23      Q    And --

24      A    ▮▮▮ ▮▮▮▮'s friend.

25      Q    And where did you meet ▮▮▮▮ ▮▮▮▮?

BRANDON SMITH REPORTING & VIDEO


Page 251

```
 1    A    ██████ ██████ I met him in 2000?  I believe

 2    2005.  I'm not sure.

 3    Q    Where did you meet him?

 4    A    Um, in Willimantic.

 5    Q    Where?

 6    A    By the house I purchased, I believe.

 7    Q    What location?  What real -- what house?

 8    A    ████ Street.

 9    Q    Where you live currently?  Or where you were

10    living at the time?

11    A    The business -- the business, uh, the real

12    estate, the one in ████ Street, Willimantic.

13    Q    But I thought you told me you didn't live there.

14    Did you ever live at that address?

15    A    No, I didn't live.

16    Q    Okay.

17    A    That's where I met him.

18    Q    You met him at the real estate?

19    A    The house, yes.

20    Q    And so when you say "the house," you don't mean

21    where you are living?

22    A    No.

23    Q    And ████ ████ was he involved in the real

24    estate?

25    A    He was a -- what do they call this word.  Uh, the
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 252

1    one who works in real estate.  I forgot the word now.

2        Q.  A real estate agent?

3        A   Yes.

4        Q   And did you know him as a real estate agent?

5        A.  No.  Before I -- after he told me he works there.

6    That's why he was coming to the...

7        Q   When did you last meet with or meet ████ ████?

8        A   The last day, uh, I think he has a problem, uh,

9    international department, um....

10       Q   I'm asking a date.  Because this is a student and

11   I don't want to hear anything about a student's

12   information.  What -- do you know the date when you last

13   saw him?

14       A   Last I saw him, I don't know what day was the

15   last.

16       Q   Do you know what year?

17       A   2009, I believe.

18       Q   If you turn to your complaint, your federal

19   complaint there, Page 3.

20       A   Yes.

21       Q   You see Paragraph 12.  It says, "From June 2004

22   through March, 2005, ████████ traveled to Dubai on a

23   number of long-term assignments for the University."

24       A   Mmm.

25       Q   Do you see that?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 253

1    A   Yes.

2    Q   Now, you told my today that ████ ██████ was out

3   of the country for about three months.

4    A   But I didn't tell you --

5    Q   Let me finish, please.  And so my question is

6   this, now that you've read your federal complaint, was

7   he out of the country for only three months?  Or was he

8   out of the country from June of 2004 to March of 2005?

9        MS. GARDNER:  And I'm going to object to the

10   characterization of his -- characterization of his

11   earlier testimony.

12        MS. BROUILLET:  Okay.

13        MS. GARDNER:  But you can answer.

14    Q   (By Ms. Brouillet)  Well, let me withdraw the

15   question.  When was ████ ██████ out of the country in

16   Dubai?  Because I'm looking at Paragraph 12 and I'm

17   trying to understand if this is accurate.

18    A   I think he went three times, but -- two times or

19   three times he went traveling to Dubai for researching

20   to open campus.

21    Q   Well, the complaint says, "From June, 2004

22   through March of 2005, ██████ traveled to Dubai."  Is

23   that accurate?

24    A   2004, yes.

25    Q   Is what -- it's right in front of you, sir.  Is

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                                      

Page 254

1    that accurate?  Do you see it, Page 3, Paragraph 12?

2    Take your time and read it.

3       A   I'm sorry, what's your question then for this?

4       Q   Okay, have you read Paragraph 12?

5       A   Right there, yes.

6       Q   It says -- my question is this, now, that you've

7    read Paragraph 12, is that accurate?

8       A   I believe, yes.

9       Q   Okay.  Now, if you turn to Paragraph 14, on Page

10   4 it says, "On May 5, 2006, ███ ████ falsely accused

11   plaintiff of threatening him with a knife and a gun

12   while they were dining with friends at a local

13   restaurant."

14      A   Yes.

15      Q   Do you see that, sir?

16      A   Yes, ma'am.

17      Q   Did you threaten ███ ████ on May 5, 2006?

18      A   No, I didn't want to interact with him, no.

19   That's why he filed --

20      Q   Well, you were charged with a crime as result of

21   your actions on that night, weren't you?

