1        A    Yes.

2        Q    Okay.  Can we agree that if you are a family

3   friend you don't touch the vaginas of the girls?

4        A    Right.

5        Q    Okay.  And so now that you have read this, sir, I

6   am going to ask you this question, did you admit to ███

███ ██████ ██████ ████ to improper sexual contact of

8   a minor female?

9        A    No.

10       Q    No.  And so this record, sir, would be

11  inaccurate?

12       A    Okay.

13       Q    I'm sorry?

14       A    I don't know the record.  I never seen -- they

15  never gave me this, and I am not sure --

16       Q    Okay.

17       A    -- what you are referring to because I haven't

18  seen this.

19       Q    Well, now that you have seen this, sir --

20       A    No, I don't know what is this?  You know, maybe

21  you're making up this to me.  I am sorry.

22       Q    Oh, you're concern is you think that the state is

23  making up that document?

24       A    Well, the state -- most of the state people that

25  work in UConn they're lying.

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 272

1       Q    Okay.  Let me ask you this, sir --

2       A    I see.  I work there for ten years, I know.

3       Q    So --

4       A    Excuse me.  Sorry.

5       Q    Let me be clear --

6       A    Yeah.

7       Q    -- you never told Mr. ████████ as part of your

8    treatment that you admitted to touching ████████████'s

9    vagina?

10      A    I haven't seen this document, no.

11      Q    That wasn't my question, sir.

12      A    No.

13      Q    You have never told that to Mr. ████████?

14      A    No, no.

15      Q    Okay.  And so if Mr. ████████ tells us that, would

16   he be lying?

17      A    That's different story.  If he gave me the

18   letter, that's different.

19              THE REPORTER:  If he gave me the what?

20              THE WITNESS:  The letter.  If he gave me

21   this letter, I will look at it.

22      Q    (By Ms. Brouillet)  No, sir.  I'm not ask you

23   what Mr. ████████ has given you, sir.  I'm asking you

24   what you told ████████.  So --

25      A    I said, no.

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 273

1    Q    My last question to you was this though, if Mr.

2    ████████ testifies that you admitted to touching ████████

3    ████████'s vagina --

4    A    That's false.

5    Q    -- would -- let me finish the question, sir.

6    A    Okay.

7    Q    Would Mr. ████████ be lying if he said that under

8    oath?

9    A    I'm not sure.

10   Q    You don't know?

11   A    No.

12   Q    Okay.

13   A    Thank you.

14        (Thereupon, the reporter marked The

15        Connection, Inc., Document for identification

16        as Exhibit No. 19.)

17   Q    (By Ms. Brouillet)  Mr. ████████, I am going to show

18   you a document that I have marked as Exhibit 19.  It's

19   another report from ████████████████████████████████

20   ████████████████████████████████████████████.  And this

21   is dated at the top left you can see January 19, 2010,

22   and it says, "████████ ████████████████."  And under

23   ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 274



6     A    Yes.

7     Q    Okay.  Did you tell your wife in January of 2010

8     that you had actually touched ▆▆▆▆▆▆▆ improperly?

9     A    No.

10    Q    Okay.  And do you recall saying to ▆▆ ▆▆▆▆▆▆

11    ▆▆ ▆▆▆▆▆▆▆▆▆      ▆▆▆▆▆▆▆▆▆  that you did commit the

12    offense?

13    A    No.

14    Q    And do you recall saying to ▆▆▆▆▆▆▆▆▆

15    ▆▆ ▆▆▆▆▆▆▆▆▆▆▆  ▆▆▆▆▆▆▆▆▆▆▆▆

16    ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

17    ▆▆ ▆▆▆▆▆▆

18    A    No.

19    Q    So if Mr. ▆▆▆▆▆ wrote this in a report about

20    you, would it be a lie?

21    A    I don't know.

22    Q    Do you continue to treatment ▆▆▆▆▆▆▆▆▆

23    ▆▆ ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

24    ▆▆ ▆▆▆▆▆▆

25    A    Yes.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 275

1    Q   And do you see ███ ███████ still?

2    A   Yes.

3    Q   Okay.  When's the last time that you saw him?

4    A   I saw him yesterday.

5        (Thereupon, the reporter marked ███

6    ███████████ ████ Document for

7    identification as Exhibit No. 20.)

8    Q   (By Ms. Brouillet)  I will show you a another

9    document from the ███████████████████████████

10   ██████████████████ And this has been labeled Exhibit 20,

11   it says ██████████████ ██████ And the date at top

12   left-hand corner is July 20, 2010.  It says, ██████████

13   ████████████████ █████████████ ██████

14   A   I see October 7th.

15   Q   Okay.  I'm talking about the upper -- the date,

16   group date, on the top, sir.  It says "October 20,

17   2010."  Do you see that, sir?

18   A   Yes.

19   Q   And do you see where it says, "████████ ███████

20   ██ ███████ on the right?

21   A   Yes.

22   Q   And under "Client Note," do you see where it

23   says, "███ appeared sincere and remorseful taking

24   greater responsibility, i.e., admitting to more than a

25   single offense episode, admitting to inappropriate

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

1    sexual contact, admitting to an offense cycle and

2    presently perplexed with why he committed said acts,

3    good job." Do you recall the meeting on July 20th,

4    2010?

5       A    I don't remember that.

6       Q    Okay.  Do you recall admitting to more than a

7    single offense?

8       A    No.

9       Q    Do you recall admitting to Mr. Salafia that you

10   were perplexed as to why you committed such acts?

11      A    No.

12      Q    Have you ever admitted to Mr. Salafia that you

13   had -- you didn't know why you committed such acts?

14      A    I don't remember.

15      Q    Okay.  But do you have any reason to believe why

16   Mr. Salafia wouldn't be truthful in filling out reports?

17      A    I'm not sure.

18      Q    Other than him being your --

19      A    I'm not sure.

20      Q    Withdraw the question.

21           Let me ask you this, Mr. Salafia is your

22   therapist?

23      A    Yes.

24      Q    Do you trust him?

25      A    He's with twenty-five people.  It's not only me.

BRANDON SMITH REPORTING & VIDEO



Page 277

1    Q   That wasn't my question, sir.  Do you trust Mr.

2    Salafia?

3    A   I said that he's in the group, twenty-five

4    people.  It's not only me.  I don't trust no one.

5    Q   You don't trust anyone?

6    A   No.

7    Q   And so that would be you don't trust Mr. Salafia?

8    A   I don't trust no one.

9    Q   Okay.

10   A   Thank you.

11        MS. GARDNER:  I want to take a ten minute

12   break.

13        MS. BROUILLET:  Okay.

14        THE VIDEOGRAPHER:  Off the record, 4:15.

15        (Thereupon, a short break was taken at 4:15

16   p.m.  Testimony continues at 4:21 p.m.)

17        THE VIDEOGRAPHER:  On the record, 4:21.

18   Tape six.

19   Q   (By Ms. Brouillet)  I'm sorry, Mr. ▓▓▓▓ during

20   the break did you have the chance to talk to your

21   attorney?

22   A   Yes, ma'am.

23   Q   You gave a name earlier of a gentleman who is a

24   high schoolteacher.  And would his name be Chirzad

25   Armotti (phonetic?

6/29/2011                                                        

Page 278

1    A    I don't know.

2    Q    Was Chirzad the first name you gave us?

3    A    That's all I know, first name.

4    Q    And would that be spelled, C-H-I-R-Z-A-D?

5    A    I'm very sorry.  I don't know.

6    Q    Okay.

7    A    Last -- his name.

8    Q    But you don't know if his last name could be

9    Armotti.  You don't know his last name.

10   A    No.

11   Q    Okay.

12            (Thereupon, the reporter marked The

13        Connection, Inc., Document for identification

14        as Exhibit No. 21.)

15   Q    (By Ms. Brouillet) Mr. ▓▓▓▓ --

16   A    Yes.

17   Q    -- I'm going the show you a document from The

18   Center for the Treatment of Problem Sexual Behavior -

19   Adult, The Connection, and this is dated in the upper

20   left corner, uh, July 27, 2010.  Do you see that?

21   A    Yes, ma'am.

22   Q    And the therapist is Joseph Salafia?

23   A    Yes, ma'am.

24   Q    Okay.  And under "Client Note," it says,

25   "Regarding admitting to the offense, ▓▓▓▓ continues to

Page 279

1   be consistent (see last weeks notes) about his prior

2   sexual offense.   ███ still struggles with why he

3   committed such acts and denies any past or present

4   sexual interest in minor children."  Do you recall

5   making those comments on July 27, 2010?

6        A    Excuse me, yeah.  Please read it again for me.

7        Q    All right.

8             MS. GARDNER:  The question?

9             THE WITNESS:  Yes.

10       Q    (By Ms. Brouillet)  Under "Client Note," for the

11   July 27, 2010, it says, "Regarding admitting to the

12   offense, ███ continues to be consistent (see last weeks

13   notes) about his prior sexual offense.  ███ still

14   struggles with why he committed such acts and denies any

15   past or present sexual interest in minor children.  And

16   so my question is, do you recall making that statement

17   at the group on July 27, 2010?

18       A    I have three kids and I have a wife, and I have

19   to because I don't want to go to jail for something that

20   I haven't done.  So, yes, I have.

21       Q    And so you recall making that statement?

22       A    Yes, ma'am.  And I have three kids and I have a

23   wife.  They are underage, so I have to do it.  And I

24   lost my job, I lost all my life, whatever I have.  And

25   I cannot go to jail.  I cannot afford it.  And I cannot

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 280

1  leave my family alone. And, yes, I said it. See this,

2  everything I said, yes, ma'am (indicating).

3      Q   Okay.

4      A   Everything in document you see, yes. Because of

5  my family, I did it. Because I don't want to go to

6  jail. I have three kids.

7      Q   Okay.

8      A   And I have a wife.

9      Q   I don't understand your response. Are you

10 saying --

11     A   That's my response.

12     Q   Because of your family --

13     A   Yes,

14     Q   -- you touched ▓▓▓▓▓▓▓▓▓'s vagina? What are

15 you saying?

16             MS. GARDNER:  Objection. That's not --

17             THE WITNESS:  Not touching. Not touching.

18 I'm not touching. You tell me for the treatment. I'm

19 going to treatment for Joe -- I'm sorry, say his last

20 name.

21     Q   (By Ms. Brouillet)  Salafia?

22     A   Salafia. I cannot -- I lost everything. I lost

23 my job. I lost my money. Emotionally, physically I've

24 been destroyed. And I have -- I have the say this. I

25 know under oath I did it, say it, but I committed this

Brandon Smith Reporting & Video
860-549-1850        production@brandonreporting.com     249 Pearl Street

1   -- not committed, I say because I have to protect my

2   family.  And I don't know if this question has satisfied

3   you.

4        Q    Well, you told me earlier today --

5        A    Yes.

6        Q    -- one thing, and then you told me before the

7   break that you never touched ▆▆▆▆▆▆▆▆ --

8        A    Correct.

9        Q    -- improperly?

10       A    Correct.

11       Q    And is that still your response under oath, that

12   you never touched ▆▆▆▆▆▆▆▆?

