on 07/12/2011

```
 1    home"?

 2      A    They didn't give me explanation.

 3      Q    Other than this lawsuit, did you file any

 4  complaints against the Department of Children and

 5  Families for this behavior?

 6      A    No.

 7      Q    How about any of the employees of the Department

 8  of Children and Families?

 9      A    No.

10      Q    The next sentence in Paragraph 17, which goes

11  over to Page 5, says, "There are many, many other

12  aspects of this case that I will bring to light if my

13  appeal is accepted."  What are those "many, many other

14  aspects"?

15      A    I don't know.

16      Q    You don't know?

17      A    (No audible answer.)

18            THE REPORTER:  No?

19      Q    (By Ms. Brouillet)  You have to answer out loud.

20      A    I don't know I said.

21      Q    Okay.  Was it upsetting to you that the

22  Department of Children and Families persistently failed

23  to afford you due process?

24      A    Pretty much, yes.

25      Q    Was it upsetting to you that throughout the
```

1    process, the Department of Children and Families

2    practically invaded your home?

3       A    Yes.

4       Q    Now, if you turn to Page 5, under the section

5    that says, "The Defendant's Notice," Paragraph 18 says,

6    "Consistent with its cavalier treatment of me and denial

7    of due process, the Defendant," referring to the

8    Department of Children and Families, "allegedly sent me

9    the determination in November 2006, again, allegedly by

10   First Class Mail. After camping out in my home for a

11   year, the most important piece of information in this

12   whole demoralizing and disappointing saga was,

13   allegedly, delivered First Class Mail."  Was your

14   dealing with the Department of Children and Families

15   demoralizing to you?

16      A    Say -- I'm sorry, this word I didn't understand.

17      Q    Okay.  In this complaint at Paragraph 18, the

18   sentence I'm drawing your attention to is, "After

19   camping out in my home for a year, the most important

20   piece of information in this whole demoralizing and

21   disappointing saga was, allegedly, delivered by First

22   Class Mail."  How was this demoralizing to you?

23      A    I don't understand "demoralizing."

24      Q    Well, this is the complaint -- withdraw the

25   question.



```
 1          Turn to Page 6.

 2     A    Okay.

 3     Q    That's your signature, sir?

 4     A    Yeah.

 5     Q    Okay.  So this is what you wrote to the court,

 6   and so I'm asking what you meant when you used that

 7   term.

 8               MS. GARDNER:  Object to form.  He's already

 9   testified that he had an attorney do this.

10               But you can answer, if you understand it.

11     Q    (By Ms. Brouillet) Well, did you read this

12   complaint before you filed it with the court?

13     A    Yes.

14     Q    Okay.  And so I'm asking you when you represented

15   to the court that this was a "demoralizing and

16   disappointing saga," what did you mean?

17     A    It wasn't right.

18     Q    Was it upsetting to you?

19     A    Sure.

20     Q    Did you tell Dr. ███████ about it?

21     A    No, that was Dr. ███████.

22     Q    Did you tell Dr. ███████ about it?

23     A    Yes.

24     Q    What did you tell him about it?

25     A    I told him about the case.
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
 1        Q    What did you tell him?

 2        A    I said I have to go court.

 3        Q    Did you tell him why?

 4        A    Yes.

 5        Q    What did you tell him?

 6        A    I said they want to put me on registry for

 7  lifetime.

 8        Q    What else did you tell him about it?

 9        A    I don't remember all of the detail.

10        Q    When did you last see Dr. ████████?

11        A    I believe it was 2009.

12        Q    Why did you stop seeing Dr. ████████?

13        A    Because my insurance doesn't cover.

14        Q    Does your insurance cover Dr. ████████?

15        A    No.

16        Q    You're on -- you testified last time you're on

17  Social Security Disability.  Do you have Medicare?

18        A    Yes.

19        Q    And you don't submit --

20        A    They don't accept that.

21        Q    Let me finish, please.  To your knowledge, are

22  Dr. ████████'s bills submitted to Medicare?

23        A    No, that time it was from UConn.

24        Q    To your knowledge, are Dr. ████████'s bills

25  submitted to Medicare?
```

```
 1     A    Probably, yes.  But didn't -- I don't think it
 2  goes through.
 3     Q    How do you pay Dr.             ?
 4     A    From my pocket,  And also he help me.
 5     Q    I'm sorry, I missed the last part.
 6     A    Some -- I pay him a little bit, but he's helping
 7  me because I don't have a -- money.
 8     Q    Who's helping you?  Dr.             ?
 9     A    Yes.
10     Q    Okay.
11     A    To get better.
12     Q    Now, Dr. Levine provided us some records in
13  response to our request after you provided an
14  authorization.  You remember signing authorization?
15     A    Yes, ma'am.
16     Q    And his records indicate he began treatment of
17  you on June 6, 2006.  Does that date sound correct to
18  you?
19     A    It must be correct, yes.
20     Q    And so that would be after your first arrest for
21  breach of peace relating to             ?
22     A    I believe before that, yes.
23     Q    Well, if you started treating on June 6, 2006
24  with Dr.       , would you agree that that was after you
25  were arrested the first time on May 6, 2006?
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                                    Page 361

```
 1      A    I believe, yes.

 2      Q    And his record indicates that you resumed

 3   treatment in December 6, 2007.  And so did you have a

 4   gap in treatment with Dr.            ?

 5      A    I don't remember, maybe some week.

 6      Q    Well, when you saw Dr.            , how often would

 7   you see him?

 8      A    Um, every week.

 9      Q    And so if he said that you stopped treatment for

10   a period of months, do you think that would be accurate

11   or inaccurate?

12      A    Yes.

13      Q    No.

14      A    It was accurate, yes.

15      Q    If he said you stopped for a period of months,

16   you think that would be accurate?

17      A    Yes.

18      Q    Okay.  And Dr.          's records indicate that you

19   terminated treatment on March 28, 2008.  Do you think

20   that's accurate?

21      A    Yes, my -- yeah.

22      Q    Now, Dr.          's records indicate that he had

23   five sessions with you that were held between January

24   31st, 2008 and March 28, 2008, and he provides the

25   dates.  Now, January 31, 2008, was that after you had
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

1      pled guilty to the criminal charges relating to ████████

2      ████████?

3      A    Say it again, I'm sorry.

4      Q    January -- I'll withdraw the question.

5           Dr. ████████ says that he had five sessions with

6      you between January 31st, 2008 and March 28th, 2008.

7      That January 31st date, is that after you pled guilty to

8      the criminal charges relating to ████████?

9      A    I don't remember that.

10     Q    Okay.  On January 31, 2008, were you on paid

11     administrative leave from UConn, not actually at work?

12     A    Yes.

13     Q    And when were you dismissed from UConn's

14     employment?

15     A    Um, I believe it was January 18th, 2008.

16     Q    Is that the date you were convicted of the

17     criminal charges involving ████████?

18     A    From UConn you asked me, from UConn?

19     Q    Yes.

20     A    Yes.

21     Q    It wasn't March 9th, 2008 that you were dismissed

22     from UConn?

23     A    It could be I miss with the time, the date.

24     Q    Going back to the complaint that you have before

25     you, sir, at Page 5, uh, Paragraph 20, "In late May

on 07/12/2011

1    2007, my lawyer at the time forwarded me to a package of

2    documents that the Defendant had finally, in May 2007,

3    delivered to my lawyer after my lawyer's repeated

4    requests."  Who is the lawyer you're referring to in

5    that paragraph?

6        A    Patrick Tomasiewicz.  Patricks [sic] -- his name

7    is Patrick Tomas -- Tomasiewicz, I believe.

8        Q    Are you referring to Patrick Tomasiewicz?

9        A    Yes.

10       Q    And so this isn't the woman lawyer who was

11   helping you prepare this complaint?

12       A    You're talking about this one?

13       Q    No, no.  If you look at Paragraph 20, okay,

14   that's what I am focusing on.  And it says, "In late May

15   2007, my lawyer at the time forwarded to me a package of

16   documents that the Defendant had finally, in May 2007,

17   delivered to my lawyer after my lawyer's repeated

18   requests."  I just want to be clear which lawyer by name

19   we're talking about.  And so in other words, who is the

20   lawyer that don't name, but you refer to in this

21   paragraph?

22       A    I think it is both lawyer, Willimantic and

23   Hartford.  Um, Patrick -- and I forgot her name.  Both

24   of them.