22      A   Yes, ma'am.  He can do a lot of things to damage

23   me.

24      Q   Well, let me ask you this, sir --

25      A   Not only this.  Yes.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 255

1     Q    And you pled no contest to those criminal

2   charges?

3     A    Yes.

4     Q    And when -- now, during that -- withdraw the

5   question.

6          When you were investigated by UConn for your

7   actions on May 5, 2006, you were represented by your

8   UCPEA.  Did you sign an agreement with UConn that you

9   had actually threatened ▓▓▓ ▓▓▓▓▓ on May 5, 2006?

10    A    No.

11    Q    You didn't?  Isn't it true, sir, that you agreed

12  to a three week suspension on September 27, 2006 because

13  you made violent threats on May 5, 2006?

14    A    No.

15    Q    So that if we have a signed agreement from that

16  date, that's inaccurate?

17    A    And they give you information, that's fine with

18  me.  But not -- I don't know about that.

19    Q    Let me ask the question again because your

20  response is, I don't know.

21    A    Okay.

22    Q    We talked earlier --

23         MS. GARDNER:  Objection.  He said, no.  And

24  then when you said what was in some document that you

25  haven't put in front of him, he said I don't know.
                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 256

1    That's what the record will show.

2         MS. BROUILLET:  The record will show

3    whatever it shows, but there is no question pending and

4    so there's nothing to object to.  You have to do the

5    objection after --

6         MS. GARDNER:  Don't you be condescending

7    with me or we'll end the deposition right now.

8         MS. BROUILLET:  Counsel, let me just be

9    clear, I want it to flow smoothly so that the court gets

10   an accurate transcript.

11   Q    (By Ms. Brouillet)  And so, Mr. ████, do you

12   recall your agreement to return to work on September 27,

13   2006 following your suspension on May 8, 2006?

14   A    Yes.

15   Q    And do you recall as part of that agreement you

16   agreed to a three-week suspension without pay based on

17   your actions from May 5, 2006?

18   A    Yes, ma'am.

19   Q    Why did you agree to such a suspension if you

20   claim you did not make any threats?

21   A    Do you want me to say the sentences?  Or just you

22   tell me yes or no?

23   Q    I want you to tell me -- do you remember the

24   question?  I want you to respond to that question and

25   that question only.

                 BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 257

1    A    I took it because I need my job and my family to

2    support.  He'd been -- he make different accusations

3    after that, and so -- which is he said he will destroy

4    my life as much as he could, for which he has done.

5    Q    Well, let me ask you this, what effect do you

6    think your behavior in 1999 and 2000 had on ▓▓▓ ▓▓

7    ▓▓▓▓▓'s life?

8    A    That's a -- that's a lie.  A lie completely.

9    Q    Your response is -- doesn't respond to the

10   question.  What effect do you think your behavior in

11   1999 and 2000 had on ▓▓▓▓▓▓▓▓▓'s life?

12   A    If I have sexual favor with him and I will,

13   excuse my language, fuck him, it wouldn't happen,

14   nothing.  Because I don't believe -- I am not gay.  I

15   don't -- I respect people.  But -- that he wants me to

16   do because I isolated him from my life.  I don't want to

17   do it any more.

18   Q    Perhaps you misheard my question.  I didn't refer

19   to ▓▓▓ ▓▓▓▓▓.  I am asking you what effect your

20   behavior in 1999 and 2000 --

21   A    Mm-hmm.

22   Q    -- had on ▓▓▓▓▓▓▓▓▓▓'s life since she was

23   nine and ten years old at the time?

24   A    This is ▓▓ ▓▓▓▓▓ get fired and she gave a

25   statement.  He told me to drop the case.  If you don't

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 258

1    drop the case, my daughter will give a statement you

2    molested her.   Which I reported in the police report,

3    UConn police.   And Mary told me --

4        Q    No, don't tell me what Mary told you, sir.

5        A    -- do not do it.

6        Q    Mr. ██████ --

7                 THE REPORTER:   One at a time.

8                 THE WITNESS:   Internally, UConn.

9        Q    (By Ms. Brouillet)  Mr. ██████ -- Mr. ██████?

10       A    Yes.

11       Q    I want to remind you of the rules of the

12   deposition.