13       A    Yes, ma'am.  But I have to protect my family, I

14   said this.  So I don't want to go to jail.  I cannot

15   afford it.  My kids will be in the street.  They will be

16   criminal and they shooting people and they go to jail

17   and they go -- there is no support for me.  And so I

18   don't want my kids to go to jail.  I don't want them to

19   kill someone; I don't want them to be uneducated.  And

20   so I've been sacrifice myself for this.  And I've been

21   through UConn for so long and I took sexual harassment,

22   abuse, all these things because just my family and

23   shame, I couldn't do anything.  I have to protect my

24   family, you know.  So this is my point.

25       Q    So your claim today --

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 282

1    A    Yes.

2    Q    -- your testimony, to be accurate, is that ████

3    ██████, when she told her teachers --

4    A    Yes.

5    Q    -- that you sexually abused her when she was a

6    kid, she was lying?

7    A    I don't know if she lie.  That's not -- she was

8    raped by another people, and so how I know?  They --

9    Q    Well --

10   A    The guy was David and her -- she -- she gave a

11   statement.  She was raped and her --

12   Q    I am not asking you those questions --

13   A    I'm sorry.

14   Q    -- and I am going to strike that.  But I am

15   asking you this, you're claiming ████████████ lied

16   about you sexually abusing her?

17   A    Yes.

18            (Thereupon, the reporter marked Stipulated

19            Agreement for identification as

20            Exhibit No. 22.)

21   Q    (By Ms. Brouillet)  Mr. ██████, I am going the

22   show you the stipulated agreement between UConn -- the

23   UConn Professional Employees Association and ask you to

24   turn -- it's two pages -- turn to Page 2.

25   A    Yes, ma'am.

            BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

1      Q    Is that your signature?

2      A    Yes, ma'am.

3      Q    And if you look at the second paragraph on the

4   first page it says, "Whereas Mr. ███ has been charged

5   for violating the University's General Rules of Conduct

6   and the University's Workplace Violence policy as a

7   result of an incident that occurred on May 5, 2006; and

8   Whereas the University's investigation corroborates that

9   on May 5, 2006, Mr. ███ used abusive and threatening

10  language towards his supervisor, ███ ███ and others

11  during and after a work-related social function; and

12  Whereas Mr. ███ has been on paid administrative leave

13  since the events of May 5, 2006, to permit a complete

14  and thorough investigation of the charges." And it

15  says, "Whereas, the parties wish to stipulate and to a

16  mutually accept the consequence for this incident

17  without resort to further adversarial proceedings." And

18  it says, "The parties agree as follows." And do you see

19  Paragraph 2, do you see that?

20      A    Yes.

21      Q    You agreed that, "UCPEA and Mr. ███ acknowledge

22  that any future conduct of a similar nature will be

23  cause for discipline up to and including dismissal of

24  Mr. ███ from his position with the University."

25      A    Yes, ma'am.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

1    Q    And you understood when you signed this on

2    September 20, 2006 that you could be dismissed from the

3    university --

4    A    Yes.

5    Q    -- if you continued to have problems?

6    A    Yes, ma'am.

7    Q    And Peggy Beckett-Rinker was the UCPEA employee

8    who represented you in this?

9    A    She was the director, I believe.

10   Q    And she was the one who represented you at that

11   time?

12   A    I believe three different people represent me.

13   Q    Well, how about in regard to the stipulated

14   agreement?  Was that Peggy Beckett-Rinker?

15   A    I believe so.

16   Q    Is that her name on Page 2?

17   A    Yes, ma'am.

18   Q    Okay.

19   A    Thank you.

20   Q    Now -- I am looking for the federal complaint --

21   oh, never mind.  I'm sorry, here it is.  The federal

22   complaint that we marked as Exhibit 11, sir.

23   A    Yes, ma'am.

24   Q    If you go to Page 4, Paragraph 16, it says, "On

25   or about June 29, 2006, plaintiff filed a complaint with

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 285

1    the Office of Diversity and Equity (ODE), the

2    University's neutral investigatory unit charged with

3    gathering evidence and investigating allegations of

4    discriminatory harassment.  As a result of the

5    investigation, ODE found that ████ had violated the

6    defendant's policies prohibiting sexual harassment.

7    ████ was suspended on July 19, 2008, and eventually

8    terminated based on ODE's findings."  What is the source

9    of your information that ████ ████ was terminated

10   from the university?

11       A   I am sorry.  I -- would you say again.  I'm very

12   sorry.

13       Q   Sure.

14       A   I didn't understand.

15       Q   You've got Paragraph 16 in front of you, right?

16       A   Yes.

17       Q   The last sentence says, "████ was suspended on

18   July 19, 2008, and eventually terminated based on ODE's

19   findings."

20       A   Yes.

21       Q   Do you see that?

22       A   Yes.

23       Q   What is the source of your information that Mr.

24   ████ was terminated from the university?

25       A   Why he's terminated?

                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 286

1    Q    No.  What is the source?  How do you know?

2    A    ODE gave me the file.

3    Q    ODE gave you a file showing you --

4    A    Yes, the binder.  The binder they gave me.  They

5    gave me the binder.

6    Q    ODE gave you a binder.  Would that be their

7    report?

8    A    Right.

9    Q    And the report was from October of 2006, wasn't

10   it?

11   A    I don't know exactly the dates.

12   Q    Okay.  So are you claiming that in that report it

13   says that ██████ ████ was terminated from the

14   university?

15   A    Yes, ma'am.

16   Q    And would you be surprised to learn that ██

17   ████ was never terminated from the university?

18   A    Um, this is between UCPEA, because they gave you

19   chances to resign or fire.  And so I didn't take resign,

20   and so they fired me.  It's the same thing.  The process

21   they have --

22   Q    No, I don't -- that's not responsive to my

23   question, sir.

24   A    No, I'm not surprised.  No.

25   Q    Okay.  Do you know as you sit here today whether

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 287

1    ████  ████  resigned from the university or whether he

2   was fired?

3       A    Resigned.

4       Q    Okay.  That sentence also says, "████  was

5   suspended on July 19, 2008."  Is that accurate, sir?

6       A    I don't know the dates.  What day it was.

7       Q    You think it was in 2008 after you were

8   terminated from the university?

9       A    No.  Because he -- he resigned and then they call

10  me back to work.  And during, um, what happened was --

11      Q    I'm not asking what happened.

12      A    No, I'm trying to figure out what dates.  I have

13  to give you the date.

14      Q    Let me ask another question.

15      A    Go ahead, ma'am.

16      Q    Earlier today you testified --

17      A    Yes, ma'am.

18      Q    -- that you did not work with ████ ██████ after

19  May 8, 2006.  You recall that --

20      A    You're correct.

21      Q    -- testimony?

22      A    You're correct, yes.

23      Q    And you were fired from the university March 19,

24  2008?

25      A    Yes, ma'am.
            BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 288

1      Q   Are you claiming that ███ █████ was still

2   employed by the University of Connecticut on July 19,

3   2008?

4      A   No.

5      Q   Then what is the source of your information in

6   your federal complaint that he was suspended on July 19,

7   2008?

8      A   I don't know.

9      Q   Okay.  Do you --

10     A   Are you asking me how I know or --

11     Q   I'm asking you how you came up with this

12   date that is in your federal complaint.

13     A.  The seventeenth?

14     Q   It's Paragraph 16, Page 5.

15         MS. GARDNER:  No.

16         THE WITNESS:  Oh, the next page.

17     Q   (By Ms. Brouillet)  Oh, last sentence of

18   Paragraph 16.

19     A   Oh.

20     Q   See it?

21     A   Yes.  When, uh -- when I give the report --

22     Q   I don't have a question pending.  Let me ask you

23   another question.

24     A   Oh, I'm sorry.

25     Q   Are you sure the year is 2008?

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 289

1    A    For his, um...

2    Q    When ████ ████ was suspended.  Are you

3    claiming that he was suspended from UConn in 2008?

4    A    No.  Not 2008, no.

5    Q    What year are you claiming he was suspended?

6    A    I think it said 2000 -- I think it is the middle

7    of 2009.

8    Q    2009?

9    A    Yes.

10   Q    Okay.  If you turn to the --

11   A    Wait.  Hold on.  Wait, wait, no.  Because I went

12   back to the office work -- that was 2006.

13   Q    2006?

14   A    Yes.

15   Q    Now, Paragraph 16, it starts at Page 4, it says,

16   "On or about June 29, 2006, plaintiff filed a complaint

17   with an Office of Diversity and Equity (ODE), the

18   University's neutral investigatory unit charged with

19   gathering evidence and investigating allegations of

20   discriminatory harassment."

21   A    2006.

22   Q    So as you sit here --

23   A    June, 2006.

24   Q    Hold on.  As you sit here today --

25   A    Yes.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 290

1    Q    -- is it your testimony that ███ ████ was

2    suspended by the University of Connecticut by June of

3    2006?

4    A    Yes.

5         MS. GARDNER:  Do you mean July?

6         MS. BROUILLET:  No, I mean June.

7         THE WITNESS:  No.  June I reported.

8    Q    (By Ms. Brouillet)  Yes.

9    A    I think, um, what Mary was telling me she says --

10   Q    I don't want you to tell me what others said.

11   A    -- she's in the process.  She's in the process of

12   the paper.  She said she is investigating.

13   Q    Sir, my -- don't tell me what other people said.

14   A    Okay.

15   Q    And so you think it is July, 2006 that ███

16   ████ was suspended?

17   A    I believe so.

18   Q    Before or after you get the check for ten

19   thousand dollars dated July 6, 2006?

20   A    Yes.

21   Q    To you knowledge, was ███ ████ suspended

22   before or after you got paid ten thousand dollars on

23   July 6, 2006?

24   A    Yes.  He was suspended -- he tell me he -- he

25   told the guy he gave me this.  He has to drop this, um,

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 291

1   allegation, my complaint.

2       Q   My -- I don't want you to tell me what █████

3       █████ may have said to anybody else.

4       A   But this is the part of it.

5       Q   I understand that, but that is hearsay.  And so

6   here's what I'm asking you --

7       A   Yes, ma'am.

8       Q   -- once again, to your knowledge, was █████

9   █████ suspended by UConn before or after you got the

10  check for ten thousand dollars dated July 6, 2006?

11      A   He was suspended.

12      Q   Before or after you got the check?

13      A   After.

14      Q   After you got the check?

15      A   Yes.  Wait, wait.  You asked --

16          MS. GARDNER:  Think about it.

17          THE WITNESS:  I'm sorry.  Hold up.  When he

18  get suspended and I got the check; am I right?