25       Q    Okay.  So the woman lawyer in Willimantic and



```
 1   Patrick Tomasiewicz?

 2      A   Yes, ma'am.

 3      Q   And would Patrick Tomasiewicz be your criminal

 4   defense attorney?

 5      A   Yes, ma'am.

 6      Q   Okay.  Now, when you were treated for the panic

 7   and anxiety attacks in the emergency room in Windham in

 8   June, had you ever been treated for panic or anxiety

 9   attacks before?

10      A   Yes.

11      Q   And isn't it true that Dr. ████ had started

12   treating you for those conditions back to 1998?

13      A   I believe.

14      Q   You believe so?

15      A   Yes.

16      Q   Okay.  Mr. ████, I'm going to show you a

17   document marked Exhibit 23.  And it says the case

18   caption at the top, "John Doe versus University of

19   Connecticut."  It says, "Plaintiff's Answers to

20   Defendant's First Set of Interrogatories and Request for

21   Production."  Do you recognize that document, sir?

22      A   Yes.

23      Q   Now, when we took a short break today, your

24   attorney provided me with some -- with a couple of pages

25   of a letter from her to update those responses.  Is that
```



JOHN DOE VS. UNIVERSITY OF CONNECTICUT

1    your signature on the last page, which says "No. 23,

2    Oath of Respondent"?

3        A   Yes, ma'am.

4        Q   And were these responses to the interrogatories

5    and production requests provided to the best of your

6    knowledge --

7        A   Yes, ma'am.

8        Q   -- under oath?

9        A   Yes, ma'am.  Thank you.

10        Q   Now, I'm going to show you a document marked

11   Exhibit 24, which says at the top, "Affidavit of Illegal

12   Discriminatory Practice, State of Connecticut Commission

13   on Human Rights and Opportunities," and it has the date

14   October 5th, 2006 and a case number.  And I'm going ask

15   you to look at that, sir.

16        A   (Witness complies.)

17        Q   And it's -- the last page of that, which says,

18   "Page 4 of," and it's blank, there is a signature there

19   with an "X," it says, "Complainant's signature."  Do you

20   see that, sir?

21        A   Yes, ma'am.

22        Q   Is that your signature --

23        A   Yes.

24        Q   -- under oath?

25        A   Yes.

```
 1      Q    Okay.  When you've referred in your testimony to

 2   your complaint to the CHRO, or Commission on Human

 3   Rights, is this the complaint you're referring to

 4   against UConn?

 5      A    I believe so, yes.

 6      Q    Okay.  Did anyone assist you in preparing this?

 7      A    No.

 8      Q    Okay.  There is --

 9      A    Except the office for CHRO.

10      Q    Okay.  At page -- and I understand there's been

11   some things blacked out, like your address we blacked

12   out or redacted it.

13      A    Okay.

14      Q    And we blacked out on Page 3 the name of a

15   student.  But at Page 3, at Paragraph 10 and Paragraph

16   11, there's a couple of dates where there's a cross-out

17   and something is written in, and then there's the

18   initials, "N.O."  Whose handwriting is that?

19      A    Mine.

20      Q    Okay.  Now, I would like to go through this with

21   you.  On the first page under the affidavit it says, "My

22   name is            ," and your address," and, "The

23   respondent is the State of Connecticut, UConn."  And if

24   you go to the paragraph where it has check-off boxes, it

25   says, "I believe the Respondent discriminated against me
```

```
 1   when it (check appropriate box and insert date of

 2   occurrence)." And it's not checked, but it is typed in,

 3   "suspended me May 8, 2006 to the present." Are you

 4   pursuing that suspension that you received --- Withdraw

 5   the question.

 6        Isn't it true on May 8th you were placed on paid

 7   administrative leave?

 8   A   Yes.

 9   Q   And isn't it true that you agreed to a three-week

10   suspension without pay as part of your stipulated

11   agreement with the union?

12   A   Yes, ma'am.

13   Q   Okay.  Now, the box -- the first box that's check

14   says, "Retaliated against me for opposing a

15   discriminatory practice."  Who retaliated against you

16   for opposing a discriminatory practice?

17   A   ████████

18   Q   Okay.  And so is it accurate to say that when you

19   refer to "retaliation," you're referring to the actions

20   of ████████?

21   A   Yes, ma'am.

22   Q   Okay.  Now, you've checked off the box, "harassed

23   me," and it's checked, "sexually harassed me on or about

24   2003 to June 2006."  And who were you referring to as

25   harassing you?
```

```
 1      A    Two thousand.                    ?

 2      Q    And who are you referring to as "sexually

 3   harassed me"?

 4      A    Yes.

 5      Q    No, who are you referring to?

 6      A                         .

 7      Q                         .  Now, when you testified the last

 8   time, you said that the last time you had contact with

 9   Mr.             was May 8th, 2006 when you were placed on

10   paid administrative.  And so is that June 2006 date

11   accurate?

12      A    May, no.

13      Q    Okay.  Now, if you go to the next series of

14   check-off boxes, it says, "And I believe that," it says,

15   "my protected class basis," and you've checked off,

16   "sex:  male."  Is that accurate?

17      A    Yes.

18      Q    Now, at Paragraph 4, if you turn to the next

19   page, Page 2 --

20      A    Yes.

21      Q    -- uh, it says, "I began working for the

22   respondent in 1998 as part-time special payroll

23   administrator."  Now, you didn't start in 1998 as a

24   payroll administrator, did you?  You were working at

25   UConn dining services?
```

on 07/12/2011

```
1        A    Full-time, no.  It was -- it was ten hours a

2   week, I believe, I work.

3        Q    Well, isn't it true that in 1998 you were hired

4   as -- to work --

5        A    Yes.

6        Q    -- at the UConn -- let me finish, please -- UConn

7   dining services and you stayed there until, at least on

8   paper, until June of '99?

9        A    I believe, yes.

10       Q    Okay.  And it says in that paragraph, "I became a

11   full-time program aide and from 2003 to 2005 I was

12   employed as a business supervisor.  In November 2005,

13   Respondent demoted me back to program aide, the position

14   in which I am presently employed."  But isn't it true

15   that you were never promoted to business supervisor,

16   that you were only temporary service in a higher class?

17       A    In the middle of 2003, I was a -- a business

18   supervisor until, uh, 2005.

19       Q    My question is this, sir, you were -- isn't it

20   true you were -- withdraw the question.

21            When were you promoted to the permanent position

22   of business supervisor?

23       A    Yes.

24       Q    No.  When were you promoted to the permanent

25   position of business supervisor?
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
 1      A   The middle of 2003.

 2      Q   And it's your understanding that you were

 3   permanently promoted to the position of business

 4   supervisor in 2003?

 5      A   Yes.

 6      Q   Okay.

 7               (Thereupon, the reporter marked Letter from

 8           Tony Velez, 3/31/03 for identification as

 9           Exhibit No. 26.)

10      Q   (By Ms. Brouillet)  Sir, I'm going to show you a

11   document that I've marked as Exhibit 26.  And it says,

12   "University of Connecticut, Department of Human

13   Resources."  It's to ████████████ from Tony Valez, and

14   it's dated March 31st, 2003.  And it says, "Temporary

15   Salary Increase Approval."  And it says, "TSI, Title:

16   UCP V," roman numeral five, "Business Services

17   Supervisor."  So, sir, now that you've looked at that

18   document, is it still your testimony that you were

19   permanently promoted to be a business supervisor in

20   2003?

21      A   Yes.

22      Q   And so when you received -- Withdraw the

23   question.

24          Do you recall receiving a copy of this document,

25   sir?
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
1       A    Yes, ma'am.

2       Q    And when it said "temporary," what did you think

3  that meant?

4       A    A short time.

5       Q    Do you have any document in your possession that

6  says that instead of being temporary salary increase, it

7  was a permanent salary increase in 2003?

8       A    No.

9       Q    Okay.

10      A    Thank you.

11      Q    Isn't it true, sir, that at all times that you

12 were at -- a permanent employer at International

13 Services, your actual title was program aide?

14      A    Yes, ma'am.

15      Q    Okay.  Now, if -- looking back to Exhibit 24,

16 that complaint to the Commission on Human Rights and

17 Opportunities, at Paragraph 5, it says, "Beginning in

18 2002 and continuing Respondent's" --

19      A    Excuse me.

20      Q    Oh, I'm sorry.  Page 2, sir.

21      A    The front page?

22      Q    Page 2, sir.

23      A    Page 2, okay.

24      Q    Paragraph 5.

25      A    Okay.
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                                    Page 372

```
 1      Q    Do you see where I'm reading?

 2      A    Okay.

 3      Q    "Beginning in 2002 and continuing Respondent's

 4    Executive Director of International Services and

 5    Programs (DISP)               subjected me to sexual

 6    harassment." Now, is that accurate?

 7      A    Two thousand.

 8      Q    So my question was, was that accurate?

 9      A    No.

10      Q    Okay.  Was your memory better in 2006 than it is

11    now in 2011?