13       A    Yes, ma'am.

14       Q    You answer the question asked.   Now, I've asked

15   you more than once --

16       A    Yes, ma'am.

17       Q    -- and you've never responded to the question.

18       A    Okay.

19       Q    And so I'll ask you one more time, and then if

20   necessary, I will ask the court to order you to answer

21   it.   And so let me ask you the question, and if you

22   don't understand it, tell me you don't understand it.

23            What affect do you think your actions in 1999 and

24   2000 had on ██████████████?

25                 MS. GARDNER:   Object to form.
                 BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 259

1           THE WITNESS:  I don't know.

2           MS. GARDNER:  You can answer it.

3      Q   (By Ms. Brouillet)  Now, as you sit here today,

4  and we have gone through this a number of times --

5      A   Yes.

6      Q   -- are you telling me that you never improperly

7  touched ████████████?

8      A   No.

9      Q   No, you're not telling me that?

10     A   No.

11     Q   Okay.

12          MS. GARDNER:  Do you understand?

13          THE WITNESS:  I'm not sure what she asked

14  me, the question.

15          MS. GARDNER:  Okay.  I don't think he

16  understood you.

17          THE WITNESS:  I don't know what he say.

18     Q   (By Ms. Brouillet)  If you don't understand the

19  question, it is very important that you say you don't

20  understand.

21     A   Okay.

22     Q   You're sitting here now, we've gone through at

23  length this morning the police reports, your criminal

24  convictions.

25     A   Yes.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 260

1      Q   And so when you responded to me -- when I asked

2   you earlier about what affect your behavior in 1999 and

3   2000 had on ▟▙▟▙▟▙▟, until you said "I don't

4   know," before that you went into things ▟▙▙ ▟▙▙▟▙

5   said and that it is a lie.  And so I want to make sure I

6   am perfectly clear.

7      A   Okay.

8      Q   As you sit here today under oath --

9      A   Mmm.

10     Q   -- are you claiming that ▟▙▟▙▟▙▟▙ made up

11  everything about you?

12     A   Yes.

13     Q   Is it your --

14     A   Because the father got fired.

15     Q   Let me finish.  Is it your testimony now, despite

16  what we went through this morning, your testimony this

17  afternoon is that you never touched ▟▙▟▙▟▙▟▙'s

18  vagina?

19     A   No, it's actually -- this is lie.  Because her

20  father want her to say.

21     Q   So --

22     A   And when he got -- the last day he got fired from

23  his job --

24     Q   I'm not asking you why.

25     A   -- and she --

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 261

1    Q    I want to be perfectly clear, because I asked you

2    a lot of questions this morning --

3    A    Yes.

4    Q    And I read to you your statements in regard to

5    your violation of probation.

6    A    Right.

7    Q    And so I don't have the transcript from this

8    morning available, but I have my notes.

9    A    Okay.

10    Q    And my notes indicated -- and you can correct me.

11    I'm going to ask you a question after this.  My notes

12    reflect that you said, yes, I admitted touching ▉▉▉▉

13    ▉▉▉▉'s vagina.

14    A    Mm-hmm.

15    Q    And so I am going to ask you, that's untrue.  You

16    never touched ▉▉▉▉▉▉▉'s vagina?

17    A    Untrue.  I never.

18    Q    Never?

19    A    Untrue, she wrote.

20    Q    Is that never?

21    A    I said untrue.

22    Q    Okay.

23    A    How many times do you want me to say it?

24    Q    I just wanted to be clear on that.  And so when

25    you pled guilty to violation of the probation --
         BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011                                             

Page 262

1    A    Yes.

2    Q    -- is it your claim that you never said, I did

3    touch ████████████'s vagina?

4    A    I don't know.

5    Q    You don't know what you said?

6    A    Okay.

7    Q    Do you want me to go through it again?

8    A    I don't know I said, no.

9    Q    All right.  Because this is going to be key to my

10   next line of questions, I want to show you again Exhibit

11   5 that we covered this morning.

12   A    Okay.

13   Q    Which your lawyer has a copy of.  And I'm going

14   to call your attention to statements by Jose Torres, the

15   probation officer.

16   A    Yes.

17   Q    And first I just want to -- excuse me -- read

18   this paragraph to you, and I will show it to you, sir.