19      Q   (By Ms. Brouillet)  I'm comparing two events.

20      A   Okay.  Two events, okay.

21      Q   Two events.

22      A   Go ahead, please.

23      Q   We have you getting the check.

24      A   Okay.

25      Q   That's dated July 6, 2006.  Okay?
            BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 292

```
 1     A    Okay.

 2     Q    From Chirzad, we don't know his last name, and

 3    ██████ ███████ is suspended, that's the second event.

 4    Which went first, the check or ████ ████████'s

 5    suspension?

 6     A    ████ ██████ suspended.

 7     Q    All right.  And so ████ ██████ was suspended

 8    before you received the July 6, 2006 check?

 9     A    Correct.

10     Q    Okay.  Paragraph 16 says that you filed a

11    complaint with the Office of Diversity and Equity (ODE),

12    that's at Page 4, on June 29, 2006.  Do you see that,

13    sir?

14     A    Yes, ma'am.

15     Q    And that's a time that you spoke to Mary Signor?

16     A    I believe so.

17     Q    Okay.

18     A    I met many times in her office, many times.

19     Q    All right.  Prior to June 29, 2006, had you filed

20    any complaint against ████ ██████ with the Office of

21    Diversity and Equity?

22     A    No.

23     Q    Okay.

24     A    Only one.

25     Q    Only the one.  All right.
              BRANDON SMITH REPORTING & VIDEO
```

6/29/2011

Page 293

1      A   Yes.

2      Q   Paragraph 17 says, "In July, 2006, ▮▮▮▮

3   threatened to file false criminal charges against

4   plaintiff...," did ▮▮▮ ▮▮▮▮ speak to you in July

5   2006?

6      A   July? No.

7      Q   Okay. And so Paragraph 17 when it says, In July,

8   2006, ▮▮▮▮ threatened to file false criminal

9   charges," how do you know that happened?

10     A   Because he told me to drop the -- the complaint,

11   and he was trying to make -- give me the money.

12   Otherwise he said if you don't drop, my daughter going

13   to report.

14     Q   Now, you just told me a moment ago that you did

15   not speak to ▮▮▮ ▮▮▮▮. And so how did he tell you

16   to drop the complaint if he didn't speak to you?

17     A   Through his friend.

18     Q   Through Chirzad?

19     A   Yes.

20     Q   So just to be clear --

21     A   Chirzad and also -- hold on. Chirzad and ▮▮▮

22   ▮▮▮.

23     Q   ▮▮▮ ▮▮▮. And so when you say ▮▮▮ ▮▮▮▮

24   threatened --

25     A   And Muhammad Muhammad, sorry.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 294

1    Q    Okay.  When you say ▓▓ ▓▓▓▓ threatened in

2   Paragraph 17 --

3    A    Yes.

4    Q    -- you are not claiming that ▓▓▓ ▓▓▓▓▓ said

5   this to you or wrote this to you?

6    A    Directly, no.

7    Q    Okay.  You're --

8    A    He --

9    Q    Let me finish.

10   A    Yeah.

11   Q    You're claiming that any threat that ▓▓▓ ▓▓▓▓▓

12  made was made through Chirzad, ▓▓▓▓ ▓▓▓ or Mu --

13   A    ▓▓▓▓▓ ▓▓▓▓▓.

14   Q    ▓▓▓▓▓ ▓▓▓▓▓.

15   A    Yeah.

16   Q    Those three people?

17   A    Yeah.

18   Q    Was that put in writing?

19   A    No, verbally.

20   Q    Verbally?

21   A    Yes.

22   Q    Did this happen -- did all three people tell you

23  this at the same time?

24   A    No, different time.

25   Q    When was the first time someone said that to you?

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 295

1    A    The first time was, I was praying -- and I'm

2    pretty sure, like, church, mosque.  We pray, we get out,

3    and Muhammad was telling me that ▒▒▒ said if you don't

4    drop the case, and -- his daughter is going to report

5    you molested her.

6    Q    And what -- when was this?  What's the date?

7    A    The date he get suspended.

8    Q    Okay.  And -- so July, 2006?

9    A    I'm very sorry, I don't know exact on the date.

10   Q    All right.

11   A    But I know that time.

12   Q    And when did ▒▒▒ ▒▒ say this to you?

13   A    ▒▒▒ ▒▒ say after ▒▒▒▒ said that, and he

14   was saying -- after, like, couple of days.

15   Q    Okay.  Not the same day, a couple days later?

16   A    The following Friday.

17   Q    A week later?

18   A    Yes.  The following Friday, I have to go --

19   Q    And where were you?

20   A    I was going to pray at UConn.

21   Q    And so this happened at the mosque?

22   A    The mosque, yes.

23   Q    And when did ▒▒▒▒▒ ▒▒▒▒▒ say this to you?

24   A    Uh, that was before -- before him, before ▒▒▒

25   ▒▒▒.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 296

1      Q    So --

2      A    First ████ ██ said.

3      Q    Yep.

4      A    First ████ said and then ████ ███ say it --

5    this to me.

6      Q    Okay.

7      A    Yes, ma'am.

8      Q    What you told me a moment ago, Chirzad said it

9    and a week later ███ ███ said it?

10     A    Right.

11     Q    Was ████ ██████ in between -- in that one

12   week period in between the Friday that you were at the

13   mosque with Chirzad, and before the Friday you were on

14   the mosque with ███ ███?

15     A    No, Chirzad -- the last time I saw Chirzad, he

16   brought the check for me.  And so the check he said that

17   ███ sent.  And so he's giving you this money and drop

18   the case.

19     Q    So to be clear --

20     A    Yes.

21     Q    -- Chirzad told you this once?

22     A    Yes, when he brought the check.

23     Q    Okay.

24     A    Because I didn't interact with him anymore,

25     Q    But I thought you told me a short time ago that

860-549-1850      Brandon Smith Reporting & Video
                  production@brandonreporting.com   249 Pearl Street

Doe v. UCONN

1    this threat was first made to you the same day ▅▅▅ was

2    suspended?

3        A    I don't think so it was first day.

4        Q    Okay.

5        A    I didn't say first day.

6        Q    All right.

7        A    It was a Friday.  I don't know what day was

8    Friday.  When he got suspended, what day was that?

9        Q    And after July, 2006, did anyone else say to you

10   -- say that to you, because you only listed -- I will

11   withdraw the question.

12            You've listed July, 2006, ▅▅▅▅ threatened.

13       A    Yes.

14       Q    After July, 2006, you're not claiming that

15   ▅▅▅▅  threatened?

16       A    Say it again.  I'm sorry.

17       Q    I'll withdraw the question.  In July, 2006 --

18       A    Yes.

19       Q    -- did you ever speak to ▅▅▅ ▅▅▅▅ about the

20   allegations that you made to ODE -- the complaint you

21   filed with ODE?

22       A    To talk to him?

23       Q    Yes.

24       A    Yes, one time -- one Friday it happened because,

25   um, he was there and I -- pray finished.  That's why

                BRANDON SMITH REPORTING & VIDEO

Page 298

```
1     when he passed by, he said -- in the hallway, he said,

2     you know, you gotta drop.  My daughter going to give a

3     statement.  That's why I went to report the police

4     department.  I went to Mary first.  Mary told me to go

5     to the police station.

6         Q    This was at the mosque at UConn?

7         A    Yes, ma'am.

8         Q    And when you report -- when we say "Mary," we're

9     referring to Mary Signor?

10        A    Yes, ma'am.

11        Q    And so is it accurate to say that when you

12    complained about ████, UConn's Office of Diversity and

13    Equity told you to go report this to the police?

14        A    Yes.

15        Q    And to your knowledge, did Mary Signor also call

16    the police department at UConn to report ████ ████████?

17        A    I'm not sure.

18        Q    Okay.

19        A    Because she said it's an internal investigation,

20    nothing to do with the police.

21        Q    But Mary urged you to go to the police?

22        A    Yes, ma'am.

23        Q    Okay.

24        A    She said she could not do anything.  She

25    investigating internally.
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 299

1    Q    You understood that Mary couldn't arrest anyone?

2    A    No.  I know.

3    Q    Okay.

4    A    Thank you.

5    Q    While you were at UConn, have you ever used the

6    employee assistance program?

7    A    No.  I'm sorry, this is a long -- I mean, in the

8    beginning you asked me about dining services, that's the

9    place I went, employment assistance.  A while ago --

10    Q    Let me clarify.

11    A    I'm sorry.  Just I make it clear.

12    Q    Employee assistance program provides counseling

13    to employees, like psychological counseling.

14    A    Yes, that's when I went.

15    Q    Let me just finish though, um, they're separate

16    from the university.  And so my -- I'm not sure if you

17    understand, because I don't believe we had an employee

18    assistance program until around 2000 with the State of

19    Connecticut.

20    A    I'm not sure, but I -- one time I went.  I'm not

21    sure, um, because of the time of this or before that.

22    Q    Okay.  You're not sure.

23    A    That's why I remember the name.

24    Q    All right.  When you say "this," you're referring

25    to ▓▓▓ ▓▓▓▓▓?

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 300

1       A    Exactly.

2       Q    Is your wife employed outside of the home?

3       A    No.

4       Q    Since she came to the United States in 2000, has

5   she been employed outside of the home?

6       A    No. She's trying to get her test, the exam.

7   She's a nurse, NR -- NAR, I'm not sure.

8                 MS. GARDNER:   RN.

9                 THE WITNESS:   RN, sorry.

10      Q    (By Ms. Brouillet)   Now, in Paragraph 17 of your

11  complaint --

12      A    Yes.

13      Q    -- which is on Page 5, it also says, "In January,

14  2008, plaintiff pled nolo contendre, due to his

15  inability to afford a legal defense to this false charge

16  brought by ██████ in retaliation for plaintiff's

17  internal complaint of sexual harassment filed with ODE."

18  When you -- do you see that sentence?   Paragraph 5 --

19  I'm sorry.   Page 5, Paragraph 17.

20      A    Okay.

21      Q    Second sentence -- I'm sorry, third sentence.   Do

22  you see that?

23      A    Yes.

24      Q    When you say "false charge brought by ████████."

25  you're referring to ██████████████?

BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 301

1    A   2000, no.  2006.

2    Q   Let me -- do you see the -- let me point out -- I

3    am referring to this sentence, it starts with this, it

4    says, "In January, 2008."

5    A   Okay.

6    Q   Do you see that?

7    A   Yes.

8    Q   "In January, 2008 plaintiff pled nolo contendre,

9    due to his inability to afford a legal defense to this

10   false charge brought by ▮▮▮▮▮ in retaliation for

11   plaintiff's internal complaint of sexual harassment

12   filed with ODE."  Do you see that sentence?

13   A   Yes.

14   Q   When you say "false charge brought by ▮▮▮▮▮,"

15   are you claiming it was a false claim brought by ▮▮▮▮▮

16   ▮▮▮▮▮?

17   A   Uh, with the father, yes.

18   Q   So when you say "false charge brought by

19   ▮▮▮▮▮," is it your understanding that ▮▮▮▮▮▮▮▮

20   is the one who told the police that you did this?

21   A   That's why he was asking me to drop the, um,

22   complaint so he doesn't have to be having this.

23   Q   I'm not asking you about -- this sentence, when

24   you said "▮▮▮," isn't it true that ▮▮▮▮▮▮▮ is

25   the one who told the police that you touched her

BRANDON SMITH REPORTING & VIDEO

6/29/2011

1   improperly when she was nine and ten years old?

2       A   I believe so she said.

3       Q   Would you agree that by January of 2008 ▓▓▓▓

4   ▓▓▓ was an adult?

5       A   Yes.

6       Q   And the charges brought against you --

7       A   Yes, ma'am.

8       Q   -- the criminal charges, weren't they brought by

9   the State of Connecticut, not by the ▓▓▓▓▓▓?

10      A   By ▓▓▓▓▓, I believe.  I'm not sure, by ▓▓▓▓▓▓

11  or by...

12      Q   I am going to show you Exhibit 4.

13      A   Okay.

14      Q   And that's the transcript of the criminal

15  proceedings.

16      A   Okay.

17      Q   And at the top it says, "State of Connecticut,

18  Danielson Superior Court versus ▓▓▓▓▓▓▓▓"  ▓▓▓▓▓▓

19  ▓▓▓▓▓ wasn't there on January 18, 2008, was she?

20      A   I saw her three on four times in the court.

21      Q   On January 18, 2008?

22      A   January 18th, 2008?  I think -- no, I'm not sure

23  I saw her that time or I saw her different time.  She

24  was in hallway with her -- with ▓▓▓s sister.

25      Q   Well, this transcript says that ▓▓▓▓▓▓▓
                BRANDON SMITH REPORTING & VIDEO



6/29/2011

 1    was out of the country on that date. Do you have any

 2    reason to believe that's not true?

 3        A    Maybe I saw her before that, I'm not sure.

 4        Q    Do you any reason to believe that that statement

 5    to Judge Robaina that ████████ was out of the

 6    country on --

 7        A    Yes, she goes to Dubai, I know.

 8        Q    Let me finish, on January 18, 2008 was untrue?

 9        A    It could be because she went to Dubai.  She lives

10    in Dubai with her mother and her brother.

11        Q    And so isn't it true, Mr. ████, that the charges

12    -- the criminal charges brought against you were brought

13    by the State of Connecticut?

14        A    It's the law that's fine.

15            THE REPORTER:  I'm sorry, it's a what?

16            THE WITNESS:  It's a law, that's fine.  I

17    respect that, sure.  All parts of it.

18        Q    (By Ms. Brouillet)  So just to be clear, the

19    charges were brought by the State of Connecticut against

20    you.  And you were telling me that ████ ██████ brought

21    charges, but isn't it true that the charges -- the

22    criminal charges were brought by the state?

23        A    Okay.

24        Q    I am asking you.

25        A    And the question is?

                 BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



Page 304