12      A    No.

13      Q    Then if the actual date was 2000, why did you

14    submit this under oath to the CHRO with a date of 2002?

15      A    I wasn't looking for details.  I gave the

16    whole -- a general information.

17      Q    Now, that says, "I engaged in both anal and oral

18    sex with             for two and a half years."  And so what

19    period of time was that two and a half years?  Was it

20    beginning of 2002?

21      A    The end of 2002.

22      Q    It began the end of 2002?

23      A    Yes.

24      Q    Okay.  Paragraph 6, "I have known             since

25    1986 when entered the United States for treatment for
```

1    injuries sustained in the Afghan War against the then

2    Society Union."  Is that when you entered the United

3    States?

4        A    Yes.

5        Q    Okay.  Paragraph 7, "My friendship with ▓▓▓▓▓

6    continued for the next fifteen years and I did volunteer

7    work for the DISP until being hired as a program aide in

8    2001."

9        A    Yes.

10       Q    And so your friendship with ▓▓▓▓▓▓▓ lasted

11   for what period of time?

12       A    Um, until May 2008?

13       Q    Okay.  And Paragraph 9, which is on Page 3, sir,

14   it says, "In 2003, Respondent through ▓▓▓▓▓ promoted

15   to Business Service Supervisor."  Would this be the

16   temporary service in a higher class we talked about?

17       A    Yes, ma'am.

18       Q    And it says, "This was to be a temporary

19   position, permanent after two years."

20       A    Yes.

21       Q    Paragraph 11, "In December 2004," it says

22   "Herabia William."  Would that be Herbertia Williams?

23       A    Yes.

24       Q    "Acting DISP Director while ▓▓▓▓▓ was overseas

25   ordered an audit of my position through Respondent's

```
1    Human Resources department.  As a result of the audit,

2    William through HR reclassified my position to program

3    aide, my previous position."

4        A   Yes.

5        Q   And so you think it was Herbertia Williams who

6    was responsible for you being a program aide?

7        A   I don't know between, uh, ████████ and her.

8        Q   How do you know what went on between Herbertia

9    Williams and ████████?

10       A   I think they were keep, uh, e-mailing back and

11   forth.

12       Q   Okay.  How do you know though?  I'm asking the

13   source of your knowledge.

14       A   I, uh -- I don't know exactly.

15       Q   Okay.  Paragraph 13, "████████ has threatened to

16   kill me on previous occasions."  When did you report

17   these threats to the police?

18       A   Um, two thousand, um -- May 2008, I believe.  I'm

19   sorry 2006.  I didn't -- I'm sorry, I didn't report it

20   to the police.

21       Q   Okay.  Paragraph 14, "On May 5th, 2006 ████████

22   falsely accused me of threatening him with a gun and a

23   knife in retaliation for my continued refusal to submit

24   to his sexual advances.  This accusation led to my

25   arrest with Respondent's Police Department on May 5,
```



1    2006 and a disciplinary hearing resulting in my

2    suspension on May 8, 2006.   I presently remain on

3    suspension." Now, you weren't suspended on May 8, 2006,

4    weren't you?  Weren't you on paid leave?

5     A  They suspended me for three weeks.

6     Q   On May 8th, 2006, were you placed on paid

7    administrative leave or were you suspended?

8     A  Suspended.

9     Q   And so it's your testimony you were not receiving

10   payment from the University of Connecticut after May

11   8th, 2006?

12    A  I think for three weeks they suspended, then they

13   pay after.  I believe.

14    Q   If the stipulated agreement that you signed in

15   September 2006 provided you that you had been on paid

16   leave since May 8th, 2006 and then were -- agreed to a

17   three-week suspension, do you think it would be accurate

18   or inaccurate?

19    A  I think it's accurate.

20          (Thereupon, the reporter marked

21          Letter, 5/8/06 for identification as

22          Exhibit No. 27.)

23    Q  (By Ms. Brouillet) Mr. ████, I want to show you

24   a document -- a letter addressed to you that we may have

25   talked about previously marked as Exhibit 27.  Now, do



1    you recall receiving this letter?

2       A   Yes, ma'am.

3       Q   Okay.  Now, that you have seen this letter, do

4    you know whether you were suspended on May 8, 2006 or

5    whether you were placed on paid administrative leave

6    pending the outcome of an investigation?

7       A   Yes.

8       Q   And what was it?  Was it paid leave or was it

9    suspension?

10      A   I don't remember paid leave or suspension.

11      Q   Okay.

12      A   Exactly, I don't.  Thank you.

13      Q   Now, Paragraph 15 of your CHRO complaint,

14   returning to that, it says, "I do not own a gun and did

15   not threat Respondent."  Isn't it true that on May 6,

16   2006, you were accused of threatening Mr. ████████ and

17   others with a knife?

18      A   Yes, that's he reported.  I didn't -- I -- on the

19   records, I don't own gun or a knife.

20      Q   You don't own any knives?

21      A   Knife in the kitchen, yes.  But not for that.

22      Q   Did you ever -- Withdraw the question.

23          You testified previously that you had filed a

24   complaint against UConn in 1999, I believe, March of

25   1999, for your treatment at dining services, and then

```
 1    this October 5, 2006 complaint to the Commission on

 2    Human Rights and Opportunities.  Have you filed any

 3    further complaints to the Commission on Human Rights and

 4    Opportunities?

 5        A   On dining services?

 6        Q   Against UConn at all or anyone else?

 7        A   I believe once I did with dining service, I

 8    believe.

 9        Q   Okay.  And so you've only filed two complaints to

10    the Commission on Human Rights --

11        A   Yes.

12        Q   -- and Opportunities?  Okay.

13            MS. BROUILLET:  Okay.  I need to take a

14    five-minute break.

15            THE VIDEOGRAPHER:  Off the record, 10:55.

16            (Thereupon, a short break was taken at 10:55

17            a.m.  Testimony continues at 11:06 a.m.)

18            (Thereupon, the reporter marked Letter from

19            Attorney Gardner, 7/9/11 for identification as

20            Exhibit No. 28 during the break.)

21            THE VIDEOGRAPHER:  Beginning of Tape No. 2.

22    On the record, 11:06.

23        Q   (By Ms. Brouillet)  Mr. Omari, while we were off

24    the record, I had the reporter mark this as Exhibit 28,

25    which I received today, uh, from Attorney Gardner.  And
```

```
 1    I think you heard that exchange.  That would be a

 2    supplemental response to the interrogatories that we had

 3    marked -- interrogatory responses that we had marked

 4    earlier today as Exhibit 23.

 5    A   Yes.

 6        Q   You don't have anything in addition to those

 7    records --

 8    A   No.

 9        Q   -- or what's listed there?  Okay.  I have no

10    further questions about that document, sir.

11    A   Thank you.

12        Q   What do you know about the scheduled deposition

13    of your probation officer, Catherine McKeon?

14    A   I'm sorry, say again.

15        Q   What do you know about the scheduled deposition

16    of your probation officer, Catherine McKeon?

17    A   I don't know.

18            MS. GARDNER:  I'm going to object because

19    that may require, uh, a response of privileged

20    information.

21        Q   (By Ms. Brouillet)  Okay.  I'm not asking you any

22    discussions that you might have had with your attorney.

23    Were you aware that Ms. McKeon's deposition was

24    scheduled for tomorrow?

25    A   I think so.
```



JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
 1      Q    Okay.  Do you have any concerns about -- Withdraw

 2   the question.

 3           What concerns, if any, do you have about Ms.

 4   McKeon's deposition being taken in this case?

 5      A    No clue.

 6      Q    You have no clue?

 7      A    No.

 8      Q    So does that mean you have no concerns about her

 9   deposition testimony being taken?

10      A    The question is -- I am sorry.

11      Q    The question I had asked you is, what concerns,

12   if any, do you have about adult probation officer's

13   Catherine McKeon's deposition being taken in this

14   matter, and you said, "No clue."  And so I want you to

15   expound upon your response, because I don't understand

16   what "no clue" means.

17      A    So I don't think it -- I don't want to violate

18   the probation so -- because I am in the probation,

19   that's all.

20      Q    And how would your -- how would taking Ms.

21   McKeon's deposition violate your probation?

22      A    I don't know what -- the whole thing, I don't

23   know, but it could be.

24      Q    What could be?

25      A    To violate my probation.
```

on 07/12/2011                                                    Page 380

1       Q   Can you explain to me how that could be?

2       A   Um, I could be kicked out from the program for

3   the treatment I have.  Because -- I cannot be in the

4   treatment.  That's why the court give order, I have to

5   be in the treatment.