19   "On February 4, 2009, ████████ underwent an Instant

20   Offense Psychological Detection of Deception Forensic

21   Examination with Randall Wallace," psychiatrist -- I'm

22   sorry, "psychologist, Certified Polygraph Examiner and

23   the test confirmed that ████ was deceptive on the

24   questions of, quote, sexual contact with his victim, end

25   quote.  At that time ████ was advised of the results of
               BRANDON SMITH REPORTING & VIDEO

Page 263

1    the psychological detection of deception and ▮▮▮

2    responded by saying, quote, there were incidents where

3    she was sitting on his lap and may have accidentally

4    touched her vagina with his hand, end quote.  Do you

5    want to see that, sir?

6         A.  Yes.

7              MS. GARDNER:  What's the question?

8              MS. BROUILLET:  I haven't asked the question

9    yet.  And want him to see this and then I will complete

10   the question.  Because I want to make sure --

11             THE WITNESS:  I saw this many times.

12             MS. GARDNER:  Yes, we already went through

13   this morning.

14             THE WITNESS:  Thank you.

15        Q   (By Ms. Brouillet)  And so my question is this,

16   sir, I asked you about this this morning.  Did you tell

17   Mr. Torres what he wrote here, that there were incidents

18   where she was sitting on your lap and you may have

19   accidentally touched her vagina with your hand?

20        A   I never tell him, no.

21        Q   You never told him that?

22        A   No.

23        Q   Okay.

24        A   Thank you.

25        Q   Sir, are you required as part of your -- Withdraw

Page 264

1    the question.

2          What are you required to admit to as part of your

3    sex offender treatment?

4    A    "Required"?  I'm sorry what is --

5    Q    What are you required to admit to as part of your

6    sexual offender treatment?

7    A    I don't know what is the question, I'm sorry.

8    Say it a little bit --

9    Q    Are you required to admit to anything as a result

10   of your sex offender treatment -- as part of your

11   treatment?

12   A    I don't know.

13   Q    Do you know why you were charged with violation

14   of probation?

15   A    Yes.

16   Q    Why?

17   A    Because I didn't report them on time.

18         THE REPORTER:  I'm sorry.  I didn't...

19         THE WITNESS:  Report.  I didn't report them.

20   Q    (By Ms. Brouillet)  Report them?

21   A    Yes.

22   Q    What's -- what does it mean report them?

23   A    To report to them and then you gotta participate

24   in the group.  Those two things happened.

25   Q    Has there ever been a time when you have -- had

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 265

1    trouble with your probation officer for failing to

2    acknowledge that you did something wrong to ████

3    ████?

4        A    No.   This is not part of the probation.

5        Q    Is part of the probation going through counseling

6    for sex offenders?

7        A    The court required that, not probation.

8    Probation is working for the court.

9        Q    Okay.   Well --

10       A    Court giving order, which is you know better.

11       Q    The court orders --

12       A    Yes.

13       Q    The court ordered you to go through sex offender

14   treatment; is that correct?

15       A    That's what they required.

16       Q    And as part of the court-ordered sex offender

17   treatment, are you required to acknowledge that you did

18   something wrong to ████████?

19       A    I have to participate in the group.

20       Q    No --

21       A    According to --

22       Q    -- listen to the question.

23       A    I'm answering you.

24       Q    No.  You didn't --

25       A    According to the --

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 266

1          MS. GARDNER:  Just let her ask it again.

2      Q   (By Ms. Brouillet)  Let me have the reporter read

3  back the question and then you can answer that question.

4          (Thereupon, the question was read back by

5  the court reporter.  Testimony continues as follows:)

6          THE WITNESS:  They court gave me order to do

7  the -- to participate, part of the plea that I took.

8  Part of the plea, you have to take -- you in probation.

9  They put you on the treatment.  So it is nothing to do

10  with probation.  Probation you are reporting what time

11  you're coming, what time you're going.

12     Q   (By Ms. Brouillet)  Okay.  You haven't answered

13  my question.  Do you want me to repeat the question?

14     A   I answered you already.

15     Q   No.  I want you to focus on what I am asking in

16  that question and answer that question.

17     A   Okay.

18          MS. BROUILLET:  Can you read back the

19  question?

20          (Thereupon, the question was read back by

21  the court reporter.  Testimony continues as follows:)

22          THE WITNESS:  As a part of the -- as a part

23  of the court treatment; yes.