```
 1      Q   Isn't it true that the criminal charges were

 2   brought by the state?  Do you understand that?

 3      A   I understand -- yes.

 4      Q   Okay.

 5      A   But the state has -- someone has to complain.

 6   The state has to prove it, right?

 7      Q   Someone has to complain to the state and you --

 8   and ███████████ complained, did she not?

 9      A   And the family, yeah.  Okay.

10      Q   Well --

11      A   ████ ██████ and her.

12      Q   -- what does the -- the transcript says that

13   ████████████ made a complaint about you touching her,

14   doesn't it?

15      A   Okay.  That's fine.

16      Q   Okay.

17      A   I understand.  Thank you.

18      Q   Now, you didn't plead -- in Paragraph 17, it says

19   that you plead nolo contendre.  Isn't it true though

20   that you pled guilty under the Alford Doctrine?

21      A   Yes, ma'am.

22      Q   Okay.  Now, Paragraph -- going on at Page 5 it

23   says, "First Count Title VII Discrimination."  And it

24   incorporates Paragraphs 1 through 17.  Do you see that,

25   sir?  If you go to No. 18, it says --
```
                    BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 305

1     A    Yes, ma'am.

2     Q    Okay.  And so all of this information before is

3     incorporated.

4     A    Yes.

5     Q    Take as much time as you need to read this.  It

6     says, "By the above acts, the defendant employer

7     subjected plaintiff to unlawful sexual harassment in

8     violation of Title VII...." And then in Paragraph 20 it

9     says, "The acts of defendant as described above were

10    done maliciously or with reckless indifference to the

11    federally protected rights of the plaintiff."  The only

12    defendant here is UConn.  And so tell me what UConn did

13    maliciously?

14              MS. GARDNER:  I'm just going to object.

15              MS. BROUILLET:  Okay.

16              MS. GARDNER:  This calls for a legal

17    analysis.

18              MS. BROUILLET:  Well, if he can answer --

19    but it's his complaint, and so I really want him to be

20    able to tell me what UConn did as opposed to ████.

21    ████████.

22              MS. GARDNER:  I think that requires a legal

23    response.

24              MS. BROUILLET:  All right.

25              MS. GARDNER:  And so I place my objection on

Doe v. UCONN

6/29/2011

Page 306

1    the record.

2             And, , if you can answer --

3             MS. BROUILLET:  Let me ask -- I'll withdraw

4    that question.  Let me --

5             THE WITNESS:  No, I can answer you.

6    Q   (By Ms. Brouillet)  I will withdraw that

7    question.

8             THE WITNESS: (To Ms. Gardner)  Do you mind?

9             MS. GARDNER:  No, go ahead.

10            THE WITNESS:  (To Ms. Brouillet)  Do you

11   mind?

12            MS. BROUILLET:  Yeah, I'm withdrawing the

13   question.

14            THE WITNESS:  I want to answer --

15   Q   (By Ms. Brouillet)  I'm --

16   A   No, no --

17   Q   I'm withdrawing the question.

18            THE REPORTER:  One at a time.

19            MS. GARDNER:  She's withdrawing it.

20   Q   (By Ms. Brouillet)  Okay.  Here's my question to

21   you --

22   A   I'm sorry.

23   Q   In regard --

24   A   Confusing.

25   Q   -- to the first count and your claims of Title

             BRANDON SMITH REPORTING & VIDEO



Page 307

1    VII.  Okay?

2         A    You're talking about seventeen, Paragraph 17?

3         Q    No, I'm talking about the First Count where it

4    says "Title VII, discrimination."

5         A    Yes, ma'am.

6         Q    You see that?

7         A    Yes, ma'am.

8         Q    My question is this --

9         A    Yes, ma'am.

10        Q    -- you claim in the first seventeen paragraphs

11   that ████  █████ subjected you to unwanted sexual

12   advances, including anal and oral sex.

13        A    You're correct.

14        Q    When you're claiming discrimination by UConn, are

15   you claiming that anyone else at UConn subjected you to

16   sexual harassment or discrimination?  Or are we only

17   limiting it to what you claim about ████ ██████?

18        A    Only ████ ██████.

19        Q    All right.

20        A    Not everyone.

21        Q    And the Second Count, turn to Page 6.

22        A    Yes, ma'am.

23        Q    It says, "Title VII, retaliation."  Do see that?

24        A    Twenty-two?

25        Q    Well, at the top the title is, "Title VII,

                    BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011 

Page 308

1    retaliation."

2        A    Yes.

3        Q    And twenty-two -- Paragraph 22 says, "Paragraphs

4    1 through 17 are incorporated by reference."  And so all

5    of those things that were said in the initial seventeen

6    paragraphs, are part of this.  Who are you claiming at

7    UConn retaliated against you?

8        A    The system.

9        Q    The system.

10       A    UConn's system, yes.  Management, uh, all of

11   that.

12       Q    What was the act of retaliation you're claiming?

13       A    They are responsible for my -- for two and a half

14   years abuse, sexual abuse.  Uh, they're responsible,

15   which is, they've stripe (phonetic) uh, one of the staff

16   work as a director, because I was afraid of lose my job,

17   I was afraid to report, I was worried about my family,

18   and he used me as much as I could in the system up

19   there.

20       Q    I understand your claim in the sexual harassment

21   and discrimination.

22       A    Yes, ma'am.

23       Q    What I am trying to understand is how you

24   suffered retaliation.

25       A    Okay.

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 309

```
 1      Q    Because --
 2                MS. GARDNER:  I'm going to have the same
 3      objection as I did before.
 4                MS. BROUILLET:  Okay.
 5                MS. GARDNER:  This may require a legal
 6      response.
 7                MS. BROUILLET:  That's fine.
 8                THE WITNESS:  Okay.
 9      Q    (By Ms. Brouillet)  Let me be clear --
10      A    Yes, ma'am.
11      Q    -- I understand from your testimony earlier today
12      that you've had no contact at UConn with ████ ███████
13      since May 8, 2006.
14      A    Right.
15      Q    And so I'm unclear.  When did this retaliation
16      occur?
17                MS. GARDNER:  Same objection.
18                THE WITNESS:  When?
19      Q    (By Ms. Brouillet)  When?  When did the -- when
20      were you retaliated against by UConn?  What time frame
21      are we talking?
22      A    Since 2000 -- because he was one of the staff,
23      2000 until 2006, May, 2006.  And, uh, it then destroyed
24      my life.  I cannot get job.  I -- emotionally,
25      physically, mentally I have been destroyed.  I tried to
```
BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 310

1    heal myself. I tried to do as much as -- it's really

2    hurting me. I cannot move forward. And this is a lot

3    for me. I mean, I wish -- I wish I got shot thirty

4    times not doing this emotional, not go through this

5    emotional abuse and all kind of things. You know,

6    that's -- that's what I feel. This is --

7       Q    And is it accurate to say that the retaliation

8    stopped on May 8, 2006?

9             MS. GARDNER: Objection.

10      Q    (By Ms. Brouillet) I am trying to get a time

11   frame when this retaliation --

12      A    Well, still I'm being abused mentally,

13   physically, emotionally because of that, because of

14   that.

15      Q    Because of what?

16      A    Because of ▆▆▆▆ ▆▆▆▆.

17      Q    Okay. When did the relation -- you haven't

18   worked at UConn since March 19, 2008, right?

19      A    It's still affecting me.

20      Q    No. Listen to the question. You haven't worked

21   at UConn since March 19, 2008.

22      A    Yes.

23      Q    You agree with that?

24      A    Yes.

25      Q    Okay. Are you claiming that after March 19,

BRANDON SMITH REPORTING & VIDEO

1    2008, UConn retaliated against you?

2        A    Yes.

3        Q    Okay.

4        A    That's part of it.

5        Q    I'm sorry, what was the -- I missed --

6        A    Part of -- part of that, yes.

7        Q    UConn retaliated against you after March 19,

8    2008?

9        A    Okay.  It's very simple things.  I can say it

10   again more.  As part of the system -- and the system,

11   one of the staff, which was ████ ███████, director,

12   abused me sexually until 2000 -- May, 2006.  And, plus,

13   I keep paying this emotionally, physically, mentally.  I

14   can't fight this.  Which your question is right there.

15   You're asked me all of these question, which I have been

16   through, this is emotional.

17       Q    Are you claiming that giving --

18       A    Until I die.

19       Q    Okay.  And so you're claiming that you're going

20   to be emotionally distressed until you die?

21       A    Sure.

22       Q    And are you claiming that the lawsuit is

23   emotionally distressing?  Going through this legal

24   process?

25       A    Emotion?

6/29/2011



Page 312

1    Q    Going through the legal process of this lawsuit

2    and answering the questions, are you claiming that's

3    emotionally distressing?

4    A    Of course.

5    Q    Then why did you file the lawsuit?

6    A    Why?

7    Q    Yes.

8    A    It's destroying my life.  Can you fix me?  Can

9    someone fix my mind?  And I've been abused two and a

10   half years sexually and I cannot focus.  I cannot think.

11   And someone else is claim wrong false statement,

12   retaliation against me and destroying my career,

13   destroying my family, put criminal case, and I cannot do

14   anything.

15   Q    Well, let me ask you, sir, you say destroyed your

16   career.  Isn't it true that your career ended in part

17   because of your work -- your acts at work in November of

18   2007 and following your criminal conviction --

19   A    That's why criminal came from there.

20   Q    Okay.

21   A    ████ ████████'s daughter gave because he

22   encouraged -- when he got -- when he got suspended, when

23   he got resigned because they didn't want to give him the

24   job, and so that's why his daughter can give a statement

25   to protect -- and he put her as shield.
                 BRANDON SMITH REPORTING & VIDEO

6/29/2011

Page 313

```
 1      Q    And so it's your testimony that the retaliation

 2   that you're claiming is your criminal conviction?