6       Q   How could Ms. McKeon testifying in this lawsuit

7   cause you to violate your probation?

8       A   I don't know exactly.  I'm sorry.

9       Q   And so what concerns do you have -- because you

10  told me it could be a violation of probation, and so can

11  you explain to me what you mean?

12      A   That's how I say that.  In the group, I could be

13  violated, my group, for -- which is Joe, I go to that.

14  Then I have to wait a long time to go back to the group.

15      Q   I'm unclear how Ms. McKeon testifying would cause

16  you to violate your probation.  I'm unclear what you're

17  saying.

18      A   I'm -- I'm saying that it could violate my

19  treatment.

20      Q   What is "it," when you say it could?

21      A   No.  I don't have the whole information.  I don't

22  know.

23      Q   Okay.  Is your concern -- what concerns do you

24  have about Ms. McKeon seeing your deposition testimony?

25      A   I did explain it.  Again, I could violate my



JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011

Page 381

1    probation for treatment, that's all.

2         Q    No, what I'm asking is, what concerns do you

3    have -- and I want to make sure that you respond to this

4    question, and so let me just ask it again.  I asked you

5    a different question, I said what concerns do you have

6    about Ms. McKeon seeing your deposition testimony in

7    this case?

8         A    I don't know.

9         Q    Okay.

10             (Thereupon, the reporter marked Motion for

11             Protective Order for identification as

12             Exhibit No. 29.)

13        Q    (By Ms. Brouillet)  Mr. ████, have you seen that

14   document before?  It's a motion for a protective order

15   dated July 9th, 2011, filed in this case --

16        A    Yes, ma'am.

17        Q    -- by Attorney Gardner?

18        A    Yes.

19        Q    Did you see it before July 9th, 2011?

20        A    Yes, we talk about it.

21        Q    I don't want to ask you any -- anything -- to

22   reveal anything about any discussions that you have had

23   with Attorney Gardner, but I am going to ask you some

24   questions.  And it says, "Pursuant to," and it lists the

25   federal rule of civil procedure, "26C, plaintiff,"

1    meaning you, "moves for a protective order that the

2    deposition of Katherine McKeon, Adult Probation Officer,

3    not be had, or, in the alternative, that it be limited

4    in scope so as not to pose a threat to plaintiff such

5    that disclosure of the facts of his civil case, which

6    are under seal, would subject him to criminal

7    prosecution for a violation of his probation." Do you

8    see that, sir?

9        A    Yes.

10       Q    So are you concerned that if Ms. McKeon reads

11   your deposition testimony, she might think you violated

12   your probation?

13       A    Yes, ma'am.

14       Q    Okay. Have you had any discussion with Ms.

15   McKeon since you gave that deposition testimony about

16   your lawsuit?

17       A    No. It was in the paper. I think she read it in

18   the paper.

19       Q    About your lawsuit?

20       A    A while ago, yeah. It was in the paper. I'm not

21   sure.

22       Q    But you haven't discussed your lawsuit with her

23   since you gave your deposition?

24       A    No.

25       Q    Okay.



```
1     A    I just mention to her I have appointment with you

2   guys to go.

3     Q    Okay.  What fears do you have about being sent to

4   prison?

5     A    Fear.

6              MS. GARDNER:  Object to the form.

7              THE WITNESS:  I think anyone can have a

8   fear.  I have three children.  I have a wife and, uh,

9   plus disabled.  And, uh, it's not moral thing to go to

10  jail for no reason.  And I don't -- I think if something

11  a crime, I did, so the justice should be, uh -- you

12  know, the justice do it.  But otherwise, no.  Because I

13  always fight for justice.  That's why I fought -- I got

14  shot 30 times in my body for freedom for justice.

15    Q    (By Ms. Brouillet)  But you did plead guilty on

16  January 18th, 2008, under the Alford Doctrine to

17  impairing the morals of a minor, ████████████, when

18  she was nine years old.  So did those charges cause you

19  to fear being sent to prison?

20    A    Yes.

21    Q    And when were you arrested on those charges?

22    A    When?

23    Q    When.  When were you first arrested?

24    A    Uh, May 2006.

25    Q    And as you sit here today, do you have any fears
```

1    about going -- being sent to prison?

2        A   I hope not.

3        Q   No, I am asking do you have any?  Do you have any

4    fears as you sit here today about being sent to prison?

5        A   No.

6        Q   When you were charged in 2009 with violating your

7    probation --

8        A   Yes.

9        Q   -- which had come from your guilty plea to the

10   criminal charges relating to impairing the morals of a

11   minor, did you fear being sent to prison?

12       A   Yes.

13       Q   Was that distressing to you?

14       A   Pretty much, yes.

15       Q   Was there a time when your son was called names

16   at school because you were publically identified as a

17   sex offender?

18       A   No.

19       Q   So if that statement appears in the records, uh,

20   received from the adult probation office and from the

21   Center for Treatment of Problem Sexual Behaviors, that

22   would be inaccurate?

23       A   Say it again, ma'am.  I'm sorry.  I didn't get...

24       Q   Let me have the reporter read the question back.

25       A   Go ahead.

```
 1                    (Thereupon, the question was read back from

 2      the court reporter.  Testimony continues as follows:)

 3              MS. GARDNER:  Did you want her to go back to

 4      the previous question?

 5              THE WITNESS:  Yeah.

 6         Q    (By Ms. Brouillet)  All right.  You want to go

 7      back to the question before that?

 8         A    Please.

 9         Q    Okay.  Was there a time -- do you recall a time

10      when your son was called names at school because you

11      were publically identified as a sex offender?

12         A    No.

13         Q    You don't -- Withdraw the question.

14              Do you recall telling you counselor at the Center

15      in March 26, 2010, that your son was being called names

16      at school because you were a registered sex offender?

17         A    That could be, I don't remember.  Sorry.

18         Q    Okay.  Do you -- what do you recall telling your

19      counselor at the Center on March 26, 2010, regarding you

20      being discriminated against because you are a sex

21      offender?

22         A    Yes.

23         Q    No.  I want you to listen to the question.  I

24      asked you, what do you recall telling your counselor at

25      the Center in March -- on March 26th, 2010, about you
```

on 07/12/2011

```
 1    being discriminated against because you're a sex
 2    offender?
 3        A   Because I cannot do a lot of things.  They don't
 4    allow me.
 5        Q   And so you recall telling him that you were being
 6    discriminated against?
 7        A   I believe, yes.
 8        Q   Is that upsetting to you, this discrimination?
 9        A   Of course.
10        Q   Is being on probation for the State of
11    Connecticut for ten years starting January 18, 2008,
12    stressful to you?
13        A   Yes, ma'am.
14        Q   Is that emotionally distressing to you?
15        A   Yes.
16        Q   You testified previously that the judge in your
17    criminal case, uh, for impairing the morals of a minor
18    ordered that you not have contact with children other
19    than your own.  Since you have three young children, is
20    it hard for you that they cannot bring home friends to
21    play?
22        A   Very much.
23        Q   What did you tell your counselor at the Treatment
24    of Problem Sexual Behaviors in January of 2009 regarding
25    a problem with you working out at a health club because
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
 1    there was a day care center there?

 2         A    Um, I was taking my kids there.  They tell me

 3    don't go there.  That's all.

 4         Q    Who told you?

 5         A    Probation.

 6         Q    Well, isn't it true that you reported to your

 7    probation officer and to your counseling that you were

 8    going there and you had a problem there?

 9         A    In the locker room with one guy.

10         Q    And what happened in the locker room with one

11    guy?

12         A    I think my, um, my son was calling me and I -- I

13    was leaving.  I was talking on the phone.  He was

14    shouting at me.  And then I also -- I went to front desk

15    and I report it.  And they told me -- it was December,

16    Christmastime, I believe.  And they told me the guy has

17    a lot of issue with others, that's all.

18         Q    Who was shouting, your son or the guy?

19         A    The guy was in the locker.

20         Q    What was he --

21         A    Older guy.

22         Q    What was he shouting at you?

23         A    Because I was talking on the phone with my son.

24         Q    It wasn't in regard to you being a sex offender?

25         A    No.
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

1    Q    And what's the name of the health club?

2    A    Uh, Mansfield Center.

3    Q    Mansfield Center Health Club?

4    A    Yes.

5    Q    And you live in Willimantic, don't you?

6    A    Yes.

7    Q    Is this the health club that's located on town

8    hall in Mansfield?

9    A    Yes.

10   Q    And have you been barred from that health club?

11   A    I'm sorry?

12   Q    Have you been barred from that health club?

13   A    Bar?

14   Q    Barred.  Are you prevented from going to the

15   health club?

16   A    Yes, because, yeah, my kids.  I went there for

17   two years.

18   Q    You went to that health club for two years?

19   A    I believe, yeah.  Before -- before the incident.

20   I have a membership before also.

21   Q    Before the January 15, 2009 incident?

22   A    Yes.

23        MS. GARDNER:  What's the January 15th, 2009

24   incident?

25        MS. BROUILLET:  What he just described with



JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                      Page 389

```
 1    the --

 2              MS. GARDNER:  Oh, okay.  Okay.

 3        Q    (By Ms. Brouillet)  And did you also tell your

 4    counselor that on February 26, 2009, you were having

 5    problems working out at a gym due to a day care center?