24     Q   (By Ms. Brouillet)  Okay.

25     A   An order.  Which is, court gave order.  And I

BRANDON SMITH REPORTING & VIDEO

Page 267

1   repeat it ten times.  It is not enough?

2      Q    And isn't it true, sir, on December 22, 2009, as

3   part of your treatment at the Center for the Treatment

4   of Problem Sexual Behavior, you reported that you had

5   sexual content or touching of a neighbor's minor female

6   and you had previously denied it?

7      A    I don't have a sexual problem.

8      Q    That wasn't my question, sir.

9      A    Okay.

10     Q    Let me -- let me ask it again.  It was poorly

11  phrased.  Let me ask it.  December 22, 2009, while you

12  were undergoing treatment at the Center for the

13  Treatment of Problem Sexual Behaviors, did you admit

14  that you had -- you were an offender who had sexual

15  contact, touching, of a neighbor's minor female, which

16  you had originally denied and were now --

17     A    No, no.

18     Q    -- admitting?

19     A    No.

20     Q    And so if the record from The Connection says

21  that, it's incorrect?

22     A    No.

23     Q    Well, I was going to go to 17, but I'm going to

24  mark this instead.

25            MS. BROUILLET:  (To reporter)  Can I change

1    it?

2                    THE REPORTER:   Yes.

3        Q    (By Ms. Brouillet)  Okay.   I'm going to show you

4    a document, sir, marked Exhibit 17.   Have you ever seen

5    that before?

6        A    No.

7        Q    Okay.   And this is from the Center for the

8    Treatment of Problem Sexual Behavior.   And it says at

9    the top, "Sexual Attitudes, Identified Problem."   It

10   says, "Has considerable difficulty recognizing or

11   self-correcting attitudes or thoughts that support

12   sexual offending."   Do you see that, sir?

13       A    Yes.

14       Q    And if you go under "Sexual Attitudes, Identified

15   Problem," it says, "Has considerable difficulty

16   recognizing or self-correcting attitudes or thoughts

17   that support sexual offending."   And if you turn to Page

18   2, sir, do you see the date on that is December 22,

19   2009?

20       A    Yes, ma'am.

21       Q    Okay.   And you would agree that it says your name

22   on that in the upper left.   Correct?

23       A    Yes, ma'am.

24       Q    And so it says, "Official Offense Description,

25   see Episode Number 1, offender sexual contact/touching
                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 269

1   of neighbor's minor female...originally denied, ████

██   ██   ████████s." And so having seen that document --

3     A   No, I don't -- I haven't.

4     Q   No, no. Now that you've seen the document, ███

█   ██████ my question is this --

6     A   I'm not sure. Maybe pasted it and copied from

7   something else....

8     Q   Let me ask you a question.

9     A   I haven't seen it. Yes.

10    Q   Now that you have seen this document I have

11  marked as Exhibit 17, Mr. ████, is it still your

12  testimony that you never admitted ████████████████

██   ██████████████████████████ that you

14  improperly touched --

15    A   I don't remember.

16    Q   -- ████████████?

17    A   I don't remember.

18    Q   You don't remember?

19    A   No.

20    Q   And do you have any reason to believe that the

21  records of ████████████████████████████████

██   ██████████████ are inaccurate?

23    A   I'm not sure.

24    Q   You don't know if their records are inaccurate?

25    A   I'm not sure.
           BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

1      Q    Okay.

2      A    Thank you.

3           (Thereupon, the reporter marked ███

4           ███████ ███, Document for identification

5           as Exhibit No. 18.)

6      Q    (By Ms. Brouillet)  Mr. ████, I am going to show

7      you another document from ████████████ and it has as

8      a date -- I'm sorry, the ████████████████████

9      ███████████████████████ ███████████████ ███████

10     and it has as a date at the top January 5, 2010.  Do you

11     see that, sir?

12     A    Yes.

13     Q    And do you see the therapist listed is ███

14     ███████ on right corner there?

15     A    Yes, ma'am.

16     Q    And then under "████████," do you see where it

17     says, "███ admitted to improper sexual contact-touching

18     ████████████████████ ███████ ███████████████

19     ███████████████ ██████████ ███████████████

20     Do you see that, sir?  Do you want me to point out which

21     section it is?

22     A    So if you are a family friend, you don't hold the

23     person?  You don't touch the person?

24     Q    I'm not going to answer your questions.  Have you

25     read that, sir?