 3      A    I think UConn is accountable -- the people are

 4   accountable there, who's in charge of this.

 5      Q    For your criminal conviction?

 6      A    Not criminal conviction.

 7      Q    Okay.

 8      A    My abuse.

 9      Q    I'm trying to make that distinction.

10      A    My abuse.

11      Q    Okay.

12      A    Yes.

13      Q    But you --

14      A    Criminal --

15      Q    Has the criminal conviction and your having to

16   register as a sex offender destroyed your career?

17      A    It come from UConn, yes.

18      Q    So the -- I just want to be clear because I'm --

19   that's a little unclear.  Did the criminal conviction

20   and registering as a sexual offender, did that destroy

21   your career?

22      A    No.

23      Q    Okay.  But you told me that you've been unable to

24   find work since registering as a sex offender.

25      A    Well, of course.
```
                     BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



6/29/2011

Page 314

```
 1       Q    Is that accurate?

 2       A    Of course, I don't like word someone telling me

 3   that I am a sexual offender, because I am not a sexual

 4   offender.  I am not criminal.

 5       Q    Well, let me ask you, sir --

 6       A    Yes.

 7       Q    -- you are a registered sexual offender with the

 8   State of Connecticut.

 9       A    For you, the state, it's okay.  And so whatever

10   they believe, I don't believe myself as a criminal.  I'm

11   sitting here in front of you.

12       Q    Well, let me ask you, sir --

13       A    No, I'm not criminal.

14       Q    You're not a criminal.

15       A    If I was criminal -- if I was criminal, I will --

16   I wouldn't sit right here.  I will go make million,

17   million dollars.

18       Q    As a criminal?

19       A    Of course.

20       Q    Oh.

21       A    I'm not a criminal.

22       Q    You're not a criminal.  Let me ask you, sir,

23   isn't it true that you are a registered sex offender

24   with State of Connecticut?

25       A    Yes, ma'am.
```

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011

Page 315

1    Q   And isn't it true that you have been convicted of

2   crimes in Connecticut?

3    A   Yes.

4    Q   Wouldn't that make you a criminal?

5    A   But doesn't make me a -- but here's another

6   thing, it's very simple thing, the criminal can go in

7   Afghanistan and fight for here get $350,000; is that

8   criminal?  They give criminal job?  It's not related to

9   this.  I can get $350,000 to go to Afghanistan and

10  fight.  American taxpayer pay me, is that right?

11   Q   Are you telling me, sir, that you have been

12  offered a job for three hundred --

13   A   Yes.

14   Q   Hold on.  For $350,000 --

15   A   Yes.

16   Q   Hold on.

17   A   Yes, ma'am.

18   Q   To go to Afghanistan?

19   A   Yes.

20   Q   Who offered you that job?

21   A   Huh?

22   Q   Who offered you that job?

23   A   The state department, ma'am.

24   Q   The state department.  When did they offer you

25  this job?

BRANDON SMITH REPORTING & VIDEO



Page 316

1    A    I give you -- I give you all the information.

2    Q    Okay.  Good.

3    A    I give you --

4    Q    When -- no, tell me this, when were you offered

5    that job?

6    A    Excuse me, this is very easy.  The website is --

7    commercial every day.  There is a commercial --

8    Q    No, I am asking --

9    A    -- and a website and they pay me.

10   Q    I'm asking you a question.  You told me --

11   A    I copy it for you --

12   Q    Whoa, slow down.

13        THE REPORTER:  One at a time.

14        MS. GARDNER:  This is completely irrelevant.

15   Q    (By Ms. Brouillet)  When were you offered a job

16   by the state department?  When were you offered a job by

17   the state department?

18   A    When I was working at UConn, 2007, because I

19   couldn't go in Afghanistan without my family, and -- and

20   then I apply again.  And then they told me because I

21   have a criminal thing, they can wipe out that.  I have

22   to go Afghanistan without my family.  I cannot do it.

23   Q    And when did the state -- US state department

24   tell you that they could wipe out your criminal thing

25   and you -- if you went to Afghanistan they would pay you

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



6/29/2011

Page 317

1    $350,000?  When did the US state department tell you

2    that?

3        A    It is on the website, ma'am.

4        Q    No --

5            MS. GARDNER:  Nancy, it's after 5:00.  Are

6    you almost done?  Can I get an estimate?  Because I have

7    an issue if we have to be here much longer.

8            MS. BROUILLET:  I just want to finish this

9    line, and I'm happy to stop for today and I'll have to

10   arrange another day with you.

11           THE WITNESS:  You are asking me what --

12       Q    (By Ms. Brouillet)  No, I'm asking you -- I want

13   to clarify this job offer that you claim for $350,000.

14       A    It's on the website.

15       Q    Let me finish, sir.  Three hundred and fifty

16   thousand dollars.  You told me that you were offered a

17   job.  I'm not talking about making an application.

18       A    Okay.

19       Q    Is it your testimony under oath that you, Mr.

20   ▮▮▮▮, were offered a job by the US State Department --

21       A    Not offered, ma'am, you're manipulating my word.

22   I said that there's a website give you $350,000 --

23       Q    Okay.

24       A    -- to go to Afghanistan.

25       Q    Okay.  And so let me stop you --
            BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 318

```
 1      A    On the website and the TV.
 2      Q    Okay.  And so you --
 3      A    And I give you a copy --
 4           THE REPORTER:  One at a time.
 5      Q    (By Ms. Brouillet)  Mr. ████?
 6      A    Yes, ma'am.
 7      Q    You've seen an ad for a job?
 8      A    Yes, ma'am.  I am capable.  I know languages --
 9      Q    Mr. ████, stop.  Let me ask you this question.
10      A    Okay.
11      Q    Have you personally, you, Mr. ████, been offered
12    a job by the US State Department to go to Afghanistan
13    for $350,000?
14      A    2007, yes.
15      Q    In 2007?
16      A    I put out application, they say I cannot travel
17    with my family.
18      Q    Okay.  I will ask for those records.  And --
19      A    UConn -- --
20      Q    Mr. ████, wait.
21           MS. GARDNER:  Please, let her get through
22    this ridiculous irrelevant line of questioning.
23           THE WITNESS:  It's not related.
24           MS. GARDNER:  That's certainly right.  Wait
25    for a question.
```

BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 319

1          MS. BROUILLET:  I object to that line of

2   questions.

3      Q   (By Mr. Brouillet)  And so when was the last time

4   you were offered a job with the state department?  Was

5   it in 2007?

6      A   Offered as, ma'am, every day on the website and

7   the TV phone numbers they give --

8      Q   Mr. ▓▓▓▓ --

9          MS. GARDNER:  She's talking about you

10  personally.

11         THE WITNESS:  Oh, personally.  No.

12         MS. GARDNER:  You said 2007.

13         THE WITNESS:  2007, yes, ma'am.

14     Q   (By Ms. Brouillet)  And it's -- okay.  Who told

15  you that the US State Department can get rid of your

16  criminal record?

17     A   Commercial.

18     Q   You saw that on a TV commercial?

19     A   Yeah.

20     Q   Okay.  And so to be --

21     A   You talk to them.

22     Q   To be accurate, no one from the US State

23  Department has said to you, Mr. ▓▓▓▓, that they will

24  get rid of your criminal record?

25     A   No, they didn't state verbally.  When you apply,

               BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 320

1    it doesn't matter what crime you have.  And as long as

2    you go do Afghanistan, they -- you have to know

3    languages.

4        Q   Mr. ████, I'm just asking you, what you have

5    been actually told by the US State Department.  No one

6    has told you that they will wipe out your criminal

7    record; is that correct?

8        A   No, they didn't say wipe out.  If you go to

9    Afghanistan, it's set clear.

10       Q   Mr. ████, has anyone told you, personally you,

11   that they would erase your criminal record?

12       A   On the phone; yes.  I give you the phone number.

13       Q   Who -- and who told you this Mr, ████?

14       A   It's a state department phone number.  It's very

15   clear.

16       Q   And when did the US State Department tell you

17   this, Mr. ████?

18       A   No, the state department didn't tell me directly.

19   The phone -- if you can get phone number, you call them

20   and they will explain everything for you.  And also if

21   you want to recruit someone, they give you $6,000.

22       Q   Mr. ████, have you ever been told by any state

23   or United States --

24       A   No.

25       Q   Hold on, Mr. ████

BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 321

1        MS. GARDNER:  Well, he's already answered

2    several times.

3            MS. BROUILLET:  Well, he's just told me a

4    number of things.

5        Q    (By Mr. Brouillet)  Have you ever been told by

6    United States or a state official that they would erase

7    your criminal record?

8        A    Personally, no.

9        Q    Okay.

10       A    I said no.

11           MS. GARDNER:  End of story.

12           MS. BROUILLET:  All right.  Well, I need to

13   get a number of records from Mr. ▒▒▒▒ through you,

14   Attorney Gardner, and I obviously need to get updated

15   responses to interrogatories and production requests.

16   And so I am willing to adjourn the deposition now.  I'm

17   going to ask Judge Edgington (phonetic) for an excess of

18   the seven hours allotted because of the difficulties of

19   getting a response.  And I'm going to, um, when we go

20   off the record, ask you for the next date because we

21   have a deadline of July 15th in this case.

22           MS. GARDNER:  Okay.  And so let me be clear,

23   are you done except for documents that I may have to

24   provide that may provide -- that may provoke further

25   questioning?  Or you're suggesting that he's been

BRANDON SMITH REPORTING & VIDEO

6/29/2011



Page 322

1    unresponsive?

2              MS. BROUILLET:  I'm suggesting that he has

3    not answered the question asked repeatedly, and that

4    there have been a number of breaks.  And so when I get

5    the time line, I will know -- and I don't know whether

6    there is any -- Mr. ████ has said that he doesn't

7    understand.  And so I'm telling you --

8              MS. GARDNER:  Doesn't understand what?

9              MS. BROUILLET:  A lot of things.  When I ask

10   for a date, Mr. ████ would respond with other things.

11   So --

12             MS. GARDNER:  Yeah, but then you kept at it.

13             MS. BROUILLET:  Yeah.

14             MS. GARDNER:  And I can't think of even one

15   question that you didn't get an answer to.

16             MS. BROUILLET:  I'm not saying that he did

17   not eventually respond.

18             MS. GARDNER:  Okay.

19             MS. BROUILLET:  My distinction is --

20             MS. GARDNER:  All right.  I am going to

21   object to you asking for more time.

22             MS. BROUILLET:  That's fine.

23             MS. GARDNER:  Okay.

24             MS. BROUILLET:  And so I will ask the court

25   for additional time and I will reschedule your
                BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN



Page 323

1    deposition to come back here before July 15th because

2    that's our court-ordered deadline.  Thank you.

3              THE VIDEOGRAPHER:  Off the record, 5:07.

4              (Thereupon, the deposition suspends at 5:07

5    p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

BRANDON SMITH REPORTING & VIDEO

Doe v. UCONN

6/29/2011



Page 324

```
 1                          JURAT

 2

 3

 4          I, ████████, do hereby certify that the

 5    foregoing testimony given by me on June 29, 2011, is

 6    true and accurate, including any corrections noted on

 7    the corrections page, to the best of my knowledge and

 8    belief.