 6    That it would violate your probation?

 7        A    I don't remember.

 8        Q    If it's in the records of the Center for

 9    Problem -- for Treatment of Problem Sexual Behaviors,

10    would that be accurate or inaccurate?

11        A    It should be accurate, yes.

12        Q    Do you recall -- Withdraw that question.

13             Was it upsetting to you when you had to explain

14    to your son you can't take him to Chuck E. Cheese?

15        A    Yes.

16        Q    And what did you tell your son about that?

17        A    My son -- my older son knows all.  Because, uh,

18    he used to call ████ uncle, so when I got arrested, he

19    knows.

20        Q    What does he know?

21        A    I'm sorry?

22        Q    What does he know?

23        A    I'm sorry I...

24        Q    You said my older son knows all, and so I'm

25    asking you what does your son know?
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                        Page 390

```
 1     A   Um, know I got arrested.   It was very hard for

 2   him emotionally.   It's getting, you know, better now.

 3     Q   How old is your son?

 4     A   Ten.

 5     Q   And so you were arrested in 2006?

 6     A   Yes.

 7     Q   So did you tell your --what did you tell your

 8   son when he was five years old when you were arrested?

 9     A   It's hard to tell your son five years old

10   everything.   So he's getting older and he understands a

11   little bit.

12     Q   I asked you what you told him then.   You said

13   your son knew everything.   When you were arrested, you

14   told him, and I am asking what you told him.

15     A   Okay.   The question is before that you asked me

16   about Chuck E. Cheese, that's why I tell him I cannot

17   go.   I'm on probation.   And so this is the question, the

18   same thing.   I tell him I cannot do things with him,

19   certain things.

20     Q   Did you tell your counselor -- Withdraw the

21   question.

22         What did you tell your counselor on February 26,

23   2010, about your concerns that your family in

24   Afghanistan was being denied visas because you are a sex

25   offender?
```

```
 1        A    Yeah, they denied it because of that, yes.

 2        Q    They denied your family from coming to the United

 3   States?

 4        A    Yes.

 5        Q    Was that upsetting to you?

 6        A    Sure.

 7        Q    What did you tell your counselor at the Center

 8   around May 11, 2010, about your wife being arrested by

 9   the Willimantic Police Department for an incident in the

10   playground?

11        A    No, my wife never got arrested.

12        Q    No, listen to the question that I asked, sir.

13        A    Yes.

14        Q    What did you tell your counselor at the Center

15   around May 11, 2010, about your wife being arrested by

16   the Willimantic Police Department for an incident at a

17   playground?

18        A    I think my son was playing.  The other boy throw

19   the dust on his eyes.  And that's why she -- I think she

20   was, uh, the mother of -- the father of the boy was

21   arguing with my wife so... and then the police came they

22   said they wanted to arrest both of them.  And then they

23   did.

24        Q    Was that stressful to you?

25        A    I think it is very -- sure, because I couldn't go
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

1    to playground to solve the problem of my son.  My son

2    has severe asthma.

3            THE REPORTER:  He has severe what?

4            THE WITNESS:  Eczema [sic].

5            THE REPORTER:  Eczema?

6            THE WITNESS:  Yeah.

7        Q   (By Ms. Brouillet)  What did you tell your

8    counselor at the Center around July 20, 2010, about a

9    verbal confrontation that you had with a neighbor?

10       A   Which one?  Say it again, please.

11       Q   What did you tell your counselor around July

12   20th, 2010, about a verbal confrontation you had with a

13   neighbor?

14       A   Yes, I say something.

15       Q   What did you say?

16       A   I think he was, uh -- he was drunk or something.

17   He yelled at my son.  My son went to his, uh, his yard.

18   He was shouting.  And then I told my son, Don't go

19   there.  And I told him, Don't shout at my kids.

20       Q   Can you identify that neighbor?

21       A   It's next to me.  ███████ -- his name is ███████, I

22   believe.

23       Q   Is that his first or his last name?

24       A   First name.

25       Q   What's his last name?

on 07/12/2011

```
1      A    I don't know his last name.

2      Q    And which side is he on?  Is he closer to

3  Mansfield or closer to the Main Street in Willimantic?

4      A    He's next to my house.

5      Q    Which side though, sir?

6      A    On the left.

7      Q    Okay.  On the left as you're facing your house?

8  Closer to Main Street or closer --

9      A    Facing my house.

10     Q    Hold on.

11     A    Facing my house on the right, sorry.

12     Q    Okay.  And so closer to Main Street, Willimantic

13  then --

14     A    No, no.  It's far away from Main Street.  My

15  house is not on Main Street.

16     Q    No, no.  What I'm asking -- I understand that,

17  sir.  I'm asking the direction.  You're on Mansfield

18  Avenue.  Correct?

19     A    Yes.

20     Q    And so is it -- is it closer to the hospital than

21  you are?  Than your house?

22     A    Yes.

23     Q    Okay.  Now, the Center records indicate that you

24  had an incident at Wal-Mart in 2010 with security that

25  made you angry.  What was that about?
```

on 07/12/2011

```
1      A   I don't remember that.

2      Q   Do you remember reporting that?

3      A   Yes.

4      Q   What was the reason that you were examined by

5      ████████████, a ████████████ at Easter Seals,

6      that resulted in a January 2006 report?

7      A   Yes.

8      Q   My question, sir, was, what was the reason that

9      you were examined by Dr. ████████████?

10     A   I think it was, uh, the, um, BRS was sending me.

11     Q   Would that be the Bureau of Rehabilitation

12     Services?

13     A   Yes, because I was in the training.  They train

14     me computer.  And also, um, they send me there, ████████

15     ████████.

16     Q   At that time, sir, weren't you working fully

17     employed at UConn as a program aide?

18     A   No.

19     Q   In January of 2006?

20     A   Yes.

21     Q   But it's your belief the Bureau of Rehabilitation

22     Services sent you there for that exam?

23     A   Yeah, I think I -- I believe was, uh -- I was

24     trying to get different job or something.

25     Q   Was that related to your social security
```

1    disability application?

2       A   No.

3       Q   Okay. Do you recall meeting with Dr. ████ for

4    that January 2006 report?

5       A   Could be, yes.

6       Q   Do you recall what you said to Dr. ████ about

7    ████████ in that report?

8       A   Um, would you tell me the address? Where is

9    that? Which town? Mansfield?

10      Q   Of Dr. ████?

11      A   Yeah.

12      Q   I'm not going to answer your questions, sir.

13      A   I don't know.

14      Q   Okay.

15      A   It could be. I'm not sure, um, which town.

16      Q   Since 1999, have you threatened anyone with a

17   gun?

18      A   I'm sorry?

19      Q   Since 1999, have you threatened anyone with a

20   gun?

21      A   I never own gun.

22      Q   Have you threatened anyone with a knife?

23      A   No.

24      Q   What threats, if any, did you communicate to ████

25   ████ on May 5th, 2006?

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
 1      A   Um, I was in, uh, at Friendly's, eating there

 2   with, um, a group of students, and, uh, when I left from

 3   there, you know, was talking, and was -- one of the

 4   student -- it wasn't a student, was, uh, one guy, a

 5   visitor from Egypt, his name was ▊▊▊▊▊ -- sorry,

 6   ▊▊▊▊▊ (phonetic), and he was arguing with me. So

 7   when you know, we joke. And then after that, then I

 8   left, that's why the police pulled me over. They said,

 9   um, you know, I threatened ▊▊▊▊▊▊ with a gun and

10   knife. Um, I think after five minutes, they pull me

11   over. They searched my car. They searched me and then

12   they arrested me. And ▊▊▊▊▊▊ was there also, came

13   with the police. And I didn't have any gun, any knife.

14      Q   You're saying that ▊▊▊▊▊▊ was in the police

15   cruiser at the time of your arrest?

16      A   Yes. And another lady was, uh, um, with her --

17   with him, sorry. And ▊▊▊▊▊ was with him. And the guy

18   was ▊▊▊▊▊, four of them was...

19      Q   And did you threaten anyone at Friendly's that

20   night?

21      A   No.

22      Q   Did you use profanity?

23      A   No.

24      Q   Did you offer to fight someone that night?

25      A   I -- yes. We -- the guy was, uh -- his name was
```

on 07/12/2011

```
 1            He was wrestler and we joke.  I said, I can

 2   wrestle with you.  That's -- we joke, but not threaten.

 3        Q   Did you have a private attorney represent you in

 4   regard to those criminal charges that --

 5        A   Yes.

 6        Q   -- that you received on May --

 7        A   Yes.

 8        Q   Let me just finish.  That you received on May

 9   6th, 2006?

10        A   Yes.

11        Q   Who was the criminal attorney?

12        A   His name is Brian.  Brian Walsh?  I'm not sure

13   exactly last name, sorry.

14        Q   It wasn't John O'Brien?

15        A   John O'Brien, sorry.

16        Q   And who was the private attorney who represented

17   you in regard to the charges of violation of your

18   probation in 2009?

19        A   His name is Harris.

20        Q   Would it be Harry Arters?

21        A   Yes.

22        Q   Okay.  So just to be clear, you don't recall the

23   name of the woman attorney in Willimantic, but you have

24   been represented by Attorney Harry Arters, Attorney

25   Patrick Tomasiewicz --
```