 9

10

11

12                              _____

13              ████████████

14

15

16

17

18          Subscribed to and sworn before me on this

19    _____ day of _____ 2011.

20

21

22    My Notary Expires: _____.

23

24

25
                  BRANDON SMITH REPORTING & VIDEO
```

Page 325

1                    CORRECTION SHEET

2

3       I, ▮▮▮▮▮, do hereby certify that the following

4  corrections and additions are true and accurate to the

5  best of my knowledge and belief.

6

7  CORRECTION            PAGE    LINE      REASON

8

9

10

11

12

13

14

15

16  DATE

17      At                    in said County of              ,

18  this         day of         , 2011, personally

19  appeared ▮▮▮▮▮, and he made oath to the truth of

20  the foregoing corrections by his subscribed.

21

22  Before me,                        , Notary Public

23

24              My Notary Expires:

25

              BRANDON SMITH REPORTING & VIDEO

1          STATE OF CONNECTICUT

2

3          I, Aretha S. Martin, a Notary Public duly

4    commissioned and qualified in and for the State of

5    Connecticut, do hereby certify that pursuant to notice

6    there came before me on the 29th day of June, 2011, the

7    following-named person, to wit: ████████, who was by

8    me duly sworn to testify to the truth and nothing but

9    the truth; that he was thereupon carefully examined upon

10   his oath and examination reduced to writing under my

11   supervision; that this deposition is a true record of

12   the testimony given by the witness.

13        I further certify that I am neither attorney nor

14   counsel for nor related to nor employed by any of the

15   parties to the action in which this deposition is taken,

16   and further that I am not a relative or employee of any

17   attorney or counsel employed by the parties hereto, or

18   financially interested in this action.

19        IN WITNESS THEREOF, I have hereunto set my hand

20   this 20th day of June, 2011.

21                                 _____

22                                 Aretha S. Martin, Notary Public

23   My Notary Expires: June 30, 2012.

24

25

BRANDON SMITH REPORTING & VIDEO

Page 327

1                          Brandon Smith Reporting Service
                           249 Pearl Street
2                          Hartford, CT 06103
                           (800) 852-4589
3

   July 21, 2011
4

5  Attorney Barbara E. Gardner, Esq
   Law Offices of Barbara E. Gardner
6  843 Main Street, Suite 1-4
   Manchester, CT 06040
7

8

9

   Dear Ms. Gardner:
10

11  Enclosed please find your copy of the deposition of ████
    ████, on June 29, 2011.
12
    The original jurat and errata sheets are also enclosed.
13  Please note that the witness is allowed 30 days to read
    and sign the deposition as the rules provide.
14
    Please return only the original notarized jurat and
15  errata sheets to Attorney Brouillet, along with a copy
    to all counsel present.  Thank you for your prompt
16  attention to this matter.

17  If you have any questions, please call me.

18  Sincerely yours,

19
    Aretha S. Martin, LSR, Court Reporter
20

21  CC: Nancy A. Brouillet, Esq.

22

23

24

25
                    BRANDON SMITH REPORTING & VIDEO

# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| | ) Civil Action No. |
| JOHN DOE | ) 3:09CV0107 (WWE) |
| | ) |
| VS. | ) |
| | ) |
| UNIVERSITY OF CONNECTICUT | ) |
| | ) |

VOLUME II
VIDEOTAPED DEPOSITION OF:
DATE:      July 12, 2011
HELD AT:  Assistant Attorney General
          55 Elm Street
          P.O. Box 120
          Hartford, CT 06141


Reporter:  Aretha S. Martin, LSR
BRANDON SMITH REPORTING SERVICE
249 Pearl Street
Hartford, Connecticut  06103
(800) 852-4589

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                    Page 328

APPEARANCES:

LAW OFFICES OF BARBARA E. GARDNER
   843 Main Street, Suite 1-4
   Manchester, CT 06040
   representing the Plaintiff.
BY:   BARBARA E. GARDNER  ESQUIRE

ASSISTANT ATTORNEY GENERAL
   55 Elm Street
   P.O. Box 120
   Hartford, CT 06141-0120
   representing the Defendant.
BY:   NANCY BROUILLET, ESQUIRE

Also present:

Legal Intern
Officer Michael Zella
Jake Brandon, Videographer



```
                        I N D E X
```

| WITNESS | DIRECT | CROSS | REDIRECT | RECROSS |
|---------|--------|-------|----------|---------|
|         | 331*   | 412** | 415*, 417* | 416** |

*    By (Nancy Brouillet)
**   By (Barbara Gardner)
***  By
****By

```
            *   *   *   *   *   *   *
```

| EXHIBITS | DESCRIPTION | PAGE |
|----------|-------------|------|

Defendant's:

| Exhibit 23 | Plaintiff's Answers to Defendants Interrogatories and Requests for Production | 331 |
| Exhibit 24 | Affidavit of Illegal Discrimination Notice | 331 |
| Exhibit 25 | Appeal Complaint | 350 |
| Exhibit 26 | Letter from Tony Velez, 3/31/03 | 370 |
| Exhibit 27 | Letter from Boris Bravo-Ureta, 5/8/06 | 375 |
| Exhibit 28 | Letter from Attorney Gardner, 7/9/11 | 377 |
| Exhibit 29 | Motion for Protective Order | 381 |

(Original Exhibits retained by Attorney Brouillet.)



JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                    Page 330

```
 1                    S T I P U L A T I O N S

 2

 3        It is agreed by and between the parties that all

 4   objections except objections as to the form of the

 5   question are reserved to be raised at the time of trial

 6   for the first time.

 7

 8        It is further agreed by and between the parties that

 9   all motions to strike unresponsive answers are also

10   reserved to be raised at the time of trial for the first

11   time.

12

13        It is also agreed that the deponent will read and

14   sign the deposition and that the sealing of the said

15   deposition will be waived.

16

17        It is further agreed by and between the parties that

18   notification to all parties of the receipt of the

19   original deposition transcript is also hereby waived.

20                          *****

21

22

23

24

25
```



on 07/12/2011

```
 1              (Thereupon, the deposition begins at 9:55

 2    a.m.)

 3              (Thereupon, the reporter marked for

 4         identification Exhibit No. 23 and 24.)

 5              THE VIDEOGRAPHER:  The date today is July

 6    12th, 2011.  We're going on the record at 9:55 a.m.  The

 7    case is John Doe versus the University of Connecticut

 8    filed in the U.S. District Court of Connecticut.  The

 9    name of the witness today is ▓▓▓▓▓▓▓, Volume II.

10    This deposition is being held at the Office of the

11    Attorney General, 55 Elm Street, Hartford, Connecticut.

12    My name is Jacob Brandon and the court reporter is

13    Aretha Martin, both from Brandon Smith Reporting and

14    Video.

15              Counsel will now state their appearances for

16    the record, please, after which the court reporter will

17    swear in the witness.

18              MS. BROUILLET:  Nancy A. Brouillet,

19    Assistant Attorney General, Employment Rights Department

20    for the defendant, University of Connecticut.

21              MS. GARDNER:  Barbara Gardner representing

22    the plaintiff, ▓▓▓▓▓▓

23              ▓▓▓▓▓▓ (SWORN)

24                    DIRECT EXAMINATION

25    BY MS. BROUILLET:
```



on 07/12/2011

```
 1    Q   Good morning, Mr. Omari.

 2    A   Good morning.

 3    Q   Um, as you know, this is the second day of your

 4  deposition.  Did you have the chance to meet with your

 5  attorney following the deposition on June 29th?

 6    A   Yes.

 7    Q   Okay.  Are you taking any medication today that

 8  would affect your ability to answer questions under

 9  oath?

10    A   No.

11    Q   Are you taking any medication today that would

12  preclude you from speaking with a clear mind?

13    A   No.

14    Q   At last -- at the last deposition, I forgot to

15  ask you at the beginning if you wish to read and sign

16  your deposition transcript.  You have the right to do,

17  uh, to -- not to change what you said, but to ensure

18  that the court reporter accurately wrote down what you

19  said.  Do you wish to do so?

20        MS. GARDNER:  Yes, we'll -- we'll read and

21  sign.

22        MS. BROUILLET:  Okay.

23    Q   (By Ms. Brouillet)  Now, when we were at the

24  deposition last time, I had marked the notice of

25  deposition as Exhibit 1.  And I'm going to show that to
```



1    you again, sir, and ask you to look at it.

2       A   (Witness complies.)  I'm sorry, what is your

3    question?

4       Q   I -- I haven't asked you a question.  I just

5    asked you to look at it.  Do you recall that document?

6       A   Uh, probably I do, yes.

7       Q   At your last deposition date on June 29th, I

8    asked you if you brought any documents in response to

9    that Schedule A, and you said you had not.  Do you have

10   any documents today that are responsive to that Schedule

11   A asking you to produce documents?

12      A   No.

13      Q   Okay.

14          MS. BROUILLET:  And I just want to note that

15   I haven't received any updated responses to

16   interrogatories.

17          MS. GARDNER:  I sent it by e-mail.  Did you

18   not get it?

19          MS. BROUILLET:  I haven't received anything.

20   When did you send it?

21          MS. GARDNER:  Saturday.  I'll give you a

22   copy today before I leave.  I actually have the

23   original.

24          MS. BROUILLET:  Well, why don't we go off

25   the record and I'll make a copy now in case there's



JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                    Page 334

1      something that I have to ask him about.

2                      MS. GARDNER:  Okay.  Um...

3                      THE VIDEOGRAPHER:  Off the record?

4                      MS. BROUILLET:  Yeah.

5                      THE VIDEOGRAPHER:  Off the record, 9:59.

6                      (Discussion held off the record.)

7                      The VIDEOGRAPHER:  On the record, 9:59.

8          Q   (By Ms. Brouillet)  Okay.  And while we were off

9      the record, Mr. Omari, your lawyer provided me with a

10     copy of some updated responses I'm having photocopied,

11     so when we have a break, I'll review those and see if I

12     have any further questions for you.

13             Are you treating with any health care provider at

14     this time?

15         A   Yes, I do.

16         Q   And who do you treat with?

17         A   With, uh, David Bonanno.

18         Q   Anyone else?

19         A   No.

20         Q   And would that be David Bonnano, B-O-N-A-N-N-O,

21     who's a psychologist?

22         A   Yes.

23         Q   And he's located in Mansfield Center?

24         A   Yes.

25         Q   Okay.  And you didn't start treating with --

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

1.    Withdraw the question.

2            When did you start treating with Dr. Bonanno?

3      A    Three years ago.

4      Q    Okay.  When did you last see him?

5      A    Um, last week.

6      Q    And did you discuss with Dr. Bonanno your

7    lawsuit?

8      A    No.

9      Q    Did you tell Dr. Bonanno about giving a

10   deposition?

11     A    Yes.

12     Q    What did you tell him?

13     A    I told him that, uh, I have an appointment and I

14   have to go, uh, deposition, meeting.

15     Q    Did you discuss with Dr. Bonanno the deposition

16   before June 29th?

17     A    Yes, I met him, yes.

18     Q    Okay.  And what -- and what did you tell him

19   before you saw him on -- withdraw the question.

20          When did you see him last before your June 29th

21   deposition?  When did you --

22     A    Last -- last -- last week.

23     Q    Okay.  I'm going back in time and so it may be a

24   little confusing.

25     A    Okay.

on 07/12/2011

```
 1    Q   Um, how often do you see him?