1    A    Yes.

2    Q    I'm not counting Attorney Gardner, who's on this

3    case, obviously, and that female attorney.

4    A    Yes.

5    Q    Okay.  What chronic health conditions do you

6    have?

7    A    I have a ▓▓▓▓▓ and ▓▓▓▓▓, ▓▓▓▓▓,

8    and ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ my leg.

9    Q    And you had those conditions before you were

10   hired at International Services?

11   A    Yes, ma'am.

12   Q    And weren't you also diagnosed with ▓▓▓ in 1985?

13   I think we covered this last time.

14   A    Yes, could be.

15   Q    Okay.  In 2010, what plans did you have for

16   opening a restaurant in your wife's name?

17   A    I'm sorry?

18   Q    In 2010, what plans did you have for opening a

19   restaurant in your wife's name?

20   A    She wants to open restroom -- I mean, restaurant.

21   And she was planning to buy it, but the probation didn't

22   allow me.  They said I cannot own -- own the restaurant.

23   Q    Is that why you were planning to put it in your

24   wife's name?

25   A    No.  She wants to buy it, and so I was going to

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                    Page 399

```
 1    help her.
 2        Q    And so if the records from the Center for
 3    Treatment of Problem Sexual Behaviors say that you were
 4    going to open the restaurant but put it in your wife's
 5    name, that would be inaccurate?
 6        A    I think we were planning to do it together, and
 7    they told me -- and I told them -- you know, my wife
 8    told me she wants to own that restaurant.  I said, okay,
 9    and so I have to help her.  But that's why I talk about
10    it, and then probation told me I cannot do it.
11        Q    What do you recall about a physical fight at the
12    mosque in 2005 where the police were called?
13        A    I don't know.  I don't remember that.
14        Q    When you were working at International Services
15    --
16        A    Mmm.
17        Q    -- in 2005, did they provide you with a Dell
18    Omniflex G1 desktop laptop computer?
19        A    In the office, yes.
20        Q    Did they give that to you in February of 2005?
21        A    Uh, the laptop, yes, in the office.  Using all in
22    the office.
23        Q    Wasn't that for you to be able to work from home?
24        A    No.
25        Q    When did you return that laptop to UConn?
```

on 07/12/2011                                                    Page 400

```
 1      A   Laptop I think in --  ████  took that one.  He was
 2   traveling with that.
 3      Q   You don't recall signing that you returned a
 4   laptop in May 2006, after you were placed on paid
 5   administrative leave?
 6      A   If that's the office laptop, yes.
 7      Q   No, this is -- I'm talking about a laptop that
 8   was assigned to you.  That's why it's very specific
 9   about the laptop, the type.
10      A   Yes.
11      Q   Do you recall a laptop assigned to you?
12      A   Yes.
13      Q   And do you recall returning it in May 2006?
14      A   Yes.
15      Q   And who requested the return of that laptop?
16      A   Uh, the day -- May 2006, um, that's the day they
17   ask me to give all of those things.
18      Q   I'm asking you who requested the return of the
19   laptop?
20      A   Um,  ████████  did.
21      Q   Isn't it true that it was Boris Brava-Ureta who
22   instructed you to return the laptop?
23      A   Yeah, he send letter and was communicating with
24   Mark.  He --
25      Q   Boris didn't tell you that in person?
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
 1      A   He came with the letter.  And then (        ) got the

 2   key, my office key, my password, and the computer, and a

 3   camera, everything.

 4      Q   And when you returned that laptop to UConn, did

 5   you -- what did you tell them about the hard drive?

 6      A   The hard drive was different.  That wasn't from

 7   laptop.  That was for, um, lounge.  I set up all of the

 8   computers, and then I asked Boris --

 9      Q   No, I'm just asking you about the hard drive from

10   the laptop.  And so let me ask you the question again,

11   when you returned the laptop to UConn, what did you tell

12   them about the hard drive?

13      A   I didn't say anything.

14      Q   Do you recall being questioned about why your

15   laptop had its hard drive removed?

16      A   No, that's desktop, not laptop.

17      Q   Your desktop had its hard drive removed?

18      A   Yes.

19      Q   And do you recall telling people at UConn that it

20   was stolen?

21      A   Yes, from the office.  Um, we get new equipment.

22      Q   No, no, I'm not asking you a further question.

23   Do you recall saying that your hard drive was stolen

24   when you returned your computer?

25      A   I believe so.
```

```
 1        Q    When did Susan Atrens, acting as the assistant

 2   director of Department of Internal Services and

 3   Programs, evaluate your work performance?

 4        A    When?

 5        Q    Yes.

 6        A    I believe it was 2005.

 7        Q    When did Herbertia Williams evaluate your work

 8   performance?

 9        A    Two thousand four?  I believe it was 2004.

10        Q    Since you have left UConn in March of 2008 when

11   you were dismissed, has your doctor told you that you

12   could not work?

13        A    Yes.

14        Q    Who?

15        A    Um, they sent me from, uh, Social Security.  I

16   went to see doctor.

17        Q    What doctor?

18        A    I don't know his name, but they gave -- uh, they

19   told me to go there for evaluation.

20        Q    When was that?

21        A    It was two times happened.  That was, I believe,

22   was '99?

23        Q    Okay.  I think we established last time that you

24   started collecting social security disability -- or were

25   eligible in 1999.  My question is a different time
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

```
1    frame.  After leaving UConn in March of 2008, after you

2    were fired, has any doctor said you cannot work?

3        A    No.

4        Q    Okay.  But when did you start collecting social

5    security disability again?  Because last time you told

6    me you were on Social Security Disability.

7        A    In 2006.

8        Q    As you sit here today, we've talked about a

9    number of doctors and we talked about a number last

10   time.  We talked about Dr. ████████, Dr. ████████, the nurse

11   practitioner with Dr. ████████, ████████████, we've talked

12   about Dr. ████████, uh, we've talked about Dr. ████████

13   -- something from social security, and some unidentified

14   doctors from social security.  Are there any other

15   doctors that have treated you since 2000 that you have

16   not named?

17       A    I don't remember all, so...

18       Q    You can't recall any other doctors?

19       A    No.

20       Q    If you -- I'm sorry, it was Dr. ████████████.

21   That was the doctor I couldn't remember his last name.

22   If you recall any other doctors that have treated you --

23   oh, and, of course, the Center has treated you since

24   2008.  If you recall new other health care providers,

25   would you provide that to Attorney Gardner?
```



on 07/12/2011                                                          Page 404

```
 1      A    Besides that?

 2      Q    If there's anyone else that you remember

 3      A    Yes.

 4      Q    -- would you give that name to Attorney Gardner

 5  so that she can give it to me?

 6      A    Okay.

 7      Q    Did you ever tell Dr. ████████ that you were

 8  having marital problems?

 9      A    Which -- what?

10      Q    Did you ever tell Dr. ████████ that you were

11  having marital problems?

12      A    Marital?

13      Q    Problems with your marriage?

14      A    No.

15      Q    What did you tell the doctor about how you punish

16  your wife when she makes you angry?

17      A    I never say that.

18           THE REPORTER:  I'm sorry, what?

19           THE WITNESS:  No, I didn't...

20      Q    (By Ms. Brouillet)  You never told anyone that

21  you ground your wife and deny her sex when you're angry

22  with her?

23      A    No.  I don't remember.

24      Q    And so that appears in the records of the Center,

25  that would be inaccurate?
```

```
 1     A    I don't know.  I don't remember.