 2    A   Every week.

 3    Q   Okay.  And how long have you been seeing him

 4   every week?

 5    A   Uh, probably -- two years?

 6    Q   I'm sorry, was that two or three?

 7    A   Two years.

 8    Q   Two years, okay.

 9    A   Off and on, two weeks, one week.  You know,

10   sometimes twice a week.

11    Q   And so before you went to the deposition on June

12   29th, did you discuss that you were going to a

13   deposition with him?

14    A   Yes.

15    Q   And what did you tell him before June 29th about

16   your deposition?

17    A   I told him I have a meeting with, uh, with you

18   guys here.

19    Q   And after June 29th, after you went to the

20   deposition, did you tell him anything about the

21   deposition?

22    A   No.  As I said, I had meeting with you guys,

23   that's it.

24    Q   Okay.  What is he treating you for?

25    A   Uh, for stressed emotion.
```

on 07/12/2011

1    Q    Does he provide you any medication?

2    A    Uh, no.

3    Q    Okay.  Does anyone provide you medication for

4    stress?

5    A    Yes.

6    Q    Who?

7    A    My family doctor.

8    Q    Who's that?

9    A    Dr. Leach.

10    Q    And so besides treating with Dr. Bonanno and Dr.

11    Leach, do you see any other health care provider?

12    A    No.

13    Q    Do you continue to see a counselor at the Center

14    for Treatment of Problem Sexual Disorders?

15    A    Yes.

16    Q    Okay.  And how often do you see your counselor?

17    A    Every week, once a week.

18    Q    When was last time you saw your counselor?

19    A    Last Tuesday.

20    Q    Is that Mr. Salafia?

21    A    Yes.

22    Q    Okay.  Did you tell Mr. Salafia anything about

23    your deposition?

24    A    I told him I have a meeting.  I will be late.

25    Q    And when did you tell him that?



```
1      A    Uh, last Tuesday I told him.

2      Q    Okay.  Did you tell him anything else about your

3   deposition?

4      A    No.

5      Q    Have you discussed with Dr. Bonanno your criminal

6   conviction?

7      A    Yes.

8      Q    Did you discuss with him your criminal conviction

9   relating to the breach of peace charge, uh, from May 6,

10  2006?

11     A    Yes.

12     Q    And did you discuss with Dr. Bonanno the other

13  criminal convictions that you've had?

14     A    Yes.

15     Q    And what have you told Dr. Bonanno in regard to

16  your criminal charges?

17     A    I told him what happened at UConn and, uh, ████

18  █████ call -- fall, uh, false, uh, accusation against

19  me, so...

20     Q    And what do you mean ██████████ 's false

21  accusations against you, sir?

22     A    On May -- you're talking about May 6th, right?

23     Q    Well, let me ask you the question again so that

24  it's clear.  I'm asking you what you told Dr. Bonanno in

25  regard to the criminal charges against you.  And just
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
 1    because there's a number of criminal charges --

 2              MS. GARDNER:  Two.

 3              MS. BROUILLET:  Actually, he's had three

 4    criminal --

 5              MS. GARDNER:  Oh, three.  Okay.  All right.

 6              MS. BROUILLET:  -- convictions.  Okay?

 7       Q   (By Ms. Brouillet)  And so because you had three

 8    criminal convictions, I'm going to ask you, if you can,

 9    to try and be specific.

10              MS. GARDNER:  Actually --

11              MS. BROUILLET:  Let me withdraw that.

12              MS. GARDNER:  -- the first one wasn't a

13    conviction.  Wasn't the first one -- you know, it

14    doesn't matter.

15              MS. BROUILLET:  Well --

16              MS. GARDNER:  I just don't want you to

17    suggest something that --

18       Q   (By Ms. Brouillet)  Then let me withdraw that

19    question and ask you, um, in regards to your May 6,

20    2006, uh, breach of peace, uh, according to judicial

21    website, you were -- you pled guilty to that charge.  Do

22    you recall in June of 2007 what occurred in regards to

23    the breach of peace?

24       A   Yes, ma'am.

25       Q   And what is your understanding of whether you
```

on 07/12/2011                                                                        Page 340

```
 1    have a criminal conviction for that?

 2       A   I took the plea.

 3       Q   So does that mean your understanding is you do

 4    have a criminal conviction?

 5       A   Yes.

 6       Q   Okay.  Did you tell that to Dr. Bonanno, that you

 7    had a criminal conviction --

 8       A   Yes.

 9       Q   -- for the beach of peace?

10       A   Yes.

11       Q   Okay.  I was bad last time and we spoke over each

12    other, and so I'm going to just remind you so the

13    reporter gets it accurately, let me finish the question

14    and then respond.  Okay?  And focus on the question so

15    it will go more quickly.  So did you tell Dr. Bonanno

16    about your conviction in regard to the charges of

17    impairing the morals of a minor?

18       A   Yes.

19       Q   And what did you tell him in regard to that

20    charge?

21       A   I said this, um, report it, that's all.

22       Q   I'm sorry?  You said it was reported?

23       A   Yes.

24       Q   Did you tell him that you pled guilty under the

25    Alford Doctrine to those charges?
```

1      A    Yes.

2      Q    Okay.  Did you tell him anything else about those

3   charges?

4      A    No.

5      Q    And what did you tell Dr. Bonanno about your

6   conviction for breach of -- I'm sorry, for violation of

7   probation in 2009?

8      A    I talk about it with him.

9      Q    I understand that.  I'm asking you what you told

10   him.

11      A    I told him that, um, they asked me to, uh, admit

12   it and so I assaulted the girl sexually.  So I said, No,

13   I didn't.

14      Q    You told that to Dr. Bonanno?

15      A    (No audible answer.)

16      Q    I need you to answer out loud, because you're

17   nodding your head.  So is that a "yes"?

18      A    Yes.

19      Q    Okay.  I'm just going to remind you that we need

20   you to answer out loud because the reporter has to take

21   it down.  Even though we're videotaping it, we need you

22   to say "yes" or "no."  And I don't want to assume.

23      A    Okay.

24      Q    What did you tell Dr. Bonanno about this lawsuit?

25      A    I told him I have a meeting with you guys.

on 07/12/2011

```
1      Q    Anything else?

2      A    No.

3      Q    Did you tell him you had a lawsuit?

4      A    Yes.

5      Q    What did you tell Dr. Bonanno about your lawsuit

6    against the Department of Children and Families?

7      A    Say again, sorry.

8      Q    What did you tell Dr. Bonanno about your lawsuit

9    against the Department of Children and Families?

10     A    I -- I took them to court.

11     Q    That's what you told Dr. Bonanno?

12     A    Yes.

13     Q    Did you tell him anything else about that

14   lawsuit?

15     A    No.

16     Q    Was the lawsuit against the Department of

17   Children and Families distressing to you?

18     A    Yes.

19     Q    And why did you sue the Department of Children

20   and Families?

21     A    Because they violated my privacy, two and a half

22   years -- I'm sorry, two years.  Because I told them

23   welcome, any time.  They investigate it and they didn't

24   give me result.  And also, they want to put me, um, on

25   the registry for lifetime, sexual offender, and so I
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

1    fight it..

2        Q   What two-year period did the Department of

3    Children and Families violate your privacy?

4        A   Because it was constantly they coming and, uh,

5    the violation of that was to put me in registry

6    lifetime, and so that's why.

7        Q   I understand that, but you responded to my prior

8    question by telling me that for a two-year period, the

9    Department of Children and Families violated your

10   privacy.  And so I'm asking you dates.  When -- when was

11   that two years?

12       A   2006 to two thousand -- the middle of 2008?   I

13   believe.

14       Q   Was the Department of Children and Families

15   violating your privacy for those two years emotionally

16   distressing to you?

17       A   Um, no, that's their job, no.

18       Q   And --

19       A   Distressing my family, yes.

20       Q   And this occurred prior to -- the Department of

21   Children and Families started invading your privacy

22   prior to your criminal conviction in January 18, 2008,

23   for impairing the morals of a minor?

24       A   During that.

25       Q   But when did it start?  You told me it started in

on 07/12/2011

1    2006, and you weren't convicted until January 18, 2008.

2       A    When, uh -- when, uh, ▓▓▓▓▓▓ got terminated

3    from UConn, that's why they investigated me.

4              THE VIDEOGRAPHER:  Ms. Brouillet?

5              MS. BROUILLET:  Yes?  Oh, I'm sorry.

6              (Discussion held off the record.)

7       Q    (By Ms. Brouillet)  Well, I thought we covered

8    last time Mr. ▓▓▓▓ was not terminated from UConn, was

9    he?

10      A    I have no clue --

11      Q    Okay.

12      A    -- so this is...

13      Q    All right.  And so when I'm asking you for the

14   time frame, since you have no clue whether Mr. ▓▓▓▓

15   was terminated from UConn, can you give me a time frame

16   when this occurred separate from Mr. ▓▓▓▓?  You said

17   that it happened -- it began --

18      A    August.

19      Q    Let me finish.  You said previously that the

20   Department of Children and Families began invading your

21   privacy for a two-year period in 2006 until the middle

22   of 2008.  And so I'm asking you if you know a month or a

23   year precisely.