 2     Q    You don't remember telling anyone that?

 3     A    Right.

 4     Q    Do you remember doing it?

 5     A    Nope.

 6     Q    Okay.  What do you hope to accomplish with this

 7  lawsuit against UConn?

 8     A    Justice, rights for others.

 9     Q    For others?

10     A    Yes, I hope never repeat it.  Like me, someone

11  else come work in professional environment and be abused

12  sexually.  It should be -- shouldn't be.  And I think

13  right and wrong, the justice should be, you know --

14  someone see the justice.  Where is the justice?  I see

15  it as a democracy world.  I see a professional person

16  doing this.  I think, uh, it's a horrible thing.  And it

17  -- and it destroyed my life emotionally, physically,

18  mentally.  And this is a lot to me.

19     Q    And do you think what you did to -- how would you

20  describe what you did to [redacted]?  Was that

21  horrible?

22     A    I think so, horrible.

23     Q    Do you think that --

24     A    I -- go ahead.

25     Q    Do you think that what you did to [redacted]
```

JOHN DOE VS. UNIVERSITY OF CONNECTICUT

on 07/12/2011                                                    Page 406

```
 1    when she was nine years old may have affected her life?

 2        A   Yeah, but I    think was accusation.  I never did

 3    that to her, to do -- to do sex with her or anything.

 4        Q   Well, you testified last time that you had

 5    admitted that you touched (          )'s vagina

 6    numerous times when she was nine years old.  Do you

 7    recall that?

 8        A   No, I didn't say that.

 9        Q   And so is it your testimony that you never

10    improperly touched (            )?

11        A   No.

12        Q   You never did?  Do you recall having a polygraph

13    test?

14        A   Yes.

15             THE VIDEOGRAPHER:  Mr. (      ), your

16    microphone.  Thank you, sir.

17        Q   (By Ms. Brouillet)  And following that polygraph

18    test, didn't you tell your adult probation officer, Mr.

19    Torres, that you had repeatedly touched (          )'s

20    vagina?

21        A   I could -- yeah, I could tell her [sic], yes,

22    probably.

23        Q   You told him that?

24        A   Yes.

25        Q   So is it your testimony today, now that you're
```

```
 1    under oath, that that wasn't the truth?

 2        A    You're right.

 3        Q    Well, as you sit here today, what other

 4    statements did you say to your probation officer that

 5    weren't true?

 6        A    Such as?

 7        Q    I'm asking you.  You just told me that you lied

 8    to your probation officer.

 9        A    Under oath.  I'm not under oath.

10        Q    So --

11        A    I have to -- I have to say because I have my

12    family, so I have to go to treatment.  The court gave

13    order.  I couldn't afford it.  ██████████ got, uh --

14        Q    I'm -- there's no question pending, sir.

15        A    Okay.  Go ahead.

16        Q    Were you under oath on January 18, 2008?

17        A    Yes.

18        Q    Before the criminal court?

19        A    Yes.

20        Q    And do you recall the judge asking you questions?

21        A    Yes.

22        Q    And do you recall the judge telling you what the

23    charges were?

24        A    Yes.

25        Q    And do you recall the court asking you under oath
```

```
 1    on January 18th, 2008, if your plea was voluntarily?

 2        A    Yes.

 3        Q    And what was your reply?

 4        A    Yes.

 5        Q    And do you recall the court asking you on January

 6    18, 2008, "Nobody's forced or threatened you in any way

 7    to plead guilty?"

 8        A    Yes.

 9        Q    And what was your reply?

10        A    I said, yes.

11        Q    You said, "yes," that somebody forced you or

12    threatened you?

13        A    Forcing my family, forcing me -- my situation.

14        Q    Well, sir, I've marked as an exhibit the

15    transcript of that testimony.  Let me read it to you.

16              "The Court," and I'm on Page 7, "Nobody's

17    forced or threatened you in way to plead guilty,

18    question mark."

19              "The Defendant, no."

20              Did you tell the truth to the court when you

21    were under oath on January 18, 2008?

22        A    Yes, in that situation, yes.

23        Q    Okay.  And the court also asked you on that date,

24    January 18, 2008, under oath, "And you understand that

25    as part of the conviction of this offense, one of the
```



```
 1    consequences will be that you have to register as a sex

 2    offender.  Do you understand that?"

 3       A   Yes, ma'am.

 4       Q   And do you remember what your response was?

 5       A   Yes.

 6       Q   And do you recall on January 18, 2008 the court

 7    asking you, "You understand that the failure to register

 8    or to comply with those registration requirements can

 9    give rise to a separate crime known as failure to

10    register as a sex offender which is a Class D felony."

11       A   Yes.

12       Q   And what was your response?

13       A   I said yes.

14       Q   So to be clear, is it your testimony today that

15    when you're not under oath, you don't feel compelled to

16    tell the truth to your probation officer?

17            MS. GARDNER:  Object to the form.

18            You can answer it.

19            THE WITNESS:  Well, I tell the truth as much

20    as I can.  But, uh, this situation, because I have my

21    family and I couldn't afford it, to fight this case, and

22    so I have to take the plea.  I spend as much as I could

23    have, money, and, uh, and so I have to protect my -- my

24    kids.  I have kids and wife, a family.

25       Q   (By Ms. Brouillet)  And do you recall the court
```



on 07/12/2011

```
 1    asking you when you were under oath in January 18, 2008,

 2    "All right.  You understand, sir, that as part of the

 3    conditions of your probation, you're going to be

 4    required to undergo sexual offender evaluation and

 5    treatment.  Part of that treatment may require you to

 6    admit outside of the context of the Alford Doctrine the

 7    behavior that the allegations here state that you've

 8    engaged in."

 9         A   Yes.

10         Q   And what did you respond?

11         A   I said yes.

12         Q   And do you recall the court saying to you on

13    January 18, 2008, "And you understand that if you don't

14    comply with that treatment, it can give raise to a

15    violation of probation.  Do you understand that, sir?"

16         A   Yes.

17         Q   And what was your response?

18         A   I said yes.  That's why they violated me.

19         Q   What do you mean that's why they violated you?

20         A   They told me to admit it, and so I told them I --

21    I have anything to admit it.

22         Q   Who --

23         A   And so the violated me.

24         Q   Who is "they"?

25         A   Probation.  And I went to court nine months.
```



```
 1      Q    What was nine months?

 2      A    The process of the court.

 3      Q    Was that your -- for your conviction of violation

 4   of probation in 2009?

 5      A    Yes, yes.  Because he admitted.

 6      Q    And did you file this lawsuit after you were

 7   convicted of violation of probation?

 8      A    Lawsuit what?

 9      Q    This lawsuit, sir.  This lawsuit against the

10   University of Connecticut.

11      A    I'm sorry, I don't understand.

12      Q    Did you file this lawsuit after you were

13   convicted of violation of probation?

14      A    Yes.

15      Q    Has ███████████ sued you?

16      A    No.

17      Q    And do you know how long ███████████ has to

18   sue you?

19      A    No.

20      Q    Other than your attorneys, has anyone discussed

21   ███████████ suing you?

22      A    No.

23      Q    Is your home in your name?

24      A    Yes.

25      Q    And what have you told your doctors about your
```

```
 1    concerns about ███████████ suing you?

 2        A   No clue.  I am sorry, I don't know.

 3        Q   You don't know what you've told your doctors?

 4        A   No.

 5        Q   Do you --

 6        A   Don't remember.

 7        Q   Okay.

 8            MS. BROUILLET:  Okay.  I may be done.  I'm

 9    going to take a five-minute break.

10            THE VIDEOGRAPHER:  Off the record, 11:49.

11            (Thereupon, a short break was taken at 11:49

12    a.m.  Testimony continues at 11:55 a.m.)

13            THE VIDEOGRAPHER:  On record, 11:55.

14        Q   (By Ms. Brouillet)  Mr. Omari, during the break,

15    did you have a chance to speak to your attorney?

16        A   Yes.

17        Q   Okay.

18            MS. BROUILLET:  I have no further questions

19    for you.

20            MS. GARDNER:  Okay.  Just a couple of

21    questions, Mr. Omari.