24      A    I think it was August.

25      Q    Of what year, sir?



```
 1     A    August two thousand --- I'm not sure, 2006 or

 2    2007.

 3     Q    Okay.  And what medications is Dr.

 4    providing you at this time for your mental distress?

 5     A    Antidepressant.

 6     Q    Do you know name of the medication?

 7     A    I think it's            .  Um, I believe            .

 8     Q    Okay.  When's the last time you saw Dr.            ?

 9     A    Yesterday.

10     Q    And what did you see him for?

11     A    For, um, I was sick.

12     Q    And what was your complaint?  What was

13    your problem?

14     A    I was in the emergency room, so... follow-up.

15     Q    What were you in the emergency room for?

16     A    I, um -- I got panic, um, anxiety attack.

17     Q    Which emergency room, sir?

18     A    Windham.

19     Q    Were you admitted to the hospital?

20     A    No.

21     Q    And when were you in the emergency room?

22     A    Last Tuesday.  No, I'm sorry.  Uh, July 1st I

23    believe.  July 1st?  Two Tuesday, two weeks ago.

24     Q    Well, your deposition was June 29th.  July 1st

25    would have been Friday.  Uh...
```

1     A    July 1st is Tuesday, I believe.

2          MS. GARDNER:  Can I just make a suggestion

3     --

4          MS. BROUILLET:  Sure.

5          MS. GARDNER:  -- that you ask him in

6     relation to when his deposition was taken.

7          MS. BROUILLET:  Thank you.

8     Q    (By Ms. Brouillet)  Do you recall when it was in

9     relation to your deposition, sir?

10    A    Yes.

11    Q    When?

12    A    Uh, when was it?

13    Q    In relation -- you're not sure of the precise

14    date you were in the emergency room, and so I'm asking

15    you was it before or after your deposition was taken.

16    A    After.

17    Q    After.  How far after?

18    A    Uh, I believe four or five days.  I'm not sure.

19         MS. GARDNER:  Can we just go off the record

20    for a second?

21         MS. BROUILLET:  Sure.

22         THE VIDEOGRAPHER:  Off the record, 10:14.

23         (Discussion held off the record.)

24         THE VIDEOGRAPHER:  On the record, 10:15.

25    Q    (By Ms. Brouillet)  Mr. ████, when we were off

1    the record, Attorney Gardner suggested it may have been

2    the day before your deposition.

3        A    Yes.

4        Q    Was it before your --

5        A    Wednesday, yes.

6        Q    -- deposition?  No, listen to the question.  Was

7    it before your deposition when --

8        A    Yes.

9        Q    Let me finish, please.

10       A    Okay.

11       Q    Was it before your deposition that you went to

12   the emergency room for a panic or anxiety attack?

13       A    Yes.

14       Q    Okay.  And how often do you see your probation

15   officer?

16       A    Every Tuesday.

17       Q    Every single week?

18       A    Yes.

19       Q    Who is your current probation officer?

20       A    Kathy.

21       Q    Would that be Kathy McKeon?

22       A    Yes.

23       Q    When did Mr. Torres stop being your probation

24   officer?

25       A    A year ago.



```
1     Q    And where do you go for the probation office?

2     A    Where do I go?

3     Q    Where do you go?

4     A    In, uh, Willimantic.

5     Q    And when did you last see your probation officer?

6     A    Tuesday, last Tuesday.

7     Q    Have you told your probation officer anything

8   about your deposition?

9     A    I mentioned to her I have an appointment with you

10  guys, yes.

11    Q    Did you tell her anything else?

12    A    No.

13    Q    Now, when you went to the emergency room, was

14  that before or after you saw your probation officer that

15  day?

16    A    Uh, I fall down on the -- in the office, and so

17  they call emergency ambulance so they check my blood.

18  And after the group finished, 5:00, I went to the

19  emergency, Tuesday.

20    Q    When you say "I fall down in the office," what

21  office, sir?

22    A    Probation office.

23    Q    And when you were at the probation office, were

24  you seeing Ms. McKeon or were you there for counseling?

25    A    Um, I saw her first and then I went to
```

```
 1    counseling.

 2        Q    And when you say you fell down at the office,

 3    what caused you to fall down?

 4        A    Um, the stress, panic.  So I -- I got numb.  I

 5    fall down from the chair.

 6        Q    Did anyone provide you first aid?

 7        A    Emergency.

 8        Q    No one at the office provided you with any first

 9    aid?

10        A    Joe did.  Joe was there.

11        Q    "Joe" would be Mr. Salafia --

12        A    Yes.

13        Q    -- your counselor?

14        A    Yes.

15        Q    Okay.  And have you returned for counseling since

16    that panic attack?

17        A    Yes.

18        Q    Okay.  And did you actually see Dr. ▓▓▓▓ or

19    someone else in his office when you had your last

20    appointment?

21        A    Uh, I saw different doctor.  She -- he wasn't

22    available.

23        Q    Do you know who you saw?

24        A    I don't know her name, I'm sorry.

25        Q    Okay.
```

```
 1              (Thereupon, the reporter marked Complaint

 2          against DCF for identification as

 3          Exhibit No. 25.)

 4     Q    (By Ms. Brouillet)  Mr. ▓▓▓▓, I'm going to show

 5  you something -- and my numbers are a little out of

 6  order.  Do you recognize that complaint that's been

 7  marked Exhibit 25?

 8     A    Yes.

 9     Q    Is this your complaint against the State of

10  Connecticut Department of Children and Families?

11     A    Yes, ma'am.

12     Q    And this is what we referred to earlier when I

13  asked you about a lawsuit?

14     A    Yes, ma'am.

15     Q    Okay.  Um, did anyone help you with this lawsuit?

16     A    Um, they help me, yes, my friend.

17     Q    Who is your friend that you're saying helped you

18  with the lawsuit?

19     A    Uh, Vinnie.

20     Q    Vinnie?

21     A    Vinnie Coyle, yeah.

22     Q    And is Vinnie Coyle an attorney in Connecticut?

23     A    No.

24     Q    Okay.  Now, if you turn to Page 2, of that

25  lawsuit --
```

```
1       A    Okay.

2       Q    -- I'm looking under where it says,

3    "Jurisdiction" at the top paragraph, No. 3.

4       A    Mm-hmm.

5       Q    Do you see that, sir?

6       A    Yes.

7       Q    Okay.  It says, "I am appealing the Defendant's

8    July 5, 2007 determination that my request for appeal of

9    the Defendant's original November 2006 determination, in

10   parenthesis, the 'Determination' to place me on the

11   Defendant's Centralized Registry was untimely."  Are you

12   referring to the child abuse and neglect registry

13   maintained by the Department of Children and Families?

14      A    I'm not sure what you ask me, the question.  I'm

15   sorry.

16      Q    All right.  Tell me which Central Registry --

17   Centralized Registry you were referring to in Paragraph

18   3.

19      A    Uh, as a -- I'm not sure, sexual offender they --

20   they were putting me.

21      Q    Now, if you turn to Page 3, Paragraph 13 it says,

22   "Second, DCF never bothered to contact my lawyer after I

23   finally retained one to stop the unannounced intrusions

24   into my home."  Who was the lawyer you retained to stop

25   DCF from visiting your home without prior notice to you?
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011

Page 352

```
 1      A   Um, it was, uh, my lawyer in Willimantic.  I

 2   forgot her name, sorry.  I don't remember her name.  She

 3   helped me.

 4      Q   Where is she located in Willimantic?

 5      A   On Main Street.

 6      Q   Did you pay her?

 7      A   Yes.

 8      Q   Could you provide her name to your attorney?

 9      A   Yes.

10      Q   Okay.

11              MS. GARDNER:  Can I just ask for

12   clarification?  Which attorney?

13              MS. BROUILLET:  The attorney just referred

14   to in Willimantic.

15              THE WITNESS:  DCF.

16              MS. GARDNER:  Did you provide her name?

17              MS. BROUILLET:  No, I'm -- I'm saying could

18   he provide to you --

19              MS. GARDNER:  Oh.

20              MS. BROUILLET:  -- her name.

21              MS. GARDNER:  Okay.

22              MS. BROUILLET:  I'm sorry.  And then --

23              MS. GARDNER:  That totally went over my

24   head.

25              MS. BROUILLET:  To Attorney Gardner.
```

```
 1              MS. GARDNER:  Okay.

 2              MS. BROUILLET:  I'll stop using pronouns.

 3      Q    (By Ms. Brouillet)  Could you provide the name of

 4   the Willimantic attorney you used for DCF, who you

 5   referred to in Paragraph 13, to Attorney Gardner so that

 6   she can supply that to me?

 7      A    I don't remember.

 8      Q    I understand that.  I'm saying if you look

 9   through your bills or you look through your paperwork or

10   even look at a Willimantic phone book, then give that

11   information to Attorney Gardner who will provide it to

12   me, please.

13      A    Sure.

14      Q    Now, Paragraph 15 --

15      A    Yes.

16      Q    -- Page 4, it says, "Fourth, the allegations that

17   support the finding, in large part, were made by a

18   father and his daughter.  The father, who was formerly

19   my manager, had his employment terminated at UConn

20   because I filed a complaint in July 2006 that he had

21   sexually harassed me."

22      A    Yes.

23      Q    But as you sit here today, you understand that

24   Mr. ████████ was not terminated from UConn?

25      A    The binder was saying it's terminated, but that's
```

```
 1    fine.

 2        Q   I'm sorry, sir, let me ask you another question,

 3    because I don't understand your response.  As you sit

 4    here today, do you know whether Mr. ████████ was

 5    terminated by UConn?

 6        A   I think I saw somewhere in the documents they

 7    terminated, that's all I know.

 8        Q   You don't personally know?

 9        A   No.

10        Q   Okay.  Now, Paragraph 16 of this complaint you

11    filed against the Department of Children and Families in

12    2007 says, "The daughter's allegation of abuse was made

13    in" 2006 -- I'm -- excuse me, "in August 2006 only," and

14    that's underlined, "after I had filed my complaint

15    against her father for sexual harassment at UConn.  Upon

16    information and belief, she made these false allegations

17    at the instigation of her father and mother, who is

18    estranged from the father."  Now, sir, isn't it true

19    that ████████████ reported you improperly touching her

20    vagina in 2004?

21        A   Yes.

22        Q   Okay.  And isn't it true, sir -- well, let me ask

23    you, is this statement in Paragraph 16 that you made to

24    the court accurate, that ████████████ made false

25    allegations against you?
```

B S
R M

1       A   Yes.

2       Q   Now, Paragraph 17, you say, "The foregoing is

3   only a sampling of the incompleteness and shoddiness of

4   the Defendant's investigations," referring to the

5   Department of Children and Family, "its bias against me

6   and its persistent failure to afford me due process

7   throughout the process as they practically invaded my

8   home."  What bias do you think the Department of

9   Children and Families had against you?

10      A   Anytime they like to come and go so -- and other

11  things.  And so they didn't -- they didn't investigate

12  completely.  Um, that's all.

13      Q   And that is bias?

14      A   Yes.

15      Q   And what due process do you think they failed to

16  afford you?

17          MS. GARDNER:  Object to the form.

18          THE WITNESS:  I'm sorry, say it --

19          MS. GARDNER:  You can --

20          MS. BROUILLET:  I'll withdraw the question.

21  I'll withdraw it.  It was poorly phrased.

22      Q   (By Ms. Brouillet)  What do you mean by the term,

23  referring to the Department of Children and Families,

24  "its persistent failure to afford me due process

25  throughout the process as they practically invaded my