22                      CROSS-EXAMINATION

23    BY MS. GARDNER:

24        Q   Uh, Ms. Brouillet just asked you something about

25    your hard drive and whether you had told people at UConn
```

BS
R  BRANDON SMITH

1    that your hard drive was stolen.  And what -- what --

2    was there something about your hard drive, uh, at around

3    the time you left UConn, um, that was unusual?

4        A    We get new computers.  The old computer was --

5    they told me to set it up in the lounge, and so the old

6    one, um, we recycle -- recycle the whole thing, I think

7    that's the one of them was -- has gone to recycle, so --

8        Q    And you think that was your computer?

9        A    Yeah, one of them was my computer, yes.

10       Q    Okay.  So did you tell people that it was stolen

11   or that it was recycled?

12       A    Recycled.

13            MS. BROUILLET:  Objection.  Just let me have

14   a moment to respond.  Objection as to form.

15            You can answer.

16            THE WITNESS:  Okay.

17       Q    (By Ms. Gardner)  Stolen or recycled?

18       A    I think it is recycled, yes.

19       Q    Okay.  Um...

20            MS. GARDNER:  I'm just going to want a

21   couple of those exhibits.

22            MS. BROUILLET:  Oh, sure.  I was -- they may

23   be out of order.

24            MS. GARDNER:  That's all right.  I think I

25   can find...

1        MS. BROUILLET:  Can I ask which exhibits the

2   witness has in front of him?

3        MS. GARDNER:  The appeal -- I don't know.

4   What are they?  Exhibit 24 and Exhibit 1--

5        THE WITNESS:  Twenty-five.

6        MS. GARDNER:  --twenty-five,

7        MS. BROUILLET:  Thank you.

8        MS. GARDNER:  And Exhibit 11.

9   Q    (By Ms. Gardner)  Um, Mr. Omari, I'm showing you

10  what has been marked as Exhibit 11, um, which is your

11  complaint in this case; is that right?

12  A    Yes.

13  Q    And other than the dates, is everything in the

14  complaint -- uh, other than the dates and anything else

15  that you've corrected in your prior testimony over these

16  two days, is everything correct --

17  A    Yes.

18  Q    -- in the complaint?  Um, showing you what has

19  been marked Exhibit 24, again, other than the dates, is

20  everything correct in Exhibit 24?

21  A    Yes.

22  Q    And Exhibit 25, other than the dates, is

23  everything that you've alleged in there correct?

24  A    Yes.

25  Q    Okay.  I want to draw your attention to earlier

1    testimony about your friendship with ▇▇▇▇▇▇▇.   I

2    think you've testified -- or it was in your complaint

3    that it lasted about fifteen years, and Ms. Brouillet

4    asked you when it ended, and you said May 2008; is that

5    correct?

6        A    No, May 2006.

7        Q    Okay.  And is that about the last time that you

8    saw Mr. ▇▇▇▇▇?

9        A    Yeah, the last day.

10       Q    Okay.  Um, there was also some earlier testimony

11   today about ▇▇▇▇▇▇▇▇ having reported in 2004 that

12   you had touched her inappropriately.  Do you remember

13   that testimony?

14       A    No, I don't know.  But the --

15       Q    But do you remember the testimony earlier today?

16       A    I -- yes, yeah.

17       Q    Okay.  And when was the first time that you

18   learned that ▇▇▇▇▇▇▇▇ was accusing you of touching

19   her inappropriately?

20       A    August -- it was August 2006 or '7.  I'm not sure

21   the dates exactly.

22       Q    Okay.  And so if it's true that she reported this

23   to somebody in 2004, you don't --

24       A    I don't know.

25            MS. GARDNER:  Objection as to form.

1          THE WITNESS:  I don't know.

2          MS. BROUILLET:  You have to give me a chance

3  to respond, sir.

4          MS. GARDNER:  That's all that I have.

5                  REDIRECT EXAMINATION

6  BY MS. BROUILLET:

7     Q    Just to follow up, Mr. ████████, Attorney Gardner

8  just asked you in regard to the CHRO complaint, which is

9  Exhibit 24.

10    A    Yes, ma'am.

11    Q    I believe the question was, except for the dates,

12  everything else in that affidavit is accurate; do you

13  recall that?

14    A    Yes, ma'am.

15    Q    Your response confuses me, sir, because I asked

16  you earlier about being a program -- a business services

17  person versus a program aide, and you testified, I

18  believe, that you weren't a permanent business services.

19  Your position was permanent.

20          MS. GARDNER:  Nancy, can I just suggest

21  something here?

22          MS. BROUILLET:  Yes.

23          MS. GARDNER:  Can I re-ask the question --

24          MS. BROUILLET:  Certainly.

25          MS. GARDNER:  -- because at least with the

```
 1    complaint I clarified that apart from the dates and your

 2    earlier testimony, that's all I want to establish.

 3              MS. BROUILLET:  Certainly.

 4                        RECROSS-EXAMINATION

 5    BY MR. GARDNER:

 6        Q   Mr. ██████, with respect to Exhibit 24, 25, and

 7    11, except for the dates and except everything for

 8    anything that you clarified earlier in your testimony

 9    over two days, are the complaints accurate?  Are --

10        A   Yes.

11        Q   -- those exhibits accurate?

12        A   Yes.

13              MS. GARDNER:  Okay.  That's fine.

14              MS. BROUILLET:  I have nothing further for

15    you -- oh, one more question, Mr. ██████.

16              THE WITNESS:  Sure.

17                     FURTHER REDIRECT EXAMINATION

18    BY MS. BROUILLET:

19        Q   If the records from the Department of Children

20    and Families show that ██████████ complained about

21    you molesting her started in -- first complained in 2004

22    that you had molested her started in 1999, do you have

23    any reason to believe that those records are inaccurate?

24        A   I don't know.

25        Q   Okay.
```

```
 1        A   She might, and so I'm not sure.

 2            MS. BROUILLET:  Thank you.  I have nothing

 3   further.

 4            THE VIDEOGRAPHER:  Off the record, 12:02.

 5            (Thereupon, the deposition concludes at

 6   12:02 p.m.)

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
1                          JURAT

2

3

4           I, ██████████, do hereby certify that the

5    foregoing testimony given by me on July 12, 2011, is

6    true and accurate, including any corrections noted on

7    the corrections page, to the best of my knowledge and

8    belief.

9

10

11

12                          _____

13                               ██████████

14

15

16

17

18           Subscribed to and sworn before me on this

19    _____ day of _____ 2011.

20

21

22    My Notary Expires: _____.

23

24

25
```



```
 1                        CORRECTION SHEET

 2

 3        I, (REDACTED), do hereby certify that the following

 4   corrections and additions are true and accurate to the

 5   best of my knowledge and belief.

 6

 7   CORRECTION              PAGE      LINE      REASON

 8

 9

10

11

12

13

14

15

16   DATE

17      At                  in said County of              ,

18   this          day of          , 2011, personally

19   appeared (REDACTED), and he made oath to the truth of

20   the foregoing corrections by his subscribed.

21

22   Before me,                      , Notary Public

23

24               My Notary Expires:

25
```



```
 1                    STATE OF CONNECTICUT

 2

 3          I, Aretha S. Martin, a Notary Public duly

 4    commissioned and qualified in and for the State of

 5    Connecticut, do hereby certify that pursuant to notice

 6    there came before me on the 12th day of July, 2011, the

 7    following-named person, to wit: ███████, who was by

 8    me duly sworn to testify to the truth and nothing but

 9    the truth; that he was thereupon carefully examined upon

10    his oath and examination reduced to writing under my

11    supervision; that this deposition is a true record of

12    the testimony given by the witness.

13          I further certify that I am neither attorney nor

14    counsel for nor related to nor employed by any of the

15    parties to the action in which this deposition is taken,

16    and further that I am not a relative or employee of any

17    attorney or counsel employed by the parties hereto, or

18    financially interested in this action.

19          IN WITNESS THEREOF, I have hereunto set my hand

20    this 29th day of July, 2011.

21

22                    _____
                      Aretha S. Martin, Notary Public

23    My Notary Expires:   June 30, 2012.

24

25
```

```
 1                        Brandon Smith Reporting Service
                          249 Pearl Street
 2                        Hartford, CT 06103
                          (800) 852-4589
 3

     July 31, 2011
 4

 5   Attorney Barbara E. Gardner, Esq
     Law Offices of Barbara E. Gardner
 6   843 Main Street, Suite 1-4
     Manchester, CT 06040
 7

 8

 9
     Dear Ms. Gardner:
10

11   Enclosed please find your copy of the deposition of ▆▆▆▆
     ▆▆▆▆, on July 12, 2011.
12
     The original jurat and errata sheets are also enclosed.
13   Please note that the witness is allowed 30 days to read
     and sign the deposition as the rules provide.
14
     Please return only the original notarized jurat and
15   errata sheets to Attorney Brouillet, along with a copy
     to all counsel present.  Thank you for your prompt
16   attention to this matter.

17   If you have any questions, please call me.

18   Sincerely yours,

19
     Aretha S. Martin, LSR, Court Reporter
20

21   CC: Nancy A. Brouillet, Esq.

22

23

24

25
```

